Cranch, C. J.,
delivered the opinion of the Court upon the petition for a writ of mandamus.
The material facts stated in the affidavit upon which the rule was founded, are substantially as follows :
By the Act of Congress of the 2d of July, 1836, [6 Slat, at Large, 665,] “for the relief of William B. Stokes, Richard C. Stockton, Lucius W. Stockton, and Daniel Moore,” the Solicitor of the Treasury was authorized and directed to settle and adjust their claims for extra services as contractors for carrying the mail under certain contracts made with them by Mr. Barry, the late Postmaster-General; and for that purpose to inquire into and determine the equity of their claims for and on account of any contract with the said Postmaster-General on which their pay had been suspended by the present Postmaster-General, and to make them such allowances therefor, as upon a full examination of all the evidence might seem right according to the principles of equity; “And that the Postmaster-General be and he is hereby directed to credit such mail contractors with whatever sum or sums of money, if any, the said Solicitor shall so decide to be due to them for or on account of any such service or contract.”
The Solicitor decided the sum of $161,563.89 to be due to them. The Postmaster-General has credited them with the sum *172 of $122,101.46 only, and refuses to credit them with the residue of the sum so decided to be due to them, being $39,492.47.
These facts, not being denied, must, for the present, be taken to be true; and the first question is, whether this Court, in such a case, has power and authority to issue a writ of mandamus commanding the Postmaster-General to credit the said mail contract-tors, Stockton, Stokes, and others, with the sum or sums of money decided by the Solicitor of the Treasury to be due to them for and on account of the services or contracts mentioned in the said Act of Congress of the 2d of July, 1836, [6 Stat. at Large, 665.]
The duty of the Postmaster-General under that act is clear and absolute, leaving him no discretion. It is a duty, in the execution of which the private rights of individuals are concerned ; and the party against whom the right is claimed is resident within this district and county.
The-right of the relators and the duty of the Postmaster-General appearing to be clear and absolute, the question arises, Do the laws afford a remedy ?
If this had been a case against a State officer, arising upon a statute of a State in which the common law of England had been adopted, it would be a clear case for a mandamus, because the relators could not have any other specific remedy, nor any other remedy equivalent to a specific remedy, according to the forms of the common law.
But it is suggested that this Court has no power to issue a mandamus in such a case, because the other circuit courts of the United States have no such power ; according to the decision of the Supreme Court of the United States in the cases of McIntire v. Wood, 7 Cranch, 504, and McClung v. Silliman, 6 Wheat. 598.
To understand the opinions of the Supreme Court, in those cases, it may be necessary to state the language of the eleventh and fourteenth sections of the Judiciary Act of 1789, [1 Stat. at Large 73,] to which Mr. Justice Johnson, who delivered those opinions, refers.
The words of the eleventh section, so far as they relate to this subject, are, “ That the circuit courts shall have original cognizance, concurrent with the courts of the several States, of all suits of U civil nature, at common law or in equity, where the matter in dispute exceeds, exclusive of costs, the sum or value of five hundred dollars, and the United Slates are plaintiffs or petitioners ; or an alien is a party; or the suit is between a citizen of the State where the suit is brought and a citizen of another State.”
The words of the fourteenth section are, “ That all the before-mentioned courts shall have power to issue writs of scire facias, *173 habeas corpus, and all other writs, not specially provided for by statu-te, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law.”
The Constitution of the United States, (Art. 3, <§> 2,) provides, that “ The judicial power shall extend to all cases in law and equity arising under this Constitution, the laws of the United States and treaties made, or which shall be made, under their authority ; to all cases affecting ambassadors,” &e.
The case of McIntire v. Wood, came up to the Supreme Court of the United States from the Circuit Court of Ohio, upon a certificate stating that the judges of that court were divided in opinion upon the question whether that court had power to issue a writ of mandamus to the register of a land-office in Ohio, commanding him to issue a final certificate of purchase to the plaintiff for certain lands in that State.
Mr. Justice Johnson,
in delivering the opinion of the Supreme Court of the United States, said,
“ This Court is of opinion that the Circuit Court did not possess the power to issue the mandamus moved for.
“Independent of the particular objections which this case presents from its involving a question of freehold, we are of opinion that the power of the circuit courts to issue a writ of mandamus, is confined exclusively to cases in which it may be necessary for the exercise of their jurisdiction.
“ Had the eleventh section of the Judiciary Act covered the whole ground of the Constitution, there would be much reason for exercising this power in many cases wherein some ministerial act is necessary to the completion of an individual right arising under the laws of the United States; and the fourteenth section of the same act would sanction the issuing of Jhe writ for such a purpose; but although the judicial power of the United States extends to cases arising under the laws of the United States, the legislature has not thought proper to delegate the exercise of that power to its circuit courts, except in certain specified cases.”
Here it is evident that the Supreme Court do not deny the power of the circuit courts to issue the writ of mandamus in some cases, but say that the power is confined exclusively to those cases in which it may be necessary to the exercise of their jurisdiction. If, then, a case should occur in which a writ of mandamus should be necessary to the exercise of the jurisdiction of a circuit court of the United States, it would seem that that court might issue it. And the Supreme Court says, further, that “ had the eleventh section of the Judiciary Act covered the whole ground of the Constitution,” that is to say, (as we understand the *174 opinion,) that if that section had given to the circuit courts cognizance of all cases in law and equity arising under the Constitution and laws of the United States, “ there would have been much reason for exercising this power in many eases ; ” “ and the fourteenth section,” which gives them power to issue all writs necessary for the exercise of their jurisdiction, and agreeable to the principles and usages of law, “ would sanction the issuing of the writ for such a purpose.”
But Congress, in giving jurisdiction to this court by the 5th section of the Act of the 27th of February, 1801, [2 Stat. at Large, 103,] “ concerning the District of Columbia,” has covered the whole ground of the Constitution, and much more ; with the exception of those cases only in which exclusive jurisdiction is given by the Constitution or Acts of Congress, to the Supreme Court of the United States, or to the District Courts of the United States. With that single exception, this Circuit Court of the District of Columbia has cognizance of all cases in law and equity, whether arising under the Constitution or laws of the United Slates, or under the adopted laws of Virginia and Maryland, with the only condition that one of the parties shall be resident, or found within the district.
The words of that section, (the fifth section of the Act of the 27th of February, 1801,) are,
“ That the said court,” (the Circuit Court of the District of Columbia,) “ shall have cognizance of all crimes and offences committed within the said district, and of all cases in law and equity between parties, both or either of which shall be resident, or shall be found within the said district; and also of all actions or suits of a civil nature at common law or in equity in which the United States shall be plaintiffs or complainants; and of all seizures on land or water ; and all penalties and forfeitures made, arising, or accruing under the laws of the United States.”
This Court, therefore, is in that condition in which the Supreme Court, in the ease of Mclntire v. Wood, say, “there would be much reason for exercising this power in many cases wherein some ministerial act is necessary to the completion of an individual right under the laws of the United Slates; and the fourteenth section of the Judiciary Act would sanction the issuing of the writ for that purpose.”
Here is a case in which a ministerial act is necessary to the completion of an individual right under the laws of the United States.
The right of the relators, and the obligation of the Postmaster-General are clear and absolute. It is a case in law ; and the only appropriate remedy is a writ of mandamus. This is the only judicial tribunal which can take original cognizance of the case and apply the proper remedy.
*175 How, then, can this Court refuse it ? To refuse it would be a denial of justice.
If it be a case for a writ of mandamus, the relators are as much entitled to it as any other person would be entitled to a writ of capias in a common action of assumpsit against an individual. If the law gives them a right, it gives them a remedy in some form. The only question, then, is, what is the proper form?
There are various writs to bring parties and their cases before the court. The selection of the writ depends upon.the nature of the case. Neither an action upon the case, nor of assumpsit, (if it could be maintained,) nor an indictment, could give the relators a specific remedy.
Their right might, perhaps, be tried in some such form of action, but it would not give them a specific remedy, nor a remedy which would be certainly adequate to a specific remedy.
The proceeding by mandamus is a remedy given by that common law which was in force in Maryland and Virginia on the 27th of February, 1801, and continued in force in this district by the Act of Congress of that date, and which is still in force here. If a case is made out, in which, according to that law, the proceeding by mandamus is the proper remedy, this Court is bound to grant it.
The Supreme Court, in the case of Marbury v. Madison, (1 Cranch, 163,) say, “The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws whenever he receives an injury.”
“One of the first duties of government is to afford that protection. In Great Britain the king himself is sued in the respectful form of a petition, and he never fails to comply with the judgment of his court. In the third volume of his Commentaries, page 23, Blackstone states two cases in which a remedy is afforded by mere operation of law; ‘ in all other cases,’ he says, ‘ it is a general and indisputable rule, that where there is a legal right there is also a legal remedy by suit or action at law, whenever that right is invaded.’ And afterwards, in page 109 of the same volume, he says, ‘I am next to consider such injuries as are cognizable by the courts of common law, and herein I shall for the present only remark that all possible injuries whatsoever that did not fall within the exclusive cognizance of either the ecclesiastical, military, or maritime tribunals, are, for that very reason, within the cognizance of the common law courts of justice ; for it is a settled and invariable principle in the laws of England, that every right when withheld, must have a remedy, and every injury its proper redress.
“ The government of the United States has been emphatically *176 termed a government of laws, and not of men. It will 'certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested, legal right. If this obloquy is to be cast on the jurisprudence of our country, it must arise from the peculiar character of the case. It behooves, then, to inquire whether there be, in its composition, any ingredient which shall exempt it from legal investigation, or exclude the injured party from legal redress.”
The Chief Justice then goes on to show that it was not a case of damnum absque injurié, and says, “Is it in the nature of the transaction ? Is the act of delivering or withholding a commission to be considered as a mere political act, belonging to the executive department alone, for the performance of which entire confidence is placed, by our Constitution, in the supreme executive; and for any misconduct respecting which, the injured individual has no remedy ? That there may be such cases is not to be questioned ; but that every act of duty, to be performed in any of the great departments of government, constitutes such a case, is not to be admitted.
“By the act concerning invalids, passed in June, 1794, (vol. iii. p. 112,) the Secretary at War is ordered to place on the pension list all persons whose names are contained in a report previously made by him to Congress. If-he should refuse to do so, would the wounded veteran be without remedy ? Is it to be contended that where the law, in precise terms, directs the performance of an act in which an individual is interested, the law is incapable of securing obedience to its mandate ?
“Is it bn account of the character of the person against whom the complaint is made ? Is it to be contended that the heads of departments are not amenable to the laws of their country ? Whatever the practice on particular occasions may be, the theory of this principle will certainly never be' maintained. No act of the legislature confers so extraordinary a privilege, nor can it derive countenance from the doctrines of the common law.
“After stating that personal injury from the king to a subject is presumed to be impossible, Blackstone, (vol. iii. p. 255,) says, ‘But injuries to the rights of property can scarcely be committed by the crown without the intervention of its officers; for whom, the law, in matters of right, entertains no respect or delicacy, but furnishes various methods of detecting errors and misconduct of those agents, by whom the king has been deceived and induced to do a temporary injustice.’
“By the act passed in 1796 authorizing the sale of the lands above the mouth of Kentucky River, (vol. iii. p. 299,) the purchaser, on paying his purchase-money, becomes completely enti- *177 tied to the property purchased; and on producing to the Secretary of State the receipt of the treasurer upon a certificate required by the law, the President of the United States is authorized to grant him a patent. It is further enacted that all patents shall be countersigned by the Secretary of State, and recorded in his office. If the Secretary of State should choose to withhold this patent, or, the patent being lost, should refuse a copy of it, can it be imagined that the law furnishes to the injured person no remedy ? It is not believed that any person whatever would attempt to maintain, such a proposition. It follows, then, that the question, whether the legality of an act of the head of a department be examinable in a court of justice, or not, must always depend upon the nature of the act.
‘£If some acts be examinable, and others not, there must be some rule of law to guide the court in the exercise of its jurisdiction. In some instances there may be difficulty in applying the rule to particular cases; but there cannot, it is believed, be much difficulty in laying down the rule.
“By the Constitution of the United States the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience. To aid him in the performance of these duties, he is authorized to appoint certain officers, who act by his authority, and in conformity with his orders.
“ In such eases, their acts are his acts; and, whatever opinion . may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion. The subjects are political. They respect the nation, not individual rights, and being intrusted to the executive, the decision of the executive is conclusive. The application of this remark will be perceived by adverting to the Act of Congress for establishing the department of foreign affairs. This officer, as his duties were prescribed by that act, is to conform precisely to the will of the President. He is the mere organ by whom that will is communicated. The acts of such an officer, as an officer, can never be examinable by the courts.
“But when the legislature proceeds to impose on that officer other duties; when he is directed peremptorily to perform certain acts; when the rights of individuals are dependent on the performance of those acts; he is so far the officer of the law; is amenable to the laws for his conduct; and cannot, at his discretion, sport away the vested rights of others.
“ The conclusion from this reasoning, is, that, where the heads of departments are the political or confidential agents of the *178 executive, merely to execute the will of the President, or rather to act in cases in which the executive possesses a constitutional or legal discretion, nothing can be more perfectly clear, than that their acts are only politically examinable. But where a specific duty is assigned by law, and individual rights depend upon the performance of that duty, it seems equally clear that the individual who considers himself injured, has a right to resort to the laws of his country for a remedy.
“ If this be the rule, let us inquire how it applies to the case under the consideration of the court.
“ The power of nominating to the senate, and the power of appointing the person nominated, are political powers, to be exercised by the President, according to his own discretion. When he has made an appointment, he has exercised his whole power, and his discretion has been completely applied to the case. If, by law, the officer be removable at the will of the President, then a new appointment may be immediately made, and the rights of the officer are terminated. But as a fact which has existed cannot be made never to have existed, the appointment cannot be annihilated; and, consequently, if the officer is by law not removable at the will of the President, the rights he has acquired are protected by the law, and are not resumable by the President. They cannot be extinguished by executive authority, and he has the privilege of asserting them in like manner as if they had been derived from any other source.
“ The question whether a right has vested or not, is, in its nature, judicial, and must be tried by the judicial authority. If, for example, Mr. Marbury had taken the oaths of a magistrate, and proceeded to act as one, in consequence of which a suit had been instituted against him, in which his defence had depended on his being a magistrate, the validity of his appointment must have been determined by judicial authority.
“ So, if he conceives that, by virtue of his appointment, he has a legal right either to the commission which has been made out for him, or to a copy of that commission, it is equally a question examinable in a court, and the decision of the court upon it, must depend on the opinion entertained of his appointment.
“ That question has been discussed, and the opinion is, that the latest point of time which can be taken as that at which the appointment was complete, and evidenced, was when, after the signature of the President, the seal of the United States was affixed to the commission. It is, then, the opinion of the Court,
“1st. That by signing the commission of Mr. Marbury, the President of the United States appointed him a justice of peace for the county of Washington, in the District of Columbia ; and *179 that the seal of the United States, affixed thereto by the Secretary of State, is conclusive testimony of the verity of the signature, and of the completion of the appointment; and that the appointment conferred on him a legal right to the office for the space of five years.
“ 2d. That, having his legal title to the office, he has a consequent right to the commission ; a refusal to deliver which is a plain violation of that right, for which the laws of his country afford him a remedy.
“ It remains to be inquired whether,
“ 3d. He is entitled to the remedy for which he applies.
“ This depends on,
“ 1st. The nature of the writ applied for ; and,
“ 2d. The power of this court.
“ 1st. The nature of the writ.
“ Blackstone, in the third volume of his Commentaries, page 110, defines a mandamus to be ‘ a command issuing in the king’s name from the Court of King’s Bench, and directed to any person, corporation, or inferior court of judicature within the king’s dominions, requiring them to do some particular thing therein specified, which appertains to their office and duty, and which the Court of King’s Bench has previously determined, or at least supposes to be consonant to right and justice.’
“ Lord Mansfield, in 3 Burrow, 1266, in the case of The King v. Baker et al., states, with much precision and explicitness, the cases in which this writ may be used. ‘ Whenever,’ says that very able judge, ‘ there is a right to execute an office, perform a service, or exercise-a franchise, (more especially if it be in a matter of public concern, or attended with profit,) and a person is kept out of possession, or dispossessed of such right, and has no other specific legal remedy, this court ought to assist by mandamus, upon reasons of justice, as the writ expresses, and upon.reasons of public policy, to preserve peace, order, and good government.’ In the same case he says, ‘ this writ ought to be used upon all occasions where the law has established no specific remedy, and where in justice and good government there ought to be one.’
“In addition to the authorities now particularly cited, many others were relied on at the bar, which show how far the practice has conformed to the general doctrines that have been just quoted.
“ This writ, if awarded, would be directed to an officer of government, and its mandate to him would be, to use the words of Blackstone, 1 to do a particular thing therein specified, which appertains to his office and duty, and which the court has previously determined, or at least supposes to be consonant to right and justice.’ Or, in the words of Lord Mansfield, the applicant, *180 in this case has a right to execute an office of public concern, and is kept out of possession of that right.
“ These circumstances certainly concur in this case.
“ Still, to render the mandamus a proper remedy, the officer to whom it is to be directed, must be one to whom, on legal principles, such writ may be directed ; and the person applying for it must be without any other specific and legal remedy.
“ 1. With respect to the officer to whom it would be directed. The intimate political relation subsisting between the President of the United States and the heads of departments, necessarily renders any legal investigation of the acts of one of those high officers peculiarly irksome, as well as delicate; and excites some hesitation with respect to the propriety of entering into such investigation. Impressions are often received without much reflection or examination, and it is not wonderful that in such a case as this, the assertion, by an individual, of his legal claims in a court of justice, to which claims it is the duty of that court to attend, should, at first view, be considered by some as an attempt to intrude into the cabinet, and to intermeddle with the prerogatives of the executive.
“ It is scarcely necessary for the court to disclaim all pretensions to such a jurisdiction. An extravagance, so absurd and excessive, could not have been entertained for a moment. The province of the court is, solely, to decide on the rights of individuals, not to inquire how the executive, or executive officers perform duties in which they have a discretion. Questions in their nature political, or which are, by the Constitution and laws, submitted to the executive, can never be made in this court.
“ But, if this be not such a question ; if, so far from being an intrusion into the secrets of the cabinet, it respects a paper which, according to law, is upon record, and to a copy of which the law gives a right, on the payment of ten cents; if it be no intermed-dling with a subject over which the executive can be considered as having exercised any control; what is there in the exalted station of the officer, which shall bar a citizen from asserting, in a court of justice, his legal rights, or shall forbid a court to listen to the claim, or to issue a mandamus, directing the performance of a duty, not depending on executive discretion, but on particular acts of Congress, and the general principles of law ?
“ If one of the heads of departments commits any illegal act, under color of his office, by which an individual sustains an injury, it cannot be pretended that his office alone exempts him from being sued in the ordinary mode of proceeding, and being compelled to obey the judgment of the law. How, then, can his office exempt him from this particular mode of deciding on the *181 legality of his conduct, if the ease be such a case as would, were any other individual the party complained of, authorize the process ?
“ It is not by the office of the person to whom the writ is directed, but the nature of the thing to be done, that the propriety or impropriety of issuing a mandamus is to be determined. When the head of a department acts in a case, in which executive discretion is to be exercised; in which he is the mere organ of executive will; it is again repeated, that any application to a court to control, in any respect, his conduct, would be rejected without hesitation.
“ But where he is directed by law to do a certain act affecting the absolute rights of individuals, in the performance of which he is not placed under the particular direction of the President, and the performance of which the President cannot lawfully forbid, and therefore is never presumed to have forbidden ; as for example, to record a commission, or a patent for land, which has received all the legal solemnities; or to give a copy of such record; in such cases, it is not perceived on what ground the courts of the country are further excused from the duty of giving judgment, that right be done to an injured individual, than if the same services were to be performed by a person not the head of a department.
“ This opinion seems not now, for the first time, to be taken up in this country.
“ It must be well recollected that in 1792, an act passed, directing the Secretary at War to place on the pension list such disabled officers and soldiers as should be reported to him by the circuit courts, which act, so far as the duty was imposed on the courts, was deemed unconstitutional; but some of the judges thinking that the law might be executed by them in the character of commissioners, proceeded to act, and to report in that character.
“ This law being deemed unconstitutional at the circuits, was repealed, and a different system was established; but the question whether those persons who had been reported by the judges, as commissioners, were entitled, in consequence of that report, to be placed on the pension list, was a legal question, properly determinable in the courts, although the act of placing such persons on the list, was to be performed by the head of a department.
“ That this question might be properly settled, Congress passed an act in February, 1793, [1 Stat. at Large, 333,] making it the duty of the Secretary of War, in conjunction with the Attorney-General, to take such measures as might be necessary to obtain an adj udication of the Supreme Court of the United States, on the validity of any such rights, claimed under the act aforesaid.
*182 “ After the passage of this act, a mandamus was moved for, to be directed to the Secretary at War, commanding him to place on the pension list, a person stating himself to be on the report of the judges.
“ There is, therefore, much reason to believe, that this mode of trying the legal right of the complainant was deemed by the head of a department, and by the highest law officer of the United States, the most proper which could be selected for the purpose.
“ When the subject was brought beforexthe court, the decision was, not that a mandamus would not lie to the head of a department directing him to perform an act, enjoined by law, in the performance of which an individual had a vested interest; but that a mandamus ought not to issue in that case; the decision necessarily to be made, if the report of the commissioners did not confer on .the applicant a legal right.
“ The judgment, in that case, is understood to have decided the merits of all claims of that description ; and the persons, on the report of the commissioners, found it necessary to pursue the mode prescribed by th'e law subsequent to that which had been deemed unconstitutional, in order to place themselves on the pension list.
“ The doctrine, therefore, now advanced, is by no means a novel one. It is true that the mandamus, How moved for, is not for the performance of an act expressly enjoined by statute.
“It is to deliver a commission ; on which subject the acts of Congress are silent. This difference is not considered as affecting the case. It has already been stated that the applicant has, to that commission, a vested legal right, of which the executive cannot deprive him., He has been appointed to an office, from which he is not removable at the will of the executive; and being so appointed, he has a right to the commission which the secretary has received from the President for his use. The Act of Congress does not, indeed, order the Secretary of State to send it to him, but it is placed in his hands for the person entitled to it; and cannot be more lawfully withheld by him, than by any other person.
“ It was, at first, doubted whether the action of detinue was not a specific legal remedy for the commission which has been withheld from Mr. Marbury ; in which case a mandamus would be improper. But this doubt has yielded to the consideration that the judgment in detinue is for the thing itself, or its value. The value of a public office not to be sold, is incapable of being ascertained ; and the applicant has a right to the office itself, or to nothing. He will obtain the office by obtaining the commission, or a copy of it from thp record.
“ This, then, is a plain case for a mandamus.”
*183 From a consideration of the opinions of the Supreme Court in the cases of Marbury v. Madison, McIntire v. Wood, and McClung v. Silliman, we can have no hesitation in saying that the relators have made out a ease, in which, according to the principles and usages of law, a writ of mandamus is -the proper remedy, and that it is necessary to enable this Court to exercise its jurisdiction in that case.
But although we have shown, as we think, that, even under the opinion of the Supreme Court, in McIntire v. Wood, this Court has power to issue the writ of mandamus, in this case, yet it may possibly be objected that our argument is founded upon inferences drawn from the language of that opinion; which inferences Mr. Justice Johnson, in the case of McClung v. Silliman (6 Wheat. 598) repudiates.
The only point decided in that case was, that “ a State court cannot issue a mandamus to an officer of the United Slates.”
But Mr. Justice Johnson in delivering the opinion of the court, in that case, (in p. 599) said: “ In the case of McIntire v. Wood, decided in this court in 1813, the mandamus contended for was intended to perfect the same claim, and in point of fact, the suit was between the same parties. The influence of that decision on these cases, is resisted on the ground that it did not appear in that case that the controversy was between parties, who, under the description of person, were entitled to maintain suits in the courts of the United States; whereas the averments, in the present eases, show that the parties litigant are citizens of different States, and therefore competent parties in the Circuit Court. But we think it perfectly clear, from an examination of the decision alluded to, that it was totally uninfluenced by any considerations drawn from the want of personal attributes of the parties. The case came up on a division of opinion, and the single question stated is, whether the court had power to issue a writ of mandamus to the register of a land-office in Ohio, commanding him to issue a final certificate of purchase to the plaintiff, for certain lands in the Slate ?
“ Both the argument of counsel, and the opinion of the court, distinctly show that the power to issue the mandamus, in that case, was contended for as incident to the judicial powers of the United States. And the reply of the court is, that though, argu-menti gratid, it be admitted that this controlling power over its ministerial officers would follow from vesting in its courts the whole judicial power of the United States, the argument fails here, since the legislature has only made a partial delegation of its judicial powers to the circuit courts; that if the inference be admitted, as far as the judicial power of the court actually extends, still cases arising under the laws of the United States, are *184 not per se among the eases comprised within the jurisdiction of the Circuit Court under the provisions of the 11th section of the Judiciary Act of 1789 [1 Stat. at Large, 73] ; jurisdiction being in such cases reserved to the Supreme Court, under the 25th section, by way of appeal from the decisions of the State courts.
“ There is, then, no just inference to be drawn from the decision in the case of McIntire v. Wood, in favor of a case in which the circuit courts of the United Slates are vested with jurisdiction under the 11th section. The idea is in opposition to the express words of the court, in response to the question stated, which are, f that the Circuit Court did not possess the power to issue the mandamus moved for.’
“ It is now contended that as the parties to this controversy are competent, to sue under the 11th section, being citizens of different States, this is a case within the provisions of the 14th section ; and that the Circuit Court was vested with power to issue this writ under the description of 1 a writ not specially provided for by statute,’ but ‘ necessary for the exercise of its jurisdiction.’ The case certainly does present one of those instances of equivocal language, in which the proposition, though true in the abstract, is, in its application to the subject, glaringly incorrect.
“ It cannot be denied, that the exercise of this power is necessary to the exercise of jurisdiction in the court below ; but why is it necessary? Not because that court possesses jurisdiction, but because it does not possess it. It must exercise this power, and compel the emanation of the legal document, or the execution of the legal act by the register of the land-office, or the party cannot sue.
“ The 4th section of the act under consideration, could only have intended to vest the power now contended for, in cases where the jurisdiction already exists, and not where it is to be courted or acquired by means of the writ proposed to be sued out. Such was the case brought up from Louisiana, in which the judge refused to proceed to judgment; by which act the plaintiff must have lost his remedy below, and this court have been deprived of its appellate control over the question of right.”
As far as we can understand this argument of Mr. Justice Johnson, which probably would have been more intelligible if the arguments of the counsel had been reported, he places the decision of the court, in the case of McIntire v. Wood, upon the ground that the controversy between the parties was a case arising under the laws of the United Stales, which would, per se, have been a good ground óf jurisdiction in the circuit courts, if it had been given to those courts by the 11th section of the Judiciary Act of 1789; but as it was not so given, they had not *185 jurisdiction; and therefore they had not the power to issue the mandamus in that ease. And from that decision, he says, as we understand him, it cannot be inferred that, if, in a like case, the controversy should be between citizens of different States, (which would be a case in which the Circuit Court would have jurisdiction under the 11th section of the Judiciary Act of 1789,) the court would have power to issue the writ of mandamus.
Whether we have, or have not, however, understood that opinion correctly, we do not deem of much importance in this case, because, as observed before, this Court has cognizance of all cases in law and equity, however arising, between parties, both or either of which are resident, or found within this district.
Our powers are given by the 3d and our jurisdiction By the 5th section of the Act of the 27th of February, 1801.
By the third section it is enacted, “ That there shall be a court in the said district, which shall be called the Circuit Court of the District of Columbia; and the said court and the judges thereof, shall have all the powers vested in the circuit courts, and the judges of the circuit courts of the United States.”
The only circuit courts, and judges of the circuit courts of the United States, then existing, were those ordained and established by the Act of Congress of the 13th of February, 1801; [2 Stat. at Large, 89]; by the 10th section of which they were invested with all the powers theretofore granted by law to the circuit courts of the United States, unless where otherwise provided for by that act.
And by the 11th section it was enacted, among other things, that the said courts respectively should have cognizance of all crimes and offences cognizable under the authority of the United States, and committed within their respective districts, or upon the high seas, “ and also all eases in law or equity arising under the Constitution and laws of the United States, and treaties made, or which may be made, under their authority.” “ And also of all actions or suits, matters or things cognizable by the judicial authority of the United-States, under and by virtue of the Constitution thereof, where the matter in dispute shall amount to $400, and where original jurisdiction is not given, by the Constitution of the United States, to^the Supreme Court thereof, or exclusive jurisdiction, by law, to the district courts of the United States.”
It is evident that this section “ covered the whole ground of the Constitution; ” so that, if it had been in force when the case of McIntire v. Wood arose, the decision in that case would probably have been different.
Although the Act of February 13, 1801, was repealed by the Act of 1802, yet the repeal did not in any manner affect the *186 powers or jurisdiction of this Court, given by the Act of February 27, 1801. [2 Stat. at Large, 103.]
But this Court has a jurisdiction still more extensive than that which was given by the Act of the 13th of February, 1801; and if the jurisdiction given by the 11th section of that act would have justified the court in issuing the mandamus under the 14th section of the Judiciary Act of 1789, á fortiori will the jurisdiction given to this Court, by the 5th section of the Act of the 27th of February, 1801, justify this Court in issuing it.
In the opinion of the Supreme Court, in McClung v. Silliman, Mr. Justice Johnson seems to have supposed that it was not sufficient .that the writ of mandamus should be necessary for the exercise of its jurisdiction in the mandamus case itself; but that it must be necessary for the exercise of its jurisdiction in some ulterior suit. He says, (p. 601,) “ It cannot be denied that the exercise of this power ” (meaning the writ of mandamus,) “ is necessary to the exercise of jurisdiction in the court below; but why is it necessary ? Not because that court possesses jurisdiction; but because it does not possess it. It must exercise this power,” (that is, issue the writ,) “ and compel the emanation of the legal document, or the execution of the legal act by the register of the land-office, or the party cannot sue.”
Although in the case of McClung v. Silliman, the mandamus might have been asked, for the purpose of obtaining a document necessary to the prosecution of another suit, yet it cannot be necessary, in all cases, that the mandamus should be merely an ancillary proceeding, with a view to an ulterior action. In the greater number of cases, the remedy by mandamus is final; and the Court must have jurisdiction of the case stated as the cause for issuing the writ, before it can be lawfully issued. The Court must possess the jurisdiction before they can exercise it. The Court exercises its jurisdiction when it calls the parties before it. If B., a resident of this district, is indebted to A., upon a promissory note, this Court has jurisdiction of the case. To enable the Court to exercise its jurisdiction in the case, some kind of writ is necessary. A capias is the usual writ. But it is only because it is a “writ necessary for the exercise of its jurisdiction” in that case, that the Court is authorized to issue it; for it is not specially given by the 14th section of the Judiciary Act, which is the only authority for issuing it. But it is one of the writs not specially provided for by statute; and it is a writ agreeable to the principles and usages of law, and necessary for the exercise of the jurisdiction of the Court in the given case, and therefore the Court may issue it.
Cases of mandamus stand exactly on the same footing. The *187 Court has no more authority for issuing a capias, than for issuing a mandamus. ,
It surely cannot be that a court can only issue a writ of mandamus because- it has not jurisdiction, or for the purpose of creating a jurisdiction which did not exist before. It must be that we have misunderstood the language of the opinion ; and we are the more inclined to think so, because, in the next sentence, the Judge says: “The 14th section of the act under consideration could only be intended to vest the power, now contended for, in cases where the jurisdiction already exists, and not where it is to be courted or acquired by means of the writ proposed to be sued out.” And again, in p. 604, he says: “ But when in the cases of Marbury v. Madison and McIntire v. Wood, this court decided against the exercise of that power, the idea never presented itself to any one that it was not within the scope of the judicial powers of the United States, although not vested, by law, in the courts of the general government.”
By which we suppose we are to understand that, when, in the case of Marbury v. Madison, the Supreme Court refused to issue the writ of mandamus because it would have been an exercise of original jurisdiction not warranted by the Constitution ; and when in the case of McIntire v. Wood, the court decided against the exercise of the power, by the Circuit Court, to issue the writ, because Congress had not conferred upon the Circuit Court all the jurisdiction which it was authorized by the Constitution to confer, no one supposed that the power was not within the scope of the judicial powers granted to the general government; and we are still left to infer, that if Congress had conferred on the circuit courts all the jurisdiction which they might constitutionally have conferred, there could be no doubt of the power of the Circuit Court to issue the writ, under the power given in the 14th section of the Judiciary Act of 1789.
As the Postmaster-General has not thought proper to appear to show cause why the writ of mandamus should not issue, the Court will consider such objections as occur to them as being possible to be suggested.
If it should be said that if every neglect of duty by a public officer, by which an individual suffers an injury, is to be the subject of a mandamus, it will become the common mode of redress in such cases, and the officers of government may be harassed ; we answer that every public officer who neglects or refuses to perform a mere ministerial duty, whereby an individual is injured, is legally responsible to that individual in some form or other ; and a mandamus is one of the mildest forms of action which can be used; as it supposes that the duty may still be performed; and *188 as it does not subject the officer to pecuniary damages, and is one of the best forms in which the right of the supposed injured party may be tried.
As it can be used only in cases where a duty is to be performed, and where it is still in the power of the officer to perform it, the cases cannot be very numerous, and the officers will be less harassed by this form of action than by the other usual forms of action which are generally commenced by the severe process of personal arrest.
If it be said that a mandamus, commanding the Postmaster-General to pay, as well as to credit, the sum awarded by the Solicitor of the Treasury, would be the means of compelling the United States to pay money by legal process, without previous appropriation by law, the Court will take further time to consider, as we have doubts whether the mandamus should now go to that extent.
A doubt has been suggested “whether any portion of the judiciary of the United States, and much more, whether a court established in this district, for purposes entirely local, could constitutionally inquire into the official conduct of the President or heads of departments, who are responsible through the process of impeachment, with the view to control them in their ministerial functions.”
In answer to so much of this objection as regards the other portions of the judiciary of the United States, we refer to the decision of the Supreme Court in the case of Marbury v. Madison, as delivered by the late Chief Justice Marshall, and which has been before cited.
With regard to the suggestion that the Circuit Court, established in this district, is for purposes entirely local, the fact is not so. This Court has all the jurisdiction which any other circuit court of the United States can have in its circuit, and much more. It is the court which the legislature of the United States has thought proper to ordain and establish as one of the courts inferior only to the Supreme Court of the United States, and to which it has confided the administration of those laws on which depends the protection of the lives, the personal liberty, and the property of the President, Vice-President, heads of departments, and other officers of the government, foreign ministers and strangers visiting the seat of government, as well as of the 'citizens and inhabitants of the district. This Court has power to call before it every person found in the district, from the highest to the lowest; and it is upon this power that they all depend for that protection which the law extends over them. If there is any officer of government in the district too high to be reached by the process of this Court, then *189 there is no legal security here for our lives, our liberty, or our property. If this Court cannot “ inquire into the official conduct of the President, or heads of departments,” “with a view to control them in their ministerial functions,” it is not because this Court is established in this district “ for purposes entirely local.”
The suggestion that the President and heads of departments are not responsible, except by impeachment, for the exercise of their ministerial functions, seems.to imply that the Postmaster-General, like the heads of departments, may shelter himself under the authority or command of the President. But if they can do it, in a case like the present, where the duty is expressly enjoined by an act of Congress, this officer cannot do it; for his relation to the President is very different from theirs. They, in the very terms by which their offices were created and their duties defined, are to perform such duties and execute such orders as they shall be required to perform and execute by the President of the United States. The Secretary of the Treasury,. however, may possibly stand in a different relation to the President, as his duties are better defined by law, and as there is a direct communication, established by law, between ihim and the legislature, without the intervention of the President; but still he is bound by the second section of the Act of the 2d of September, 1789, “ generally to perform all such services, relative to the finance, as he shall be directed to perform.” The act does not say by whom he may be thus directed; if by the President, then his relation to the President is the same as that of the other heads of departments. The Postmaster-General, however, clearly bears no such relation to the President. We cannot find a word in the law under which he was appointed, or in the various laws respecting the post-office establishment, or in the Constitution of the United States, which intimates any connection between him and the President; or any authority in the President to prescribe his duties, or to control him in the exercise of his official functions.
It is true that he is appointed, and therefore may be removed, by the President. But the President, if he has the power to control him, can only do it through his fear of removal. If he should so control him, no act done by him under that control, could be thereby justified. The Postmaster-General, in the exercise of the duties of his office, appears to be legally as independent of the President as the President is of him. There can, therefore, be no pretence for avoiding responsibility under any order of the President, nor for showing the irresponsibility which may be supposed to belong to that high officer.
In what cases public officers are responsible to individuals for their official acts, or for the neeleet of their official duties, is shown *190 very clearly in the opinion of the Supreme Court of the United States in the case of Marbury v. Madison, already cited.
We have thus endeavored to answer all the objections which have occurred to us as likely to be made ; and our opinion upon the whole case, after the best and most anxious consideration, with a desire and determination to do justice between the parties, according to the best of our judgment and ability, is,
That the refusal of a public officer, resident in this district, to do a ministerial act which, by law, he is positively commanded to do, whereby an individual is deprived of his right, is a case, either in law or equity, of which this Court has cognizance, by virtue of the fifth section of the Act of the 27th of February, 1801, “concerning the District of Columbia.” That the only adequate remedy, in the case presented to us, is a specific remedy; and that the only specific remedy is a writ of mandamus; which is a writ “agreeable to the principles and usages of law,” and is “necessary for the exercise of the jurisdiction” of this Court, in the case before us. If this Court has not jurisdiction of the case, no court has ; and an individual who may have been ruined by the refusal of an officer to perform a ministerial act, positively enjoined upon him by law, will be entirely without redress. Neither an impeachment nor an indictment could restore to him his lost rights; and in an action upon the case he could' only obtain judgment for damages, which the officer might be wholly unable to pay.
The Court will order a writ of mandamus to be issued, commanding the Postmaster-General to credit the relators with the balance remaining due to them according to the award and report of the Solicitor, unless the Postmaster-General shall show cause to the contrary on or before the tenth day of June instant.
The question whether a mandamus shall issue commanding him to pay the balance, may be reserved for further consideration, when the result of the mandamus to credit the balance shall be ascertained.
The mandamus nisi, was accordingly issued and served on the 7th of June.
On the 10th of June, Mr. Key, Attorney for the United States for the District of Columbia, stated to the Court that Mr. Kendall was preparing a paper to be laid before the Court. That he had beén unwell, and wished time till the 17th, which the Court granted.
Mr. Coxe, for the relators, suggested that an appearance for the Postmaster-General should be entered ; but the Court said they could not permit his appearance to be entered until he had returned the writ.
On the 17th, Mr. Key, in behalf of the Postmaster-General, *191 asked for further time until the 24th, and laid before the Court the following letter:
Post-Office Department, June 17, 1837. F. S. Key, Esq., United States District Attorney. Sir, — 'You were kind enough, at my request, to induce the Circuit Court for this district, to suspend proceedings for a few days in the case of their mandamus against me, as Postmaster-General, to give time to prepare my reasons for declining to comply with their command.
Every day’s inquiry and consideration magnifies the importance of the principles involved in this proceeding, and tends to the conclusion that it necessarily brings into discussion the constitutional and legal powers of two separate and independent departments of the government.
As the question interests every executive officer residing within the district, as well as myself, and affects the character of the entire executive department, I have not deemed it right to suffer myself to be governed altogether by my own impulses or opinions, and have taken the advice, as well of my official superior, as of the constitutional law officer of the government in relation to my duty to appear before the Circuit Court. It is their opinion that an appearance, with the avowed and sole object of contesting the jurisdiction of the Court, compromits no principle involved in the controversy, and is a proper mode of resistance to the claims of power set up in this case.
You are therefore requested and instructed to appear in the Court in my behalf as Postmaster-General, distinctly announcing to the Court that you do so only for the purpose of contesting their jurisdiction ; and that you are expressly instructed not to plead to, argue, or notice as counsel any point or fact in the case which does not affect that question.
You are aware that incessant devotion to the subject during the time allowed, has not enabled me to prepare the materials necessary to exhibit the grounds on which I disclaim the jurisdiction of the Court over the Postmaster-General, or any other executive officer acting in his official capacity. It cannot be the wish of the Court to precipitate their action in any case, and least of all in one of high constitutional law affecting their own rights and powers, as well as those of another department of the government'; and I leave it with you to suggest such further delay as may seem to you, with your present knowledge of the matter, to be necessary to complete the preparation of the case.
With high respect, your obedient servant, Amos Kendall, Postmaster-General.
The Court granted further time until the 24lh of June to return the mandamus.
On that day the mandamus nisi was returned, with the follow *192 ing paper, by way of showing cause why a peremptory mandamus should not be issued.
To the Hon. William Cranch, Chief Justice of the Circuit Court for the District of Columbia.
On the 7th instant the undersigned received by the hands of the Marshal of the District of Columbia, a writ of mandamus from the Circuit Court of the district, commanding him to credit Messrs. Stockton and Stokes and others, with a certain sum of money awarded to them by the Solicitor of the Treasury by virtue of authority alleged to be vested in him by a certain Act of Congress for their relief, passed on the 2d day of July, 1836, or to show cause why he has not so done as commanded.
The undersigned is unable to persuade himself that the performance of the act commanded would not, under existing circumstances, involve a violation of the oath he has taken, faithfully to discharge the duties of Postmaster-General according to law; and to support the Constitution of the United States.
Although his opinion of the powers and jurisdiction of this Court remains unchanged, yet that respect for the tribunal, which elicited his former communication, duty to himself, and the obligations he is under to vindicate and sustain the institutions of his country, impel him to present the reasons which have induced his present determination.
Before he proceeds with that exposition, he begs leave emphatically to disavow all intention or idea of claiming irresponsibility or immunity in the discharge of his official functions, or of shrinking from the most scrutinizing investigation by any legitimate authority, into his actions or his motives.
It is his pride to belong to a republic where no man is free from responsibility, however high, and where none is without protection or redress, however low. As a citizen it is his aim to perform his domestic and civil duties with strict regard to morality and law. As a public officer it is his most anxious endeavor to discharge every duty, which may be imposed upon him, with fidelity and zeal; in all capacities to encounter labor with patience, and responsibility without fear. If, in the attitude he now occupies in relation to this Court, there is that which every sensitive man would wish to avoid, he is sustained by a consciousness of right, under which circumstances cease to be painful and consequences become indifferent.
With these preliminary remarks, the undersigned proceeds to give his reasons for declining obedience to the order of the Court.
First reason. It is doubted whether the Constitution of the United States confers on the judiciary department of the government authority to control the executive department in the exercise of its functions of whatsoever character.
*193 In the division and separation of powers the Constitution of the United States uses the following language, namely, “ All legislative powers, herein granted, shall be vested in a Congress of the United States.” “ The executive power shall be vested in a President of the United States.” “ The judicial power of the United States, shall be vested in one Supreme Court and in such inferior courts as the Congress may, from time to time, ordain and establish.” It gives the President power, by and with the advice and consent of the Senate, to appoint “ Judges of the Supreme Court; and all other officers of the United States whose appointments are not herein otherwise provided for, and which shall be established by law,” See., and makes it his duly to “ take care that the laws be faithfully executed.” It is declared that .the President, Vice President, and all civil officers of the United States shall be removed from office “ on impeachment for, and conviction of treason, bribery or other high crimes and misdemeanors.” And so careful is the Constitution to give the judiciary no control over the executive department, that, instead of subjecting executive officers to the courts for official offences and delinquences, it constitutes a special tribunal, in the Senate, for their trial in all cases of impeachment.
The plan of the Constitution will be more clearly understood, by a brief reference to the history and nature of the executive and judicial powers as they exist in our government.
In the country from which the principles of our system of government are measurably derived, the judiciary originally formed a part of the executive power. An exposition of the law is frequently necessary before it can be understandingly executed, and the judges were appointed by the king to give it. When given, he proceeded to carry it into execution. Over that execution the judges had no power ; it being effected by sheriffs, another set of officers wholly dependent on the king. To shield the subject from regal oppression the judges were finally made independent of the king, though removable by parliament; but the sheriffs were still left at the monarch’s will. The expounding functionary was rendered independent; but the execution was still left to the king.
“ In our system we have followed the modern English model. Our judges, after appointment, are independent of the executive; but our district attorneys, who manage prosecutions, and our marshals, who execute the decisions, orders, and decrees of our courts, are not only appointed by the President, but hold their offices, from day to day, at his will. They are the instruments by which the President “takes care that the laws be faithfully executed,” as expounded by the courts.
The sole constitutional function of the judges is to expound *194 the laws. It is the function and duty of the executive to see them faithfully executed. The necessity of a judiciary department arises solely from the impracticability of so framing the laws as exactly to fit every case which may arise in the endless diversity of human affairs. If the laws could be precisely adapted to every case there would be no necessity of a judiciary to expound them. The executive authority could proceed forthwith to carry them into execution. But most general, and some special laws require exposition before they can be understandingly executed. This is the judicial function. It is to declare what the law is'and apply it to the case. When that is done the proper function of the judge ceases, and that of the executive commences. The duty of the marshal who is but a part of the executive department, is to execute the law as thus expounded.
Many special laws are not susceptible of any exposition. They apply directly to the case, and cannot be made plainer by any court. Nothing is needed, after their passage, but execution. Such are laws which appropriate sums of money to individuals ; such are laws which require specific acts of executive officers. The intervention of the expounding function is not necessary in these cases, because it can make them no plainer. All that is to be done is to execute them. The officers who are to perform the duties enjoined are all made dependent on the'will of the President, directly or indirectly, that he may, through his power over them, “take care” that each executes-the laws in his appropriate sphere.
A distinction has been taken between those laws which prescribe special duties to executive officers and those which do not. It is said, the courts may compel the execution of the duties prescribed in the former, but not those prescribed in the latter. No such distinction is to be found in the Constitution. It is the duty of the President to “take care that the laws be faithfully executed ; ” special laws as well as general; but no such duty is enjoined upon the judiciary. The means furnished to the President, to cause the execution of the special laws, are more immediate and direct than those furnished him for the execution of the general laws. Does a special law require the head of a department to pay a sum of money ? The officer, whose peculiar province it is to execute the law, is under the immediate eye of the President, holds office at his will, and may be removed if he refuses. So of the comptrollers, auditors, treasurer, register, commissioners of the land-office, of patents, of pensions, of Indian affairs, and the whole corps of executive officers at Washington. And the same principle embraces all executive officers throughout the Union. The executive power is one; one in principle, *195 one in object. Its object is the execution of the laws. It is not susceptible of subdivisions and nice distinctions as to its duties and responsibilities. To execute the laws, and all the laws, are its duties; and it is responsible for their faithful performance. The practical exercise of executive power is more remote in cases which go before the judicial tribunals; but it is the same in principle. The district attorneys hold their offices at the will of the President, as also do the marshals. It is not the behest of the judge that the marshal executes, but the law', passed by Congress, which the judge has merely expounded and applied to the case. It is the one executive power of the Republic, ihe President of the United States, through an officer holding office at his will, which steps in to execute the láw when the judge has declared what it is and how it applies to the case. Laws, w'hieh require no exposition, are executed without the intervention of the judicial power. Laws which require exposition are executed after that exposition has been given by the judicial power ; but in both cases the execution is, or should be, according to the Constitution, exclusively the work of the executive.
Over cases where the law prescribes special duties to executive officers, as such, in terms so plain as to admit of no exposition, their power does not extend. For instance : the law directs the President to cause $50.000 to be paid to a merchant whose ship has been bought for the naval service. Here no judge could expound the law more clearly than the legislature has done it. The proper function of the judiciary cannot be called into requisition because there is no point upon which it can constitutionally act. Nothing is to be done but to execute the law. The President directs the Fourth Auditor to state an account; it is revised by the Second Comptroller ; the Secretary of the Navy issues a requisition for a warrant; the Secretary of the Treasury issues a warrant, and the matter passes through the offices of the First Comptroller, the Register, and Treasurer. These officers are all made dependent on the will of the President, that through them he may take care that all such laws be faithfully executed. Suppose .one of them should be perverse and obstinate, and refuse to execute the law, what would be the appropriate remedy, and who shall apply it ? Could the merchant call on the courts to interfere when no expounding of the law is requisite ? Or would he rather apply to the President, whose sworn constitutional duty it is to ‘ take care that the laws be faithfully executed ? ’ Would he not request the President to issue his mandamus to his perverse subordinate, directing him to execute the law ; and, if he still refused, to remove him from office and give his place to some one who would do his duty ? The law could thus be executed, and the citizen obtain his risrht.
*196 But suppose he goes to the judiciary for their mandamus, what will he ask them to do ? Will he request the judge to expound the law for him ? That is not necessary, it is clear enough already; all he wants is the execution of the law. Will he ask the judges to execute the law, or to “take care that the law be faithfully executed ?” That is an executive function with which they have no right to interfere. Yet what else is the object of a mandamus in such a case ? What is it but an executive measure ; what else but taking the duties of the President out of his hands ; what else but the assumption of a power which by the Constitution belongs exclusively to another independent department of* the govern-, ment ?
Let this doctrine be followed out, and to what will it lead ? The Constitution makes it the duty of the President to “ commission all the officers of the United States,” and the laws impose upon him many specific as well as general duties. The heads of departments have also many duties prescribed by law, special as well as general. We have auditors to settle accounts, comptrollers to revise them, a treasurer to issue checks drawn upon warrants, a register to register accounts and warrants, commissioners of the land-office, of patents, of pensions, and of Indian affairs, all of whom have specific as well as general duties, and all of whom have heretofore looked up to the President as their common superior ; the head of the department to which they belong ; to whom they are responsible, and whose duty it is to see that each of them faithfully executes the laws in his appropriate sphere. But this doctrine gives a new superior ; a superior above the President, the highest representative of the majesty of the people, in this government; a superior which, in theory, may consign them all, from the heads of departments down to the messengers in the offices, to the county jail, if they refuse to regard the mandate of the court, in the performance of their executive functions.
Any item in an account, any specific act required by law, whether general or special, which can directly or indirectly affect a private right, (and there can scarcely be an executive act required by law which does not,) may be made the subject of the supervisory power ; and the effective and controlling executive of this great Republic will not be the chief magistrate elected by the people, but the three judges of the Circuit Court for the District of Columbia.
But which would be the most effective in all such cases, the order of the President, or the mandamus of the judges ? The President could at once accomplish the object by the obedience or removal of his subordinate. The judges have no effectual means of executing the law. They might imprison the executive *197 officer, but they could not remove him. Imprisonment might not accomplish the object. The Court could not guide his hand nor control his will. If he were conscientious in his refusal, or wished to appear so, no imprisonment, nor pains, nor penalties, could compel him to do an act which in his opinion violated his oath of office. The whole power of the Court would be impotent to control an honest man. The inadequacy of the judicial process, and the ample power vested in the President, are conclusive proof that the President and not the Court was intended to be the controlling authority in all such cases. So far as regards their execution, no distinction is made by the Constitution between special acts and general acts; between private acts and public acts. It is the duty of the President to take care that all alike “ be faithfully executed.” The executive is an unity. The framers of the Constitution had studied history too well to impose on their country a divided executive. The executive power was vested in a President. The executive officers are his agents, for whom he is held responsible by the people whose agent he is. The acts of the executive officers are the acts of the President. Constitutionally he is as responsible for them as if they were done by himself, though not morally.
So far as regards the execution of the laws, therefore, no distinction can be maintained between acts of the President and'those of his subordinate officers. In law they are all acts of the President. When the judiciary attempt to control those acts, they attempt to control the executive power, to assume the functions of the President, to make themselves the executive in the last resort, superior to the executive created by the Constitution, and elected by the people.
Suppose the laws require a specific act of the President himself, involving private rights, which he refuses to perform. The courts have as much law for issuing a mandamus against him, as against any of his subordinates in a like ease. It is a “ case ” as much as that of which the Court has already assumed jurisdiction. The President disobeys their mandamus, and they send an áttachment. By whom do they send it ? By a marshal holding his office at the will of the President, who can strike their process dead in his hands, by dismissing him on the spot. This fact proves the absurdity of the power assumed. And that which the President can legally do, to protect himself, he can do to protect any of his agents, being always responsible to his country for the proper exercise of his power.
But suppose the Court succeed in arresting the President, and put him in the county jail. Where then is the supreme executive power of this great Republic ? Transferred from the President’s *198 house to the city hall; from the chief magistrate, elected by the people of the whole United States, to three judges for the District of Columbia.
The arrest and imprisonment of any executive officer, as such, involves the same principles, and would lead to the same consequences, in a greater or less degree, according to the importance of the station held by him. It is still an attempt to control the executive power ; not by confining its head, but by tying up its hands ; or rather by forcing the hands to work, not according to the will of their constitutional head, but in obedience to the will of another department of the government.
It is said that if the Court has not this power, ‘ an individual who may have been ruined by the refusal of an officer to perform a ministerial act, positively enjoined upon him by law, will be entirely without redress.’ If it were even so, would it justify the court in assuming executive authority in violation of the Constitution ? It would but prove a defect in our institutions, which it would be incumbent on the people to repair. But it is not so. The idea that courts are the only places where wrongs of all sorts are to be redressed, and judges the only dispensers of right, is an error. Where the inferior executive officer, or even the President himself, refuses to perform his executive duties, there is an obvious mode of redress, without the interposition of the judicial authority. If a subordinate executive officer ‘refuse to perform a ministerial act positively enjoined upon him b.y law,’ the injured citizen may appeal to the President, whose duty it is to ‘ take care that the laws be faithfully executed,’ and has power to turn out a perverse subordinate. If the case be so very plain, the President will, at once, enforce the execution of the law, and the citizen will have effectual redress, though ‘ this Court has not jurisdiction.’ If the case be not so very plain, the matter may be referred back to Congress, to make it plain by further legislation ; and thus the citizen would have complete redress, without the aid of the Court. There is a process by which the President himself may be reached, for a perverse refusal to execute the laws, or take care that they be executed, and a chief magistrate, who will do his duty, put in' his place.
Thus are there ample means provided by the Constitution to enable the citizen to obtain his rights at the hand of the executive without erecting any court into a supreme controlling power over the President and the whole corps of executive officers. Indeed the Court has not, in the Constitution and laws, the means to give redress in such cases. Before they can control the President, they must assume the power to appoint their own marshal and execute their own mandates. They must do more. They must *199 proceed to the executive offices; must enter credits with their own hands; must issue warrants; and finally, with their own hands, take the money out of the Treasury.
The very case before the Court illustrates the theory of the Constitution. The Postmaster-General refused to execute a part of the Solicitor’s award, because he believed it contrary to law. Where did the relators first look for redress ? Not to the Court, but to the President. The late President deemed the -case a proper one for another application to Congress for further legislation, and refused to compel an execution of the award. The re-lators went to one house of Congress and procured the passage of a resolution in their favor; but no legislation. The cause was then again pressed upon the late President, whose views of it remained unchanged. It was afterwards pressed upon the present President, who considered the disposition made of it by his predecessor as final, so far as the executive was concerned, unless there should be further legislation. If the President, on either of these three occasions, had looked upon the law as clearly and imperatively commanding the payment of the money, he would have taken care to see it faithfully executed, and the relators would have had complete redress. If they had procured the passage of an explanatory act, or joint resolution, through both houses of Congress, sustaining their construction of the law, or requiring payment of the balance of the award, their redress would also have been complete.
These obvious constitutional and legal measures were resorted to by them; and it is only when they fail to obtain the interpretation of legitimate authority, that they apply to a court to erect itself into a tribunal of appeal from another independent department of the government.
Whether sound, or not, the views here expressed are not peculiar. Mr. Jefferson and Mr. Madison acted upon them when the former held the office of President and the latter that of Secretary of State. Mr. Jefferson has left on record his views of the case of Marbury v. Madison, now relied .upon by the Court to sustain their claim to jurisdiction in this case. The following is a letter addressed by him to George Hay, prosecuting attorney in the case of Aaron Burr, namely :
“ Washington, June 2d, 1807.
“To George Hay, — Dear Sir: While Burr's case is depending before the Court, I will trouble you from time to time, with what occurs to me. I observe that the case of Marbury v. Madison has been cited, and I think it material to stop, at the threshold, the citing that case as authority, and to have it denied to be law.
*200 “ 1. Because the judges, in the outset, disclaimed all cognizance of the case ; although they then went on to say what would have been their opinion had they had cognizance of it. This then was, confessedly, an extrajudicial opinion, and, as such, of no authority.
“ 2. Because, had it been judicially pronounced, it would have been against law ; for to a commission, a deed, a bond, delivery is essential to give validity. Until, therefore, the commission is delivered out of the hands of the executive, and his agents, it is not his deed. He may withhold, or cancel it, at pleasure, as he might his private deed, in the same situation.
“ The Constitution intended that the three great branches of the government should be coordinate and independent of each other. As to acts, therefore, which are to be done by either, it has given no control to another branch. A judge, I presume, cannot sit on a bench, without a commission, or a record of a commission; and the Constitution having given to the judiciary branch no means of compelling the executive either to deliver a commission, or to make a record of it, shows it did not intend to give the judiciary that control over the executive, but that it should remain in the power of the latter to do it or not.
“ Where different branches have to act, in their respective lines, finally and without appeal under any law, they may give to it different and opposite constructions. Thus, in the case of William Smith, the House of Representatives determined he was a citizen ; and in the case of William Duane, (precisely the same in every material circumstance,) the judges determined he was no citizen. In the cases of Callender and others, the judges' determined the Sedition Act was valid under the Constitution, and exercised their regular powers of sentencing them to fine and imprisonment. But the executive determined that the Sedition Act was a nullity, under the Constitution, and exercised his regular power of prohibiting the execution of the sentence, or rather of executing the real law which protected the acts of the defendants. From these different constructions of the same act, by different branches, less mischief arises than from giving to any one of them a control over the others. The executive, and Senate, act on the'construction that until delivery from the executive department, a commission is in their possession, and within their rightful power; and in cases of commissions, not revokable at will, where, after the Senate’s approbation, and the President’s signing, and sealing, new information of the unfitness of the person has come to hand before the delivery of the commission, new nominations have been made and approved, and new commissions issued. On this construction I have hitherto acted; on this I *201 shall ever act, and maintain it with the powers of the government against any control which may be attempted by the judges in subversion of the independence of the executive and Senate within their peculiar department. I presume, therefore, that in a case where our decision is, by the Constitution, the supreme one, and that which can be carried into effect, it is the constitutionally authoritative one, and that that by the judges was coram nonju-dice, and unauthoritative, because it cannot be carried into effect.
“ I have long wished for a proper occasion to have the gratuitous opinion in Marbury v. Madison brought before the public, and denounced as not law; and I think the present a fortunate one, because it occupies such a place in the public attention. I should be glad, therefore, if, in noticing that case, you could take occasion to express the determination- of the executive, that the doctrines of that case were given extrajudicially and against law ; and that their reverse will be the rule of action with the executive. If this opinion should not be your own, I would wash it to be expressed merely as that of the executive. If it is your own also, you will of course give to the arguments such a development as a case, incidental only, might render proper.
“ I salute you with friendship and respect. Thos. Jefferson.”
Mr. Jefferson was still President at the time this letter was written. He declares that “ the Constitution intended that the great branches of the government should be coordinate and independent of each other ; ” that “ as to the acts which are to be done by either, it has given no control to another branch ; ” that “ the doctrines of that case were given extrajudicially and against law;” that “their reverse will be the rule of action with the executive,” and that he would “ maintain ” his construction of the Constitution, “ with the powers of the government, against any control which may be attempted by the judges in subversion of the independence of the executive,” &c.
In a letter to Judge Roane, dated September 6, 1819, Mr. Jefferson adverts to this case, and the principles involved in it in the following terms, namely: “In the case of Marbury & Madison, the federal judges declared that commissions signed and sealed by the President were valid, although not delivered. I deemed delivery essential to complete a deed, which as long as it remains in the hands of the party, is, as yet, no deed ; but it is in posse only; but not in esse; and I withheld delivery of the commissions. They cannot issue a mandamus to the President, or legislature, or any of their officers, the Constitution controlling the common law in this particular.”
Again, as late as June 12th, 1823, in a letter to Judge Johnson, Mr. Jefferson speaks thus of this case, namely : “ The prac- *202 lice of Judge Marshall, of travelling out of his case, to prescribe what the law would be in a moot ease, not before the court, is very irregular and very censurable. I recollect another instance, and the more particularly, perhaps, because it, in some measure, bore on myself.
“ Among the midnight appointments of Mr. Adams, were commissions to some federal justices of the peace for Alexandria. These were signed and sealed by him, but not delivered. I found them on the table of the department of state, on my entrance into office, and I forbade their delivery. Marbury, named in one of them, applied to the Supreme Court for a mandamus to the Secretary of State, (Mr. Madison,) to deliver the commission intended for him.
“ The Court determined at once, that, being an original process, they had no cognizance of it, and there the question before them ■was ended. But the Chief Justice went on to lay down what the law would be, had they jurisdiction of the case, to wit, that they should command the delivery. The object was clearly to instruct any other court, having the jurisdiction, what they should do if Marbury should apply to them. Besides the impropriety of this gratuitous interference, could any thing exceed the perversion of law ? For if there is any principle of law never yet contradicted, it is that delivery is one of the essentials to the validity of a deed. Although signed and sealed, yet, as long as it remains in the hands of the party himself, it is in fieri only, it is not a deed, and can be made so only by its delivery. In the hands of a third person'it may be made an escroiu. But whatever is in the executive offices is certainly deemed to be in the hands of the President, and, in this case, was actually in my hands, because when I countermanded them, there was, as yet, no Secretary of State. Yet this case of Marbury v. Madison is continually cited by bench and bar, as if it were settled law, without any animadversion of its being merely an obiter dissertation of the chief justice.”
Mr. Jefferson even denied the power of the courts to compel the attendance of the President or heads of departments as witnesses in suits at law, or criminal prosecutions, at whatever distance ; on the ground that their constitutional duties in the service of the people of the United States, were paramount to all others. When, in the case of Smith v. Ogden, in New York, a subpoena was issued to some of the heads of departments, they were directed by him to attend to their official duties, and disregard it. When the order of the Px-esident was stated in court as the ground of disobedience, a motion was made for an attachment, on the ground that it was insufficient, but the motion failed upon an equal division of the court.
*203 Ill the ease of Aaron Burr, a subpoena was issued by the court for the President, which he disregarded and returned. The following are his remarks upon it, in letters to the district attorney, namely:
“ The leading principle of our Constitution is the independence of the legislature, executive, and judiciary, of each other. And none are more jealous of this than the judiciary. But would the executive be independent of the judiciary, if he were subject to the commands of the latter, and to imprisonment for disobedience; if the several courts could bandy him from pillar to post; keep him constantly trudging from North t'o South, and East to West, and withdraw him entirely from his constitutional duties ? The intention of the Constitution, that each branch should be independent of the others, is further manifested by the means it has furnished to each, to protect itself from enterprises of force attempted on them by the others; and to none has it given more effectual or diversified means than to the executive.
“ I received late last night your favor of the day before, and now reinclose you the subpoena. As I do not believe that the district courts have the power of commanding the executive government to abandon superior duties, and attend to them, at whatever distance, I am unwilling, by any notice of the subpoena, to set a precedent which might sanction a proceeding so preposterous.”
If the courts cannot take the executive officers from their public duties, even to testify in court in criminal cases, much less can they, at the instance of citizens in pursuit of private rights, subject them to mandamus and attachment.
These authorities are sufficient to show, that the doctrine laid down by the Chief Justice in the case of Marbury v. Madison, never was recognized as law by the executive authority. They will also screen the undersigned from the imputation of assuming any new ground, when he doubts whether this Court, or any other, can “ issue a mandamus to the President or legislature, or any of their officers, the Constitution controlling the common law in this particular.”
All this reasoning and these deductions the undersigned begs may be understood as applicable solely to the public character and acts of executive officers, and not to their character as citizens, or to their private transactions.
Second reason. If, according to the Constitution, the Circuit Court for the District of Columbia might be clothed, by law, with the power to issue a mandamus in such a ease, no such power has been conferred upon them by the Acts of Congress.
The undersigned is spared the labor of investigating and illustrating this position, by the clear, and, he thinks, conclusive, *204 opinion of the Attorney-General, which he transmits herewith, and requests that it may be considered a part of this letter. That opinion reviews the opinion of the Circuit Court, as delivered by Chief Justice Cranch, and published» in the National Intelligencer, and maintains the following positions.
t. That the argument of the Court in favor of the jurisdiction claimed by them, is founded on inferences from the language of Judge Johnson, in the case of McIntire v. Wood; which inferences were repudiated by the same judge, and by the judgment of the court in a subsequent case.
2. That there is no substantial difference between the words of the Judiciary Act of 1789, which the Supreme Court have twice decided do not give the other circuit courts power to issue a mandamus to an executive officer, and the words of the 5th section of the act concerning the District of Columbia, on which the Circuit Court rely; and that the jurisdiction of the latter is, therefore, in this respect, no greater than that of the other courts.
3. That no power is to be derived from the Act of the 13th of February, 1801, because that act was repealed in 1802, without any exception as to the Circuit Court of this District.
4. That even if the acts of Congress, concerning this Court, had given to it, in express terms, a jurisdiction to issue writs of mandamus to an executive officer, to compel him to perform an official act, no such jurisdiction could be exercised consistently with the provisions of the Constitution ; because such a jurisdiction would be, substantially, an exercise of executive power, which cannot be taken from the President, in whom the Constitution has vested it.
5. That the Postmaster-General is an executive officer, and equally independent, with the other heads of the executive departments, of any control, in the exercise of his official duties, by the judiciary.
Third reason. If, by the Constitution, Congress can clothe the courts with authority to issue writs of mandamus against executive officers, as such; and if they have vested the general power in this Court, by law, this is not a case in which that power can be lawfully exercised.
1. It seems to be conceded that a writ of mandamus will not lie to compel any one to do an act, in relation to the performance of which he has any discretion; and to bring this case within that principle, the Court say, “ the duty of the Postmaster-General, under that act, is clear and absolute, leaving him no discretion.” Is this so ?
The act does not require the Postmaster-General to credit or pay any specific amount. It does not absolutely require him to *205 do any specific act whatsoever. Whether he would be called upon to credit much, or little, or nothing at all, was altogether contingent, depending on the solicitor’s award. It was not like a law directing specifically and absolutely the payment of a sum of money, or the performance of a-ministerial act, where the law is the/mly guide. It was necessary for him, in this case, to look at the law, and at the Solicitor’s award. Of necessity, he must compare them together to ascertain what it was his duty to do. Now, in making that comparison, and acting upon the result, has he no discretion ? The authority of the Solicitor, by the words of the law, was, “to settle and adjust” the claims of the relators “ for extra services,” “ under certain contracts made with them by W. T. Barry,” &c., to inquire into and determine the equity of their claims “for or on account of any contract” with the said Postmaster-General, “ on which their pay had been suspended by the present Postmaster-General,” and to make them such allowances, &e, The duty of the Postmaster-General is prescribed in the following words: ' /
“And that the Postmaster-General be, and he is hereby directed to credit such mail contractors with whatever sums of money, if any, the said Solicitor shall so decide to be due to them,” “ for or on account of any such service or contract.”
The Postmaster-General was not required to credit the contractors with all the Solicitor might award them, but only so much as he might decide to be due “ for or on account of such service or contract.” What “ service or contract ? ” Why, the “service or contract” described in the preceding part of the act, “extra service;” a “contract” with W. T. Barry; a contract “ on which the pay had been suspended by the present Postmaster-General.” It is such allowances, and such only, that the Postmaster-General is directed to credit. Has he no power to examine and decide whether the allowances are of this chai-acter or not? Must he not see whether they are “for or on account of any such service, or contract,” or not ? If he have no power to look into that point, why are the words attached to the sentence which prescribes his duty ? Why was he not directed absolutely to credit whatever sums of money, if any, the Solicitor shall decide to be due to them ? But one answer can be given. It was the purpose of Congress to limit the power of the Postmaster-General to credit and pay, as well as of the Solicitor to allow; and, after defining the claims which the latter was authorized to allow, they limited, to the same claims, the power of the former to pay. He was directed to pay the sums allowed “ for and on account of any such service or contract,” and nothing more.
*206 Again, there are several provisos to the act, limiting the power of the Solicitor. One of them is as follows : “ Provided the said Solicitor is not authorized to make any allowance ” “ for any suspension or withholding of money, as aforesaid, for allowances or over-payments made, as aforesaid, on the route from Baltimore to Washington, under the contract of 1827.” If, instead of 1827, the year 1831 had been used in this proviso, it would have covered a part of the allowances embraced in the award. Had it done so, and had the award embraced that, or any other allowance prohibited by the provisos, would it not have been the duty of the Postmaster-General to refuse the credit and payment ? It cannot be doubted. But how could he ascertain whether the allowance was prohibited by the proviso, or not? Could he do it in any other way than by examining the allowance and comparing it with the proviso ? If, in his opinion, it were prohibited, he would refuse to pay it; if not, he would pay it. And is there not discretion here 1 May he not pay, or refuse to pay, according to his opinion of the power of the Solicitor to make the allowance ?
On these points, there can be no doubt that the Postmaster-General has a discretion. But what is the difference between his right to determine whether the Solicitor has transcended his power on specific points, or in his award generally ? Had he not a discretion to refuse to pay the whole award, or any part of it, if he honestly believed it to be contrary to law ? If, on looking at the law and the award, he found that the Solicitor had departed from his authority altogether, it cannot be doubted that he had a right, under the law, and that it would have been his duty to decline carrying it into effect. •
This is not a case, therefore, where a specific duty is enjoined by law, in the performance of which there is no discretion, such as the payment of a definite sum of money, the registering of a certificate, or the recording of a patent, and consequently it is not a proper case for a mandamus.
It seems to be conceded, that under existing laws a writ of mandamus can be issued by a court only as a means of exercising its jurisdiction, and not for the purpose of obtaining jurisdiction.
Let us apply the principle to this case. The jurisdiction of every court must be original or appellate. Original jurisdiction is where, by authority of the Constitution and laws, proceedings are originated in the court in the first instance. Appellate jurisdiction is where, by authority of the same Constitution and laws, a case is taken out of a lower tribunal into a higher, wilh a view to a revision of the proceedings of an inferior court.
In this ease, the Circuit Court of the district had no original *207 jurisdiction to adjudicate upon the claims of the contractors. There was no mode known to the laws by which they could prosecute those claims in any court whatsoever. Congress created a special tribunal for that purpose. They made the Solicitor of the Treasury a chancellor for the special object, and clothed.him with power to take evidence, and adjudicate upon the claims of the contractors. No other court on éarth could have entertained this case. Nor was any appeal from the decision of this special court provided for by the law which created it. Neither the Circuit Court of this district, nor the Supreme Court of the United States, nor any other judicial tribunal, had power to bring up the case from the Solicitor of the Treasury, either before or after his award, and revise his proceedings. No judge could take from or add to the amount of his aw’ard; nor has any judge the legal power to say whether that officer decided according to law, or against law. The solicitor’s power, in this case, was equal “to that conferred on the Supreme Court of the United Slates, in cases subjected to its jurisdiction, and above that of the Circuit Court for the District of Columbia, from which there is an appeal. The Solicitor had as much power, under the law which gave him jurisdiction to issue a mandamus to bring before him, for consideration or revision, a ease acted on in the District Court, or the .Supreme Court, as either of them has to issue a mandamus to bring before them, for consideration or revision, a case decided in his court; and he has as much right to interpose by a mandamus to execute their judgment, as they his. How then do the Circuit Court get jurisdiction in this case ? Not by law ; for the law gives them none, either original or appellate. They obtain it by the mandamus, and by that only.
It is said that they do not claim jurisdiction to inquire into and revise the Solicitor’s award. What then does their jurisdiction amount to ? What case is this where the jurisdiction is not to inquire into, to revise, to adjudge, but merely to execute ? In the ordinary routine of judicial proceedings, the “ case ” comes first, the “ suit” follows, and “judgment” closes the rear. Here it is not a “ case ” nor a “ suit ” of which the court takes cognizance, but a “judgment.” It is the judgment and award of another independent court, upon the proceedings of which the law gives neither resort nor appeal to the District Court. And if the court do not intend to look into the award of the Solicitor, to ascertain whether it be according to law, or against law, what do they mean by calling on the Postmaster-General to give his reasons for not carrying it into execution ? If they mean any thing by such a call, it must be that they will consider the reasons which may be adduced by him, and decide whether they be suffi- *208 eient or not. Suppose the Postmaster-General were to allege that the Solicitor had considered and allowed claims, which he was not authorized to allow by the Act of Congress, from which he derived his authority. If this were true, it would certainly be a good reason for not paying the award. But could the Circuit Court inquire into their truth ? Whence do they derive the power to inquire or decide whether the Solicitor allowed too much or too little; whether he adhered to the law, or transcended the law; whether he awarded to the claimants a just compensation for services actually rendered, or heaped upon them tens and hundreds of thousands without shadow of contracts or pretence of service ? Nothing would seem more plain than that the Court have no power to call for books and papers, or summon witnesses, or consider statements, with a view of deciding whether the award of the Solicitor be right or wrong. If they have no such power, it is palpable that they cannot make any examinations, and come to any decision which can exonerate the Postmaster-General from executing the award, however illegal or monstrous may be the allowances which it. sanctions.
Is not this absence of power to consider that, which may be a good reason for the Postmaster-General’s refusal to execute the award, the strongest possible proof that the Court have no authority to institute their present proceedings ? It will be admitted by all, that if the Postmaster-General could show that the award was illegal, or corrupt, it would be a good excuse for not carrying it into effect until it could be revised by some superior tribunal. But this court, not being clothed by law with power to consider those points, has no authority to judge of the legality or reasonableness of the Postmaster-General’s excuses, although they may be such as not only to justify him, but to entitle him to commendation.
No man will deny that cases may and do arise, in which an executive officer is perfectly justified in refusing to perform a specific act required of him by law. In these cases, he is responsible to his superior, and to Congress, but' not to the courts. If the Postmaster-General were directed by express law to pay $50,000 to a contractor, and should, before doing so, discover that the passage of the Act of Congress had been procured by false and fabricated testimony, it would be his duty to refuse payment until the whole subject could be again brought under the revision of Congress. Yet the law might be plain and peremptory in its terms, leaving him no discretion. Must not this Court, upon the principles laid down by them, grant a mandamus to the claimant ? Could they, in such a proceeding, inquire into and revise the Act of Congress, or would they peremptorily order, and forcibly com *209 pel the Postmaster-General to execute the law, the fraud notwithstanding ? If he had no “ discretion,” and they no power of revision, such must be their decision.
Hence it is inferred that the Court has no jurisdiction of this case in law, and can only obtain, what they may exercise by their mandamus, — a proof that a writ of mandamus will not lie in such a ease.
Fourth reason. The Court have ordered the Postmaster-General to perform a legal impossibility.
A mandamus is a command to do a specific act. The specific act, ordered to be done in this case, is, to credit the relators with the full amount of the Solicitor’s award. A credit can only be given by an entry upon some book in which their accounts are lawfully kept. No accounts are kept with contractors in the Post-Office Department, nor has the Postmaster-General the custody or control of the books in which they are kept.
All the accounts of the Post-Office Department are kept in the Treasury Department by the auditor created for that purpose, by the Act of July 2, 1836, [5 Stat. at Large, 80.] That officer is appointed by the President and Senate; and so far is he from being dependent on the Postmaster-General, that his clerks are appointed by the Secretary of the Treasury. To his office have been transferred, long since, all the accounts, and the books connected with them, formerly kept by the Postmaster-General.
By adverting to the fact, that "the act for the relief of Messrs. Stockton and Stokes, &c., and that to change the organization of the Post-Office Department, passed on the same day, the occasion of this practical discrepancy between them will be understood.
The former was drawn with reference to the organization of the department at the time of its introduction into Congress. Then, the Postmaster-General kept the accounts ; and the entries in the books were his entries. He had the legal power and authority to give a credit to the contractors in this case. But this power and authority was taken from him by another act on the day the act for their relief passed. That the act, now in question, was not altered so as to accommodate it to the change, and require the credit to be given by the new auditor, instead of the Postmaster-General, was, doubtless, an inadvertence; but it is one which the legislative authority alone can correct.
“As the law stands, the Postmasteri-General has just as much authority to make entries in the books of the Second, Third, and Fourth Auditors, as he has in those of the auditor created by the Act of 1836. Hence the Court will'perceive that they have ordered the Postmaster-General to do that which he cannot law *210 fully do, — to enter a credit or credits on books of which he has neither the custody nor control. .
These views the undersigned submits to the Court with much confidence in their soundness. He thinks it is shown,
1. That it is the function of the executive “to take care that the laws,” special as well as general, “ be faithfully executed ; ” and that of the judiciary, to expound such as require it. That to the President of the United States, and not to the courts of justice, belongs the duty of directing and controlling all executive officers in the performance of their official duties; and that, when the courts interpose to control them, they assume an executive function, invade the province of the President, and subvert the constitutional assignment of powers.
2. That Congress have not conferred, or attempted to confer, on the Circuit Court for the District of Columbia, authority to issue a writ of mandamus for the purposé of controlling executive officers in the performance of their duties, whether general or specific. That the Postmaster-General is an executive officer; that in the matter, upon which this proceeding has originated, he has acted in that capacity; and that he is not lawfully controllable therein, by a writ of mandamus.
3. That in the case before the Court, the Postmaster-General had a clear and undoubted discretion, in the exercise of which he is amenable to no judicial tribunal; and that the Court, having no jurisdiction of the matter in question, either original or appellate, cannot lawfully court and obtain it by mandamus.
4. That the Court have ordered the Postmaster-General to do that which he has no lawful power to do; not having official custody or control .of the books on which the credits are commanded to be entered.
In addition to these persuasive considerations, it cannot be forgotten that the power, now asserted, has been slumbering from the birth of the Constitution ; and now, about half a century from the organization of the government, is for the first time called into requisition. Plow was it that Marbury, after his right to his •commission was so strongly asserted by the Supreme Court, did not bethink himself of a resort, for redress, to the Circuit Court for the District of Columbia ? Why is it that the numberless claimants, whose accounts have been rejected at the Treasury, though asserted by them to be clearly warranted by law, have not applied to this Court for its mandamus to compel the auditors and register to give them credits upon their books ? Why did not the Bank of the United States, instead of agitating the country, and thundering in the capítol, apply to this Court for its mandamus ■to compel the Secretary of the Treasury to restore the public de *211 posits which, it was alleged, had been removed from it, in contempt of law, and in violation of the Constitution ? Have none of these occasions been sufficient to rouse this giant power from its enduring slumber ? Are its mighty arms to be flung aloft, for the first time, in vindication of Post-Office extra allowances, of doubtful legality, and undoubted enormity, which have already been denounced by Congress, and condemned by the nation ?
The undersigned desists from a theme, on which it is not pleasant to dwell. It has been his studied effort to avoid, as far as possible, expressions calculated to wound sensibility, or create excitement. The voice of reason alone is worthy of a subject so comprehensive and so grave. If a sentence or a word is to be found, in this paper, which can justly be construed as disrespectful to the Court, or personally reproachful to any one, it has escaped through inadvertence, and conveys a meaning which was not intended. ’ Amos Kendall, Postmaster-General.
June 24, 1837.” :
The following is the letter of Mr. Butler, the Attorney-General, referred to as part of the answer of the Postmaster-General.
Attorney-General’s Office, June 19th, 1837.
Sir: I have had the honor to receive your letter of the 7th instant, inclosing a printed copy of the opinion delivered by the Chief Judge of the'Circuit Court of the District of Columbia, for the county of Washington, upon the application of William B. Stokes and others, for a writ of mandamus, to be directed to the Postmaster-General of the United States; and requesting me to examine it, and inform you whether I find any thing therein to change the opinion heretofore "expressed by me, relative to the jurisdiction of the Court over the matter in question.
Pursuant to this request, I have examined the paper referred to me, with the attention and respect due to its author, and to the Court of which he is the organ ; but after the fullest consideration which I have been able to give to the arguments contained in it, I still adhere to the opinion, that the Court had no power to issue the writ in question.
The case proposed by you in your communication of the 29th ultimo, and now presented, relates to the power of the Circuit Court of this District to issue a mandamus to the Postmaster-General, an executive officer of the United States, for the purpose of compelling him to perform an official act alleged to have been enjoined upon him by a special Act of Congress passed for the relief of the parties applying for the writ. This act treats, exclusively, of certain claims depending in the Post-Office Department, and growing out of contracts with the Department. It refers these claims to the Solicitor of the Treasury, for settlement; and *212 it directs the Postmaster-General to credit the contractors with whatever sum of money, if any, the Solicitor shall decide to be due them. The duty, imposed by this law, is, therefore, in every sense, an official duty. It relates to the business of his department ; it is imposed on him by his name of office. The Solicitor of the Treasury has made an award, by which he decides that certain sums of money are due to the contractors; and the Postmaster-General has credited them with a part of these sums, but, for reasons satisfactory to his own judgment and sense of duty, has refused to credit the balance, until directed so to do by a further act of Congress. The contractors have applied to the late President of the United States, to take order, by virtue of his constitutional duty to see the laws faithfully executed, for crediting the balance ; but, being satisfied with the course of the Postmaster-General, he declined making any such order, and referred the parties to Congress for further legislative directions. The like application has been made to the present Chief Magistrate, who deemed it inexpedient to interfere with the disposition of the subject made by his predecessor; and the parties now apply to the Circuit Court of this district for an order, in the form of a writ of mandamus to the Postmaster-General, to credit and pay the balance of the Solicitor’s award; on the ground that this is a mere ministerial act, to the performance of which the applicants have a fixed legal right, under the Act of Congress, as it now stands, and for which they have no other adequate legal remedy. The Court has so far adopted these views as to issue an alternative mandamus, commanding the Postmaster-General to give the credit applied for, or to show cause why he has not done so; but it has reserved the question whether the mandamus shall issue to command the payment of the balance, for further consideration, when the result of the first writ shall have been ascertained.
In my former communication it was shown, that, according to the decisions of the Supreme Court of the United States, in the cases of McIntire v. Wood, (7 Cranch, 504,) and McClung v. Silliman, (6 Wheat. 598,) the Circuit Courts of the United States, out of the District of Columbia, have no jurisdiction, under the laws now in force, to issue a writ of mandamus to an officer of the executive departments; and the opinion was expressed that the acts of Congress, organizing the Circuit Court of this district, and regulating its jurisdiction, though they conferred some powers not delegated to the other circuit courts, did not, in express terms, or by any general grant of power, authorize it to issue a writ of mandamus to an executive office! of the United States; and therefore that its jurisdiction, in this respect, was the same with that of the other circuit courts.
*213 The character and effect of the decisions referred to, as to the other circuit courts, and the necessity of proving, before the writ applied for can be issued by the Circuit Court of this district, that Congress have conferred on it a jurisdiction, in this particular, not possessed by those courts, are fully admitted in the opinion before me; and the Court would doubtless have come to the like conclusion with me, had it taken the.like view of the acts of Congress regulating its jurisdiction.
The opinion maintains that the power and jurisdiction conferred on this Court are much more comprehensive than those possessed by the other circuit courts, and sufficiently so to include the power in question. To establish this, a comparison is instituted between the acts of Congress relative to these courts; and the result of this comparison, aided by inferences and reasonings thereon, drawn from the language of the Supreme Court, in the cases referred to, is supposed to be in favor of the jurisdiction claimed by tjiis Court.
The result, in my opinion, is directly the reverse. The power and jurisdiction of the ordinary circuit courts, so far as regards this subject, depends on the following clauses of the 11th and 14th sections of the Judiciary Act of 1789.
The 11th section.provides, “that the circuit courts shall have original cognizance, concurrent with the courts of the several States, of all suits of a civil nature, at common law, or in equity, where the matter in dispute exceeds, exclusive of costs, the sum or value of five hundred dollars, and the United States are plaintiffs, or petitioners, or an alien is a party; or the dispute is between a citizen of the State where the suit is brought, and a citizen of another State.”
The 14th section enacts, “ that all the before-mentioned courts of the United States shall have power to issue writs of scire facias, habeas corpus, and all other writs, not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and' agreeable to the principles and usages of law.”
On these provisions, the Supreme Court held, in the case of McIntire v. Wood, (7 Cranch, 504,) that the Circuit Court of Ohio did not possess the power to issue a mandamus to the Register of the Land Office. The power of the circuit courts, under the general words of the 14th section, to issue writs of mandamus, in some cases, was not denied; but it was held that the power was confined exclusively to cases in which the writ might be “necessary to the exercise of their jurisdiction.” By this was meant, as explained in the subsequent case of McClung v. Silliman, (6 Wheat. 598,) that the mandamus can only be *214 issued “ in cases where the jurisdiction already exists, not where it is to be courted or acquired by means of the writ proposed to be sued out.”
The pohvers and jurisdiction of the Circuit Court of the District of Columbia, so far as regards the present question, are conferred by the third and fifth sections of the “ Act concerning the District of Columbia,” approved February 27th, 1801.
The material part of the third section is as follows: “ That there shall be a court, in the said district, to be called the Circuit Court of the District of Columbia; and the said court, and the judges thereof, shall have all the powers vested in the circuit courts, and the judges of the Circuit Courts of the United States.”
The fifth section is in the following words: “ That the said court,” (the Circuit Court of the District of Columbia,) “ shall have cognizance of all crimes and offences committed within the said district, and of all cases, in law and equity, between parties, both or either of which shall be resident, or shall be found within the said district; and also all actions or suits of a civil nature, at common law or in equity, in which the United States shall be plaintiffs or complainants ; and of all seizures on land and water, and all penalties and forfeitures, made, arising, or accruing under the laws of the United States.”
On the latter of these sections (the fifth,) Judge Cranch holds that it confers on the Circuit Court of the District of Columbia a jurisdiction not given to the other circuit courts, which may be enforced by a writ of mandamus, whenever such a writ is necessary to the exercise of that jurisdiction. This view of the ease appears to have been suggested by the following remarks of Mr. Justice Johnson, in the case of Mclntire v. Wood: “ Had the eleventh section of the Judiciary Act covered the whole ground of the Constitution, there w'ould be much reason for exercising this power, (the power of issuing writs- of mandamus,) in many cases where some ministerial act is necessary to the completion of an individual right arising under the laws of the United States: and the fourteenth section of the same act would sanction the issuing of the writ for such a purpose. But, although the judicial power of the United States extends to cases arising under the laws of the United States, the legislature have not thought proper to delegate the exercise of that power to its circuit courts, except 'in certain special cases.”
In order to bring the case within these remarks, Judge Cranch argues that the fifth section, above quoted, has covered the whole ground of the Constitution of the United States, and much more, except as to certain cases not material to the present discussion ; and that, with such exception, the Circuit Court of the District of *215 Columbia has cognizance of all cases, in law and equity, whether arising under the Constitution or laws of the United States, or under the adopted laws of Virginia and Maryland, with the only condition, that one of the parties shall be resident or found within the district; and that the Circuit Court of the District of Columbia is, therefore, in that condition, of which Mr. Justice Johnson speaks. He also argues, chiefly on the authority of a part of the opinion of Chief Justice Marshall, in the noted case of Marbury v. Madison, 1 Cranch, 163, that the Act of Congress, for the relief of the relators, directs the performance, by the Postmaster-General, of a mere ministerial act; that the right of the relators, and the obligation of the Postmaster-General, are clear and absolute ; that the refusal of the latter to perform the act, makes a case in law, of which the court has jurisdiction ; that the only appropriate remedy is by writ of mandamus ; that this writ is, therefore, necessary to the exercise of the jurisdiction of the Court; and that the Court has not only the power, but is bound, to issue it.
The whole of this argument rests on the assumption, that if the grant of jurisdiction covers the whole ground of the Constitution, it will include the power to issue a writ of mandamus to an executive officer, commanding the performance of an official act, provided the Court shall be of opinion that such act is merely ministerial in its nature; an assumption inferred by the court from the above quoted words of Judge Johnson. I shall, hereafter, have occasion to show that the existence of such a jurisdiction, in any of the courts, is incompatible with the distribution of the powers of government made by the Constitution, and with the separate and independent authority vested by it in the President; but before entering upon that subject, some objections of a minor, but perhaps not less decisive nature, may be mentioned.
1. The above quoted observation of Mr. Justice Johnson was not necessary to the decision of the case of McIntire v. Wood; and the use, now made of it by the Circuit Court, appears to be repugnant to the opinion of the same judge, in the case of McClung v. Silliman, and to the judgment rendered in the latter case.
The existence of this objection is fully admitted by Chief Justice Cranch, in the following remarks: “ But although we have shown, as we think, that, even under the opinion of the Supreme Court in McIntire v. Wood, this Court has power to issue a writ of mandamus in the present case, yet it may possibly be objected that our argument is founded upon inferences, drawn from the language of that opinion ; which inferences, Mr. Justice Johnson, in the case of McClung v. Silliman, 6 Wheat. 598, repudiates.”
Let us see how the objection is gotten over.
*216 In the first place it is suggested that, 44 the only point, decided in the case of McClung v. Silliman, was, that a State Court cannot issue a mandamus to an officer of the United States.” And the remarks of Judge Johnson, repudiating the inferences referred to, are treated as unnecessary to the decision of the cause.
If this were so, it might still be replied, that the obiter remarks of the judge who delivered the opinion of the Court, repudiating inferences drawn from obiter remarks of the same judge in a former case, are abundantly sufficient to meet an argument founded on such inferences. But I think it will be seen, by comparing Judge Johnson’s statement of the facts with subsequent parts of his opinion, that the case presented another point which directly called for the remarks in question.
Mr. Justice Johnson says, 44 The plaintiff in error, who was also the plaintiff below, supposes himself entitled to a preemptive interest in a tract of land in the State of Ohio, and claims, of the Register of the Land-Office of the United States, the legal acts and documents upon which such rights are initiated. The officer refuses, under the idea that the right is already legally vested in another, and that he possesses, himself, no power over the subject in controversy.
“ A mandamus is then moved for in the Circuit Court of the United States, and the Court decides that Congress has vested it with no such controlling power over the acts of the ministerial officers, in the given case. The same application is then preferred .to the State court for the county in which the subject in controversy is situated. The State court sustains its own jurisdiction over the Register of the Land-Office; but on a view of the merits of the claim, dismisses the motion. From both these decisions, appeals are made to this Court, in the form of a writ of error.” He then refers to the decision in McIntire v. Wood; says, the influence of that decision on the cases before the Court is resisted on the ground that it did not then appear that the controversy was between parties who, under the description of person, were entitled to sue in the Circuit Court of the United States; and that44 it is now contended that, as the parties in this controversy are competent to sue under the 11th section, being citizens of different States, that this is a case within the provisions of the 14th section, and the Circuit Court was vested with power to issue this writ, under the description of a writ not specially provided for by statute, but necessary for the exercise of its jurisdiction.”
It thus appears that, besides the question concerning the power of the State Court, the question whether the Circuit Court of the United States for the State of Ohio could issue a mandamus to a Register of the Land-Office, to decide conflicting claims to a certi- *217 fieate of purchase; one claimant being a citizen of Ohio, and the other a citizen of another State, was also submitted for decision. The argument of the plaintiff’s counsel in support of such a jurisdiction, like that of the Circuit Court of this District in the present case, was founded on inferences drawn from the language held by Judge Johnson in the case of McIntyre v. Wood. The judge notices it at length ; rejects, in the most decided manner, the inferences on which it rested ; and thus disposes of that part of the case which related to the.proceedings before the Circuit Court.
Another answer to the anticipated objection is, that the Circuit Court of this district has cognizance of all cases in law and equity, however arising, between parties, both or either of which are resident, or found within the district; a position constantly insisted on in the opinion, and which I propose to examine under the next head.
2. Admitting, for the sake of argument, that the construction, given to the language of Judge Johnson in the cases referred to, is the correct one, and that the argument founded on it is sound in principle, still the present case cannot be distinguished from those decided by the Supreme Court, because there is no essential difference between the 5th section of the act “ concerning the District of Columbia,” on which the Circuit Court relies for its claim of jurisdiction over all cases in law and equity, however arising, and the 11th section of the Judiciary Act of- 1789, [1 Stat. at Large, 73,] which prescribes the jurisdiction of the other courts.
The material words of the 5th section, omitting other classes of cases .are, that the Circuit Court of this district shall have cognizance “ of all cases in law and equity, between parties, both or either of which shall be resident, or shall be found within the said district.”
Those of the 11th section, omitting value and alternative cases, are, that the' Circuit Courts of the United States shall have cognizance “ of all suits of a civil nature, at common law or in equity, where the matter in dispute is between a citizen of the State where the suit is brought, and a citizen of another State.”
Except, that in the other circuit courts it is requisite that one party should be a citizen of the State where the suit is brought, and the other party a" citizen of another State ; and that in this district, it will be sufficient, if either of the parties be resident or found here; there would seem to be no substantial difference between the two provisions. Indeed, unless the phrase, “ all cases in law and equity,” used in the one case, means something different from “ all suits of a civil nature, at common law or in equity,” *218 used in the other, it is certain that there can be no such difference, and consequently that the power and jurisdiction of the Circuit Court of ibis district, in regard to the writ of mandamus, so far as depends upon the 5th section above quoted, are precisely the same with those of the other circuit courts.
It may be inferred from the opinion of the Circuit Court, that the former of these phrases was supposed to mean something more comprehensive than the other ; and so much more so as to cover the whole ground of the Constitution, which’ it was adjudged in McIntyre v. Wood, that the other phrase did not do. No reason is very distinctly assigned for this distinction ; but it appears to rest on the use of the word “ cases,” in that clause of the Constitution which provides that the judicial power of the United Slates “ shall extend to all cases in law and equity under the Constitution and laws of the United States,” &c. But, according to the Supreme Court of the United States, and to the opinions of other expositors of the Constitution, the word “case” in this section, means neither more nor less than the word “ suit.” Mr. Justice Story, in his Commentaries, (vol. 3, p. 507,) in answer to the inquiry, what constitutes a case within the meaning of the clause, remarks, that a case, in the sense of this clause, arises when some subject touching the Constitution, laws, or treaties of the United States, is submitted to the courts by a party who asserts his rights in a form prescribed by law. In other words, a case is a suit at law or in equity instituted according to the regular course of judicial proceedings; and when it involves any question arising under the Constitution, laws, or treaties of the United States, it is within the judicial power confidéd to the Union.” And for this, he cites the decisions of the Supreme Court, and other authorities. On the other hand, the Supreme Court held, in 2 Peters, 464, that the word “suit” used in the 25ih section of the Judiciary Act, applies to any proceeding in a court of justice, by which an individual pursues that remedy, in a court of justice, which the law allows him. It seems, therefore, to be settled that the words are, substantially, convertible terms ; the one referring to the subject-matter of a judicial proceeding, and the other to the proceeding on such subject-matter. The words of the two acts being substantially the same, can there be any difference in their legal effect ? And if the words used in the 11th section of the Act of 1789, [1 Stal. at Large, 73,] do not cover the whole ground of the Constitution, and therefore do not authorize the issuing of a mandamus to an executive officer of the United Slates, as an original remedy, as has been adjudged by the Supreme Court, how, without overruling the decisions of that Court, can words of precisely the same import in the 5th section of the Act of 1801, *219 [2 Stat. at Large, 103,] be held to cover that whole ground, and to authorize the issuing of such a writ ?
It may be admitted that, under the words above quoted from the 5th section, taken in connection with the first section of the same act, which declares that the laws of Virginia and Maryland, as they existed at the date of the act, shall continue and be in force in the parts of the district ceded by those States respectively, the Court may lawfully issue writs of mandamus, even as original process, in all eases arising between individuals, both or either of whom are resident, or may be found within the district, in which, by the law of Virginia, or of Maryland, as the case may be, such writs could be issued. If this be so, as I am inclined to think it is, it is because this remedy existed as a part of the adopted local law which is declared to remain in force, and to which, for the purpose of this remedy, the jurisdiction of the Circuit Court is attached. But it is impossible to acquire any such jurisdiction, in this way, over the officers of the'United States in their official capacities, because, in those capacities, they were never subject to the laws of Virginia or Maryland; nor did those laws ever include, nor could they confer any jurisdiction over them, by mandamus or otherwise.
Officers of the United States cannot sue in their names of office, except when expressly authorized so to do, by act of Congress ; and the like legislative provision is necessary to render them liable, in their official capacities, to the process of the courts. No such provision is found in the act concerning the District of Columbia.
It is also worthy of remark, that, notwithstanding the strong opinion of Chief Justice Marshall, in the case of Marbury v. Madison, in favor of the right of the applicant to a remedy by mandamus, in any court possessing jurisdiction, no proceeding in the Circuit Court of this district appears to have been instituted, or to have been thought of, by the parties, or their counsel; although the Court then possessed precisely the same power, in this respect, which it possesses now, and though all the parties were residents of the district. This omission, under all the circumstances, proves, very clearly, that the jurisdiction, now claimed, was not then supposed to exist. Instances have, no doubt, frequently occurred, since that period, in which individuals have felt themselves aggrieved by the action of the executive officers, in cases affecting the rights of such individuals, but this appears to be the first application ever made to the Circuit Court of this district, for a remedy by mandamus.
After the most careful examination of the various provisions of the Act of 1801, “ concerning the District of Columbia,” I find *220 nothing in those provisions to authorize the application of such a remedy.
3. In a subsequent part of the opinion, the claim of jurisdiction is defended on another ground.
“Our powers,” say the Court, “are given by the third, and our jurisdictiomby the fifth, of the Act of the 27th of February, 1801,” [2 Slat, at Large, 103.] And after quoting the third section, (copied above,) the opinion suggests that the only circuit courts and judges of the circuit courts, existing when the Act of the 27th of February, 1801, was passed, were those ordained and established by the Act of Congress of the 13th of February, 1801, [2 Slat, at Large, 89] ; that the tenth and eleventh sections of that act were far more comprehensive than the Act of 1789, organizing the former circuit courts, and covered the whole ground of the "Constitution; and that if they had been in full force when the case of McIntyre v. Wood arose, the decision in that case, would probably have been different; and the proposition is advanced, that “although the Act of February 13,1801, was repealed by the Act of 1802, yet the repeal did not in any manner affect the powers or jurisdiction of this Court given by the Act of 27th of February, 1801.”
From the subordinate place assigned to this argument, it does not seem to be much relied on by the Court; and, in my judgment, it is wholly untenable. It is true that the Act of the 27th of February, 1801, was passed fourteen days after the enactment of the law changing the judiciary system, and establishing the new circuit courts of the United States, and that it gave a more extensive jurisdiction than the eleventh section of the Act of 1789; but it is scarcely correct to speak of those courts as in existence on the 27th of February, 1801. The law creating them was passed on the 13th of February, and the nominations were made and acted on between that day and the 3d of March, 1801 ; but no one of the courts was organized, and probably no one of the judges actually in office on the 27th of February. This, however, is not very important, because the third section of the Act of the 27th of February, 1801, concerning the District of Columbia, contains no specific reference to the Act of 13th of February ; but merely says, “ that the said Court, and the judges thereof, shall have all the powers vested in the circuit courts, and the judges of the circuit courts of the United States.”
The object of this section evidently was, to define the general powers of the Court, and not to enter into the details rendered necessary by the peculiar condition of the district, which was done in the fifth section. Its general powers, and the general powers of its judges, were to be the same with those of the circuit courts, *221 and the judges of the circuit courts of the United States, not as defined in any particular law, but as they should from time to time be vested by law in those courts and judges. This, it seems to me, is the plain meaning of the clause. Consequently, although so long as the Act of 1801 remained in force, its provisions formed the measure of the general powers of the Circuit Court of this district; yet, when it was repealed, and the old provisions of the Act of 1789 substituted in its place, those substituted provisions became, thenceforward, the measure of its general powers. This is the general 'rule of interpretation in such cases, because it is not to be presumed, unless the contrary be expressly declared, that the repealed law shall remain in force in respect to any one of several eases standing on the same ground, and thus produce an unnecessary and anomalous distinction.
This rule is especially applicable to the present case. The Act of the 8th of March, 1802, repeals the Acts of the 13th of February and the 3d of March, 1801, from and after the first day of July, then next, and contains no exception whatever of the court established in this district. The third section expressly declares, “ that all the acts, and parts of acts, which were in force before the passage of the aforesaid two acts, and which by the same were either amended, explained, altered, or repealed, shall be, and hereby are, after the said first day of July next, revived, and in as full and complete force and operation, as if the said two acts had never been made.”
Under these circumstances, it seems to me impossible to derive any power from the Act of the 13th of February, 1801; and I shall, therefore, omit any reference to the particular provisions of that law.
4. I do this, the rather, because, in my judgment, neither the provisions of that law, supposing them to be in force, nor those of any other law that has been, or can be, passed, under our present Constitution, however broad they may be in their terms, can confer on any court of the United „States the power to supervise or control the action of an executive officer of the United States, in any official matter properly appertaining to the executive department in which he is employed.
In my former communication I did not deem it needful to enter into the exposition of this part of the case. The two decisions of the Supreme Court, to which I referred, seemed sufficient for my purpose; and for obvious reasons connected with the history of the case of Marbury v. Madison, I purposely refrained from any allusion to that case. The claim of jurisdiction now made by the Circuit Court, and the course of reasoning by which it is supported, involving, as they do, an assertion of power to direct, not *222 only the Postmaster-General, but every other executive officer residing within the district, in the performance of his official duties when they are supposed to affect the legal rights of an individual, compel me to explain the constitutional grounds on which this part of my opinion is founded.
The proceedings of the convention which framed the Constitution, abundantly prove the earnest desire of its authors to separate the three great departments, the legislative, executive, and judicial, from each other, and to render each independent of the other two. This general object was accomplished, with a few specified exceptions, by the actual provisions of the Constitution. It declares that “ the executive power shall be vested in a President of the United States.” In accordance with this fundamental arrangement, it subsequently provides that the President “ shall take care that the laws be faithfully executed.” As a means to the performance of this duty, it gives to the President the exclusive power of appointing, by and with the advice of the Senate, the principal officers in the executive departments; it authorizes him to require from them their opinions in writing “ upon any subject relating to the duties of their respective offices.” It secures the appointment of inferior executive officers to the President alone, or to the heads of departments, as Congress shall, by law, direct; and according to a construction, coeval with the existence of the government, settled on the fullest deliberation, it also secures to the President the power of removing, at pleasure, either by his own act, or through the agency of the heads of the departments, every officer employed therein.
The obvious design of all these provisions, was, to make the President responsible for the faithful execution of the laws, and for the official acts of all the officers of the executive department. Not that he should be liable to impeachment, or other criminal procedure, or- to a civil action for every illegal act, or culpable omission of each one of those officers. Their great number, the distance of many of them from the seat of government, and the multifarious character of their duties, render it impossible for any one man to give such attention to their conduct, as to become responsible for them in that sense; and the law, whether prescribed by a constitution, or otherwise, never requires impossibilities; nor that the inferior officer should be exempt from personal responsibility by impeachment, indictment, or civil action, for any culpable act, or. omission of duty, even though he may be able to plead, in his excuse, the express direction of the President. But it is possible for the President, through the heads of departments, to give more or less attention to the proceedings of each department, and to take care that the laws concerning it be faithfully *223 executed ; and it is agreeable to reason and the rules of law, that where two persons are united in the performance of an illegal act, or in a culpable omission of duty, each, to a greater or less extent, and according to the circumstances of the case, should be personally responsible, although one of them may have an official superiority to the other. This species-of responsibility, it was' the design of the Constitution to fasten upon the President; and hence it vests in him, and in him alone, with a few specified exceptions, the whole executive power of the government. It is true that, within a few years, the doctrine has been advanced, that when the Constitution says “ the executive power shall be vested in a President of the United States,” it merely intends to give a name to the department, and not to grant any executive power; and that, on this ground, efforts have been made to prove that the President alone does not possess the powér of removal; but it is also true that this doctrine is directly opposed to the natural import of the language used ; to the principles on which the power of removal was established by the first Congress; to the expositions, then and since, given by the ablest expounders of the Constitution; and to the actual course of the government, acquiesced in by all its branches during the whole period of its existence.
The system thus ordained by the Constitution, whatever diversity of opinion may have existed, or may yet.exist, as to its expediency, cannot be varied or interfered with by the legislature or the judiciary. It .belongs to the legislature to create the executive departments, to define their powers and duties, to provide the requisite officers, to prescribe their various functions, and to make all other legal provisions which may be necessary and proper to regulate the action of.those departments. But when a law is once passed for the government of the executive officer, all that appertains to its execution falls under the care of the President. It is his province to instruct and command the officer ; to remove him if he acts unfaithfully ; and to appoint one in his place who will fulfil his duty agreeably to law. No other department of the government can exercise this power of removal; the legislature cannot do it themselves; nor can they devolve it on .the judiciary; nor can those two departments combined take it from the ■ President.
It results from the foregoing principles, that the writ of mandamus cannot be issued, by any court of the United States, to any officer, whether principal or inferior, of an executive department, for the purpose of commanding the execution of any law'concerning the appropriate executive duties of such officer.
This conclusion will be strengthened by a little attention to the history and nature of the writ.
*224 From an early period it has been used by the English Court of King’s Bench as a means of enforcing its general supervisory jurisdiction over courts, magistrates, and ministerial officers inferior to that tribunal.
By the statute of 9 Anne, c. 20, and 11 Geo. 1, c. 4, it was so extended as to afford a remedy for persons entitled to offices, or places, in corporations; and to compel elections, and correct abuses therein, of corporate officers; but we find no instance of iats being directed to any officer of the executive departments. In England, it issues from the King’s Bench alone, because, in that court, the king originally sat in person, and, by fiction of law, is yet supposed to do so; and because the authority to control the inferior jurisdictions is one of the royal perogatives. It is, therefore, denominated by Blackstone and other writers, “ a high prerogative writ.” And if the judge or officer to whom it shall be directed, in its peremptory form, fails to obey it, he is punishable for his contempt by attachment. During the colonial government, this branch of the'king’s prerogative extended to the colonies, and was executed through those colonial courts which were invested with a jurisdiction analogous to that of the King’s Bench ; and from them the jurisdiction has been derived to the State courts, which succeeded them. Under the fourteenth section of the Act of 1789, the Supreme Court, in aid of its appellate jurisdiction, may issue this writ in all cases where any act, necessary to the éxercise of that jurisdiction, shall be omitted to be performed by an inferior tribunal or officer; and the Circuit Courts of the United States may also issue it in like cases. In these instances the original design of the writ is plainly kept up; the tribunals or officers to which it is issued, are subordinate to the appellate court, which, in these respects,. exercises over them a supervisory jurisdiction. v
The writ, then, necessarily implies a supervisory power, in the court which issues it, over the tribunal or officer to which it is directed. In the cases mentioned, such a power exists; but under the Constitution of the United States, it has not been given to, and cannot exist in, any of our courts over the executive departments.
The existence of such a power in the judiciary, is repugnant to the whole theory of the Constitution; its effectual exertion, if it were practicable, would defeat the President’s power of removal ; would take away his responsibility for the faithful execution of the laws; and would transfer to the judiciary, in the particular ease, the whole éxecutive power; for it is palpable, that if the President, under the belief that the faithful execution of the law will be best secured by not doing a particular thing which is *225 demanded by a third party, so directs the executive officer, and the Court, on the application of such party, issues a mandamus, commanding it to be done, and the writ is obeyed, it is the Court, and not the President, that exercises the executive power ; and the distribution of powers, so carefully fixed by the Constitution, is unsettled and overturned. But its effectual exertion is not practicable ; because the President’s power of removal cannot be restrained, and by its exercise he can readily defeat any command which the judiciary may address to the executive officer.
To illustrate this, let us suppose that the Circuit Court of this district issues a peremptory mandamus to. the head of any one of the departments, commanding him to execute any particular law concerning his official duties, in a given way, and that the officer refuses obedience, and is attached and committed for the contempt. This is the end of the judicial power in a case of mandamus; but suppose, at this stage of the proceedings, the President interferes, by removing the officer, and appointing a successor, what then becomes of the judicial remedy ? The act can only be performed by a person holding the office; the individual, in the custody of the Court, no longer holds that office; it has been legally taken from him; and if he were ever so willing to perform the act, he has no longer the ability to do so. The proceeding must then be abandoned, or commenced de novo, against the new officer, to be frustrated, if the President thinks proper, at the same stage, as often as the Court shall reach it. If it be said that this is supposing an extreme .case, and that the President, from respect to the judiciary, would probably suffer the officer to obey the mandamus, rather than so exercise the constitutional power of removal, ihe answer is, that the very existence of such a power, whether it be used or not, is fatal to the claim of jurisdiction; and that cases may easily be supposed, in which the President, with the strongest desire to avoid a conflict with the judiciary, may yet have no alternative but to use it.
In cases which properly refer themselves to the judiciary, it is rarely, or never, possible to defeat, in this way, the ultimate execution of the judgment of the Court. And the fact, that without the consent of the executive department, a peremptory mandamus to an executive officer must forever remain inoperative, exhibits, in the clearest light, the incapacity of any court to issue such a writ.
I am aware that those parts of the opinion of Chief Justice Marshall, in the case of Marbury v. Madison, which are quoted at length in the opinion of Judge Cranch, may seem to be repugnant to the conclusion at which I have arrived.
In that case, (1 Cranch, 137,) applications were made, in *226 December, 1801, by Messrs. Marbury and three, other persons, to the Supreme Court of the United States, for a rule, to Mr. Madison, then Secretary of State of the United States, to show cause why a mandamus should not issue, commanding him to cause to be delivered to them, respectively, their several commissions as justices of the peace in the District of Columbia. The application was founded on the following facts. Mr. Adams, whilst President of the United Slates, and on the 2d of March, 1801, had nominated the applicants to the Senate, for the offices of justices of the peace in the District of Columbia; their nominations were confirmed the next day, and the commissions were made out, signed by President Adams, sealed, and left in the Department of State. Mr. Jefferson came into office, as President, the next day, and forbade their delivery, and they were accordingly withheld by Mr. Madison. On the return of the rule to show cause, the counsel for the relators was heard ex parte, Mr. Madison not appearing'. The case was disposed of, and the application denied, on the ground that the Supreme Court of the United States had no authority to issue a writ of mandamus, except in the exercise of its appellate jurisdiction; and that so much of the 13th section of the Judiciary Act of 1789, as pur-> ported to empower that court to issue writs of mandamus “ to persons holding office under the authority of the United Slates,” in original cases, was unconstitutional and void.
The order of discussion, adopted by the Chief Justice, was as follows:
1st. Has the applicant a right to the commission he demands ?
2d. If he has a right, and that right has been violated, do the laws of his country afford him a remedy ?
3d. If they afford him a remedy, is it a mandamus issuing from this Court ?
These questions opened all the points in the case; and they are accordingly considered at large; but it is obvious that only the remarks under the third head were necessary to the decision of the cause; and that the elaborate reasoning under the first and second heads, including all the passages quoted in the opinion referred to me, was wholly extra-judicial. Every topic embraced under these heads is therefore open to discussion, not only in the Supreme Court, but in the inferior courts. The fact that the case was argued only on one side, must also be allowed to diminish still more the weight of these parts of the opinion ; and then, also, it must be borne in mind that'general expressions are always to be taken in connection with the particular case in which those expressions are used. Chief Justice Marshall himself has claimed the benefit of this latter rule in reference even to
*227 that part of the opinion in Marbury v. Madison, which explained, under the third head, the very ground on which the cause was decided.
In the case of Cohens v. The Stale of Virginia, (6 Wheat. 264,) the counsel for the defendant in error quoted and relied upon some dicta of the court, in the case of Marbury v. Madison. In reply to the argument founded thereon, the Chief Justice observes :
“ It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles, which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing, on all other cases, is seldom completely investigated.”
“ In the case of Marbury v. Madison, the single question before the court, so far as that case can be applied to this, was, whether the legislature could give this court original jurisdiction in a ease in which the Constitution had not clearly given it, and in which no doubt respecting the construction of the article could possibly be raised. The court decided, and we think very properly, that the legislature could not give original jurisdiction in such a case. But in the reasoning of the court, in support of this decision, some expressions are used which go far beyond it.” He then explains the particular occasion of the dicta relied on, and the cases to which they were intended to apply, and proceeds as follows:
“ Having such cases only in its view, the court lays down a principle which is generally correct, in terms much broader than the decision, and not only much broader than the reasoning with which that decision is supported, but in some instances contradictory to its principle.”
He then states the construction given to the passages quoted, and the argument founded on it, and observes,
“ To this construction the court cannot give assent. The general expressions, in the case of Marbury v. Madison, must be understood with the limitations which are given to them in this opinion, limitations which in no degree affect the decision in that case, or the tenor of its reasoning.”
If the general expressions, contained in the essential parts of the opinion, require to be thus limited, the like caution must be still more necessary, in considering the other parts. On perusing *228 them with care, it will be found that before entering on the discussion of the remedy by mandamus, the Chief Justice had decided that the appointments in question became complete by the signing and sealing the commission ; that the applicant had, therefore, a vested legal right to the office, and to the commission as the evidence of it, of which the executive could not deprive him ; that the Secretary of State had received the commission from the President for the use of the applicant; and that he had no more right to withhold it than any other person.
His reasoning in support of the remedy by mandamus depends entirely on the conclusion, previously expressed, that the appointment was complete, and the agency of the President and Secretary of State in the matter at an end ; and it was precisely on this point that President Jefferson dissented, in such strong terms, from the opinion of the Chief Justice.
Speaking of this ease, in a letter to Judge Johnson, (Jefferson’s Correspondence, vol. 4, p. 372,) he says,
“The commissions were signed and sealed by him (Mr. Adams) but not delivered. I found them on the table of the Department of State, on my entrance into office, and forbade their delivery. Marbury, named in one of them, applied to the Supreme Court for a mandamus to the Secretary of State (Mr. Madison) to deliver the commission intended for him. The court determined, at once, that, being an original process, they had no cognizance of it, and there the question before them was ended.
“But the Chief Justice proceeded to lay down what the law would be, had they jurisdiction of the case, namely, that they should command the delivery. The object was, clearly, to instruct any other court having the jurisdiction what they should do if Marbury should apply to them. Besides the impropriety of 'this gratuitous interference, could any thing exceed the perversion of law ? For if there is any principle of law never yet contradicted, it is, that delivery is one of the essentials to the validity of a deed. Although signed and sealed, as long as it remains in the hands of the party himself it is in fieri only ; it is not a deed, and can be made so only by its delivery. In the hands of a third person it may be made an escrow. But, whatever is in the executive offices is certainly deemed to be in the hands of the President; and, in this case, was actually in my hands, because, when I countermanded them, there was, as yet, no Secretary of State.”
The tone and language of this passage may be regretted ; but it shows very plainly, when taken in connection with the opinion, the real point on which the controversy turned.
In this view of the case, it is manifest that the question now presented, namely, whether a mandamus can be issued to the head *229 of an executive department commanding him to perform an executive act which has not yet been commenced, did not arise. The difference between this question, and the question, whether Congress can authorize the judiciary to issue a mandamus to an executive officer, to compel the delivery of a paper, in his possession, containing the evidence of a past executive act already fully performed, is too obvious to need remark.
The limitations to which the obiter arguments, in the case of Marbury v. Madison, are thus necessarily subject, rescue the present case from their influence, and supersede the necessity of a particular examination of any part of them.
There are, however, one or two remarks on the argument of Chief Justice Marshal], which, as they may tend to elucidate the subject, and to prevent misapprehension, ought not to be omitted. He labors to prove that where a vested legal right has been violated by a public officer, or where a specific duty, on the performance of which individual rights depend, is assigned by law to an officer, and he refuses to perform it, the individual, who considers himself aggrieved, has a right to resort to the laws of his country for a remedy; and that the conduct of the officer is liable to be judicially examined.
This, if ever doubtful, is now too well settled to be disputed. Actions for trespass, and other actions for damages, against collectors of the customs, officers of the army and navy, and other public functionaries, for official acts or omissions, injurious to the vested rights of individuals, are of frequent occurrence ; and it is not to be doubted, that through such actions, any officer of the government,'the President included, may be held responsible in damages for the violation of any vested legal right. But these actions are against the officer in his individual character, and do not imply any power, in the judicial tribunals in which they may be prosecuted, to supervise, and control in advance, the official action of the officer. Such a power, however, is implied in the jurisdiction by mandamus ; and its compatibility with the Constitution, when issued to an executive officer for the purpose of compelling him to perform a specific executive duty, is a point not discussed, nor even touched, in the opinion ; probably because it was supposed that, if the appointment were regarded as complete, the point could not arise.
This subject was much considered, in the year 1808, by one of my predecessors in office. In that year an application was made, by Messrs. Gilchrist and others, to the Circuit Court of the United States for the District of South Carolina, for a rule on the collector of the port of Charleston, to show cause why a mandamus should not issue to him, commanding him to grant clearances for *230 certain ships, detained by the collector, under instructions from the Secretary of the Treasury, given under the Embargo Acts.
The collector appeared ; showed cause by producing the Secretary’s instructions, and submitted without argument to the decision of the court. The judges, being of opinion that the instructions were illegal, ordered a mandamus to be issued commanding the collector to grant the clearances applied for. President Jefferson, on hearing of these proceedings, referred the subject to the Attorney-General, Mr. Rodney, who expressed a decided opinion against the power of the court to issue the writ. After staling several reasons, growing out of the limited jurisdiction of the courts of the United States, and the peculiar provisions of the law under which the instructions of the Secretary of the Treasury had been issued, he concludes as follows: —
“It might, perhaps, with propriety, be added, that there does not appear, in the Constitution of the United States, any thing which favors an indefinite extension of the jurisdiction of courts over the ministerial oíBeers within the executive department. On the contrary, the careful discrimination which is marked between the several departments, should dictate great circumspection to each, in the exercise of powers having any relation to the others.
“ The courts are, indubitably, the source of legal redress for wrongs committed by ministerial officers, none of whom are above the law. The redress is to administered by due and legal process in the ordinary way. For there appears to be a material and obvious distinction between a course of proceeding which redresses a wrong committed by an executive officer, and an interposition by a mandatory writ, taking the executive authority out of the hands of the President, and prescribing the course which he and the agents of any department must pursue. In one case, the executive is left free to act in his proper sphere, but it is held to strict responsibility; in the other, all responsibility is taken away, and he acts agreeably to judicial mandate. Writs of this kind, if made applicable to officers, indiscriminately, and acts purely ministerial and executive in their nature, would necessarily have the effect of transferring the powers, vested in one department, to another department. If, in a case like the present, where the law vests a duty and a discretion in an executive officer, a court can not only administer redress against the misuse of the authority, but previously direct the use to be made of it, it would seem that under the name of a judicial power, an executive function is necessarily assumed, and that part of the Constitution, per.haps defeated, which makes it the duty of the President to take care that the laws be faithfully executed.
“ I do not see any clear limitation to this doctrine, which would *231 prevent the courts from compelling, by mandamus, all the executive officers, all subordinate to the President, at least, whether charged with legal duties in the Treasury, or other department, to execute the same according to the opinion of the judiciary, and contrary to that of the executive. And it is evident that the confusion arising, will be greatly increased by the exercise of such a power by a number of separate courts of legal jurisdiction, whose proceedings would have complete and final effect, without an opportunity of c'ontrol by the Supreme Court. So many branches of the judiciary acting within their respective districts, their courses might be different, and different rules of action might be prescribed for the citizens of different States, instead of that unity of administration which the Constitution meant to secure, by placing the. executive power, for them all, in the same head.
“What, too, becomes of the responsibility of the executive to the court of impeachment and of the nation ? Is he to remain responsible for acts done by command of another department ? Or is the nation to lose the security of that responsibility altogether ? From these and other considerations, were this branch of the subject to be pursued, it might be inferred that the Constitution of the United States by the distribution of the powers of our government to different departments, ascribing the executive duties to one, and the judiciary to another, controls any principle of the English law which would authorize either to enter into the department of the other, to annul the powers of the other, and to assume the direction of its operations to itself.”
. This opinion may be found, at length, in Hall’s American Law Journal, (vol. 1, p. 433,) and at page 440 of the same volume, will be found a reply from Judge Johnson, who presided in the Circuit Court when the mandamus was issued. This paper embraces a full review of most of the objections of the Attorney-General, but by no means answers the argument just quoted. The submission, of the collector and District-Attorney, is relied on as, at least, excusing the act of the court; and in the case of McIntyre v. Wood, (7 Cranch, 504,) it is expressly admitted, by Judge Johnson himself, that the court had no jurisdiction in the matter, except that derived from the consent of the public officers.
This is his language : “A case occurred, some years since, in the Circuit Court of South Carolina, the notoriety of which may apologize for making an observation upon it here. It was a mandamus to a collector to grant a clearance, and unquestionably could not have been issued but upon a supposition inconsistent with the decision in this case. But that mandamus was issued upon the voluntary submission of the collector, and the District- *232 Attorney, and in order to extricate themselves from an embarrassment resulting from conflicting duties-. Volenti non fit injuria.”
As the Charleston case is the only one, prior to the present, in which a writ of mandamus has been actually issued, by any of the courts of the United Slates to an executive officer, its history and result are interesting; and I am happy to find in them so decisive a corroboration of my own opinion.
5. But the ground is taken, in the opinion of the Circuit Court, that the relation of the Postmaster-General to the President, is very different from that of the other heads of departments.
“ They,” (say the Court,) “ in the very terms by which their offices are created and their duties defined, are to perform such duties, and execute such orders as they shall be required, to perform and execute, by the President of the United States. The Postmaster-General, however, clearly bears no such relation to the President. We cannot find a word in the law under which he was appointed, or in the various laws respecting the post-office establishment, or in the Constitution of the United States, which intimates any connection between him and the President; or any authority in the President to prescribe his duties, or to control him in the exercise of his official functions. It is true that he is appointed, and therefore may be removed by the President. But the President, if he has the power to control him, can only do it through his fear of removal. If he should not control him, no act done by him, under that control, could be thereby justified. The Postmaster-General, in the exercise of the duties of his office, appears to be legally as independent of the President, as the President is of him.”
It was with great surprise that I perused this part of the opinion. The Constitution assumes that certain executive departments will be created, but does not attempt to enumerate them; nor was any enumeration necessary; because the very nature of the functions assigned to any particular department, would readily determine its true character.
The whole business of the Post-Office Department, and all the official duties of the Postmaster-General as its head, are, exclusively, executive; and if the views of the Constitution, above taken, be correct, then, whatever may be the language of the acts of Congress respecting the department, there exists a most intimate connection between the Postmaster-General and the President; and the latter has the same control over the exercise of his official functions, when not prescribed by law, and is subject to the same obligation of taking care that all his duties are faithfully performed, which exist in respect to the other heads of departments.
*233 The passage above quoted, is not iess repugnant to the practical course of the government.
One of the first official acts of President Washington, after entering on the chief magistracy, was to call on the then Postmaster-General for an account of the state of his office. ■
“ A perfect knowledge ” (says his biographer) “ of the antecedent state of things, being essential to the due administration of the executive department, its attainment engaged the immediate attention of the President; and he required the temporary heads of departments to prepare, and lay before him, such statements and documents as would give this information.” Marshall’s Life of Washington, vol. 2, p. 150.
The form of this requisition will be found in the late collection of his Writings, (vol. 10, p. 11,) and it will be seen, by the note of the editor, Mr. Sparks, that it was addressed, among others, to Ebenezer Hazard, the Postmaster-General appointed by the old Congress.
The first law concerning the Post-Office Department, passed after the adoption of the Constitution, was the act “ for the temporary establishment of the post-office,” approved September 22, Í789. It consisted of only two sections ; the last merely declaring that the law should continue in force until the end of the next session of Congress, and no longer. The first section was in the following words:
“ Be it enacted,” &c., “ that there shall be appointed a Postmaster-General; his powers and salary, and the compensation to the assistant or clerk and deputies which he may appoint, and the regulations of the post-office, shall be the same as they last were under the resolutions and ordinances of the late Congress. The Postmaster-General to be subject to the direction of the President of the United States in performing the duties of his office, and in forming contracts for the transportation of the mail.”
This act was continued in force by the Acts of August 4th ? 1790; March 3d, 1791, and February 20th, 1792, to the 1st of June, 1792, when it gave place to the Act of the 20th of February, 1792, “ to establish the post-office and post-roads within the United States,” which fully organized the department, and introduced numerous legal provisions for the government of its concerns.
Since 1792 the duties of the Postmaster-General have been so far defined by law, as to leave little room for executive direction, and it was not until 1829, that he was regarded as a member of the President’s cabinet. But that his office has always been treated by Congress, as well as by the President, as an executive department, is shown by the Act of 1789, which left all its con *234 cerns to the direction of the President; by the Act of 1792, and all the subsequent laws, which speak of it as a “department;” by the power, of appointing postmasters, vested, by law, from 1789 to 1836, in the Postmaster-General alone, and still retained by him in all cases where the commissions of the postmaster are under $1,000. An arrangement palpably unconstitutional, unless the Postmaster-General be the head of a department; by the practice, of all those who have held the office of President, to require reports from, and to give directions to, the Postmaster-General; by the placing of the department on the same footing, in respect to salary and organization, with the other great executive departments ; and finally by the introduction of its head into the cabinet council of the President.
The relation, then, of the Postmaster-General, to the President, is the same as that of the other heads of departments. This relation does not authorize the President to give any direction, to the Postmaster-General, contrary to the laws concerning the department, but it authorizes and requires him to direct the faithful execution of those laws, and to take care that such directions be followed. And as the only coercive power, with which the President is armed by the Constitution, is the power of removal, it will be his duty to exercise that power, if he cannot otherwise secure, on the part of the Postmaster-General, a faithful execution of the laws. Nor will acts done by the Postmaster-General, under the President’s direction, be invalid, even though the judgment of the former be opposed to the act, and he be induced, through fear of removal, to execute the President’s direction. The defectiveness of the motive will not determine the legal character of the act. If it be within the power of the department, and be conformable to law, it will still be valid. I think, therefore, that this officer is no more subject, in his official action, to the supervision and control of the judiciary, than the head of any other executive department ; and that the principles above stated, if sonnd in respect to any executive officer, must be admitted, when the subject shall be fully examined, to be equally applicable to him. On the other hand, the claim of judicial power set up in the present case, in respect to the Postmaster-General, involves the like claim over the official action of every other executive department, and therefore brings into discussion one of the most grave and important questions which has yet arisen in the practical administration of the government.
I am, Sir, very respectfully, your obedient servant,
B. F. ButleR.
This communication from the Postmaster-General, having been offered to the Court as his return to the writ of mandamus nisi,
*235 Mr. Coxe, for the relators, moved the Court to quash the .return and to issue a peremptory writ of mandamus.
The case was ably argued, on the 26th, 27th, 28th, 29th, and 30th of June, by Mr. R. S. Coxe and Mr. Reverdy Johnson, for the relators, and by Mr. Key for the Postmaster-General.
On the 13th of July, CRanch, C. J., delivered the unanimous opinion of the Court, as follows:
In his return of the mandamus nisi, the Postmaster-General, by way of showing cause why he declines obedience to the command of the writ, contends,
1. That “ it is doubted whether the Constitution of the United States confers, on the judiciary department of the government, authority to control the executive in the exercise of its functions, of whatsoever character.”
2. That “ if, according to the Constitution, the Circuit Court of the District of Columbia might be clothed by law, with the power to issue a mandamus in such a case, no such power has been conferred upon them by the Acts of Congress.”
3. That “ if, by the Constitution, Congress can clothe courts with authority to issue writs of mandamus to executive officers, as such, and if they have vested the general power in this Court, by law, this is not á case, in which that power can be lawfully exercised ; ” and,
4. That “ the Court have ordered the Postmaster-General to perform a legal impossibility.”
■ The counsel for the relators have moved to quash this return, as being insufficient on its face, and the questions arising upon that motion have been fully, and very ably argued.
Although the order, in which the questions are presented in the return, is perhaps the most natural, yet, inasmuch as a decision, against the relators, upon the 4th, 3d, or 2d, of the objections stated by the Postmaster-General, would render it unnecessary to give any opinion upon the first, the Court, in considering the case will reverse that order, as suggested by the District Attorney, and commence with the fourth, which is
“ That the Court have ordered the Postmaster-General to perform a legal impossibility.”
The argument, in support of the proposition, is this : “ A mandamus is a command to do a specific act. The specific act, ordered to be done, in this case, is, to credit the relators with the full amount of the Solicitor’s award. A credit can only be given by an entry in some book in which their accounts are lawfully kept. No accounts are kept, with contractors, in the Post-Office Department; nor has the Postmaster-General the custody or control of the books in which they are kept. All the accounts of the *236 Post-office Department are kept in the Treasury Department by the auditor created for that purpose by the Act of July 2d, 1836. That officer is appointed by the President and Senate ; and so far is he from being dependent on the Postmaster-General that his clerks are appointed by the Secretary of the Treasury. To his office have been transferred, long since, all the accounts, and the books, connected with them, formerly kept by the Postmaster-General.
“By adverting to the fact, that the act for the relief of Messrs. Stockton and Stokes, and that to change the organization of the Post-Office Department, passed on the same day, the occasion of this practical discrepancy between them, will be understood. The former was drawn with reference to the organization of the department at the time of its introduction into Congress. Then, the Postmaster-General kept the accounts, and the entries in the books were his entries. He had the legal power and authority to give a credit to the contractors in this case. But this power and authority was taken from him by another act on the day the act for their relief passed. That the act, no;v in question, was not altered so as to accommodate it to the change, and requires the credit to be given by the new auditor, instead of the Postmaster-General, was doubtless an inadvertence; but it is one which the legislative authority, alone, can correct.
“As the law stands, the Postmaster-General has just as much authority to make entries in the books of the Second, Third, and Fourth Auditors, as he has in those of the auditor created by the Act of 1836. Hence the Court will perceive that they have ordered the Postmaster-General to do that which he cannot lawfully do,— to enter a credit or credits on books of which he has neither the custody nor control.”
The words of the act for the relief of the relators, are, “and that _the Postmaster-General be, and he is hereby directed to credit such mail contractors, with whatever sum or sums, if any, the said Solicitor shall so decide to be due to them, for, or on account of, any such service or contract.” The act does not require the Postmaster-General to enter the credit in any book, or in any account; but that he shall credit them. The substance is, that he, as far as is in his power, shall cause them to have credit for that amount in their account with the United States, or with the department.
This objection is not stated by the Postmaster-General as a reason why he has not credited them with the amount, but as a reason why this Court should not command him to credit them. It is not objected that there is an actual impossibility of his crediting them, but “a legal impossibility;” meaning, probably, that *237 his crediting them now would be of no avail in law, as the settlement of the account was transferred to the auditor.
That the change which was made in the Post-Office Department by the Act of the 2d of July, 1836, did not create an actual impossibility of his crediting them with the whole amount of the award, -is evident from his own letter to the President of the United States, dated December 27, 1836, in answer to the complaint. of the relators to the President, in which the Postmaster-General says,
“In obedience to the mandate of the law' I have paid those gentlemen $122,101.46, although I have yet to be convinced that they had the least claim, in law or equity, to one sixth part of that sum. When the law requires it of me, I shall, with equal promptitude, pay the remaining $40,625.59, although satisfied that not one cent of it is justly due.” He does not justify himself on account of his legal inability to pay, or to credit the amount.
But it has been stated, in the argument before the Court, that the Postmaster-General can lawfully pay the amount, although he cannot credit it. The law, w'hich allows him to pay the amount, surely should be construed to allow him to credit it, especially when the Act of Congress expressly directs him to credit it.
The act for the relief of these relators, and the act, “ to change the organization of the Post-Office Department,” were passed at the same session of Congress, and were approved on the-same day. So far as they are in pari materiá, they ought to be construed together, apd made to harmonize with each other, if possible. The arrangement of the department, so far as it authorized an auditor to be appointed for the purpose of receiving, auditing, and settling “all accounts arising in the department,.or relative thereto, must be considered as qualified by the express direction that the Postmaster-General should credit the contractors with the amount of the award; and as reserving to the Postmaster-General the power to do what the act expressly requires him to do. The auditor, also, is bound to take notice that by the act “for the relief,” &c., the Postmaster-General is directed to credit the contractors with the amount of the award ; and whenever the Postmaster-General, who still continues to be the head of the department, shall credit them with the amount or shall order it to be credited, the auditor will allow the same in auditing and settling their account. ,
Although the accounting bureau of the department has been removed to the Treasury Department, yet ample powers are given to the Postmaster-General; and by the ninth section of the Act of 2d July, 1836, “to change the organization of the Post-Office Department,” it is made his duty “ to control, according to law, *238 and subject to the settlement of the auditor,” “the expenses incident to the service of the department;” and “to regulate and direct the payment” of the said “expenses for which appropriations have been made.” Among “ the expenses incident to the service,” are included, no doubt, the expenses of the transportation of the mail, and the amount due to the contractors therefor. These duties imply powers which authorize the Postmaster-General to give this credit, or to direct it to be given ; and the fact, that the auditor has, upon the authority of such a direction, allowed that part of the award which the Postmaster-General has deemed proper to credit, shows that, upon alike authority, he would allow the balance.
We therefore think that there is neither a legal, a moral, nor a physical impossibility, on the part of the Postmaster-General, to obey the mandate by executing the law.
We must, therefore, next consider the third reason assigned by the Postmaster-General for not obeying the command of the writ; which is,
3. That “if, by the Constitution, Congress can clothe the courts with authority to issue writs of mandamus to executive officers, as such, and if they have vested the general power in this Court, by law, this is not a case in which that power can be exercised.”
The argument, in support of this proposition, is, in substance,
1. That the Postmaster-General has a discretion, because the act, for the relief of these relators, does not require him to pay any specific sum ; but a sum to be ascertained by comparing the award of the Solicitor with the act.
That the act does not require the Postmaster-General to credit all the Solicitor might award to them, but only so much as he might decide to be due, for and on account of such service or contract, as is described in the preceding part of the act; and the Postmaster-General has a discretion to pay or not, according as the allowance shall or shall not correspond with the act. That he is also to look into the award to see that it contains none of the prohibited items ; and that he has a discretion to refuse to pay the whole award, or any part of it, if he honestly believes it to be contrary to law.
2. That a mandamus can be issued by a court, only as a means of exercising its jurisdiction, and not for the purpose of obtaining jurisdiction. That this Court has no jurisdiction in this case, but what is given by the mandamus.
1. As to the first branch of this argument, we apprehend that the discretion which will justify a party in refusing to do an act, must be a legal right to do or not to do it according to his will.
The obligation of the Postmaster-General, under the act, is *239 absolute to credit whatever sum the Solicitor should decide to be due for and on account of the service and contract described in the act. The only fact to be decided, out of the act, is the amount which should thus be decided to be due. The award, upon that point, is clear and explicit. The question whether the money claimed and awarded was due for and on account of such service and contract, was as much submitted to the judgment of the Solicitor, as the question of the amount due; as to both points, his award is final and conclusive upon all persons. In the language of the Postmaster-General, “ Congress created a special tribunal for that purpose. They made the Solicitor of the Treasury a chancellor for the special object, and clothed him with power to take evidence and adjudicate upon the claims of the contractors. No other court on earth could have entertained this case; nor was any appeal from this special court provided for by the law which created it. Neither the Circuit Court of this district, nor the Supreme Court of the United States, nor any other judicial tribunal had power to bring up the case, from the Solicitor of the Treasury, either before or after his award, and revise his proceedings. No judge could take from or add to the amount of his award; nor has any judge the legal power to say whether that officer decided according to law or against law. The Solicitor’s power, in this case, was equal to that conferred upon the Supreme Court of the United States, in cases subjected to its jurisdiction, and above that of the Circuit Court of the District of Columbia, from which there is an appeal; ” and, we will add, that the act gives no appellate jurisdiction to the Postmaster-General. The award is as conclusive upon him as upon all the rest of the world.
The proviso in the act, that the Solicitor should not make any allowance for certain enumerated items, was merely directory to the Solicitor, and gave the Postmaster-General no discretion over the award, or over the duty of crediting the contractors with the amount. The Postmaster-General seems to admit that, if the law directed the payment of a certain sum, he would have had no discretion; but id cerium, est quod cerium reddi potest. The award renders that certain which was uncertain when the law was passed ; and the duty of crediting the amount of the award is now as absolute as if that amount had been ascertained and stated in the law itself. The discretion which is claimed by the Postmaster-General is no other than that discretion which every man has in regard to his own actions. Every man is a free agent. He has the power to do or not to do a particular act; and he decides upon his own responsibility. Neither his discretion nor his decision makes the act lawful or unlawful. Every *240 man must judge, for himself, of his own duty; but he acts at his peril; if correctly, he is justified; if erroneously, he must abide the consequence.
We are of opinion, therefore, that the Postmaster-General had not such a discretion over the duly enjoined by the statute, as renders it improper thqt a mandamus should issue in this case.
But it is contended that “ a mandamus can be issued by a court only as a means of exercising its jurisdiction, and not for the purpose of obtaining jurisdiction.”
This proposition is admitted, by this Court, in its fullest extent; and the only ground upon which the power of issuing that writ is claimed, is, that it is a writ necessary for the exercise of the jurisdiction of the Court, in a case of which it already has cognizance. That case is, that the Postmaster-General has refused to perform a duty positively required of him by an act of Congress, to the injury of the relators, who have brought their complaint before the Court, by affidavit and petition, praying the Court to grant them a proper remedy. A rule has been granted them upon the Postmaster-General to show cause why a mandamus, which is the only proper and adequate specific legal remedy, should not be issued, commanding him to perform what the statute directs him to do. The Postmaster-General has failed to appear upon the rule to show cause.
But it .is denied that this is a ease, because Mr. Justice Story, in his Commentaries on the Constitution of the United States, Yol. 3, p. 507, says, that “ a case, then, in the sense of this clause of the Constitution, arises when some subject, touching the Constitution, laws, or treaties of the United States is submitted, to the courts, by some party who asserts his rights in the form prescribed by law.”
In the present case, however, “ a subject, touching the Constitution and laws of the United States, is submitted to” this “ Court,” by the relators, “ who assert their rights in the form prescribed by law.” They have done all they could to bring their ease before the Court. If this is not sufficient to give the Court jurisdiction, it would never be in the power of the Court to exercise the potential jurisdiction which is given to it by .the statute.
W7hen' we say, in common parlance, that the jurisdiction is given by a statute, we do not mean that the Court has, thereby, actual jurisdiction of any given case, but only that the Court shall exercise jurisdiction in such cases when they shall be brought judicially before it. When, therefore, the 14th section of the Judiciary Act of 1789 gives to the courts power to issue all writs which may be necessary for the exercise of their respective juris *241 dictions, it is not intended that the Court shall have had actual jurisdiction of the particular case, by its having been actually submitted to the Court in the form prescribed by law, before it shall have power to issue the writ necessary for the exercise of its jurisdiction; for that writ may be the very form prescribed by law for submitting the case to the Court; and if the Court could not issue the writ until it had actual jurisdiction, and could not have actual jurisdiction until it had issued the writ, it is evident that the Court could never exercise the jurisdiction given to it by the statute. The jurisdiction, mentioned in the 14th section of the act, must, therefore, mean the potential jurisdiction ; that is, .the jurisdiction which the respective courts may exercise when the cases, described in the statutes giving the jurisdiction, shall arise and be submitted to the courts by means of the writs which, by the 14th section, they have power to issue.
This, therefore, is a case of which the Court, not only potentially, but actually, has jurisdiction by means of the petition, affidavit, and rule to show cause; and the writ of mandamus is a writ necessary for the exercise of its jurisdiction, in that case, if this Court can, by law, issue such a writ to an executive officer of the United States, commanding him to do a merely ministerial act which he is expressly required by an act of Congress to do ; and therefore this Court has power to issue it.
We are then brought to the consideration of the second ground upon which the Postmaster-General alleges that this Court has no power to issue the writ, namely:
That “if, according to the Constitution, the Circuit Court of the District of Columbia might be clothed, by law, with the power to issue a mandamus, in such a case, no such power has been conferred upon them by the acts of Congress.”
For the argument in support' of this proposition, the Postmaster-General has referred the Court to the very able and elaborate opinion of the Attorney-General of the United States, which accompanies, and makes a part of, the return to the writ of mandamus; and of which the Postmaster-General has given the following epitome, or analysis: The :undersigned is spared the labor of investigating and illustrating this position, by the clear, and, he thinks, conclusive, opinion of the Attorney-General, which he transmits herewith, and requests it may be considered part of this letter.
“ That opinion reviews the opinion of the Circuit Court, as delivered by Chief Justice Cranch, and published in the National Intelligencer, and maintains the following positions:
“ 1. That the argument of the Court, in favor of the jurisdiction claimed by them, is founded on inferences from the language of *242 Judge Johnson, in the case of McIntire v. Wood, which inferences were- repudiated by the same judge, and by the judgment of the Court in a subsequent case.
“ 2. That there is no substantial difference between the words of the Judiciary Act of 1789, [1 Stat. at Large, 73,] which the Supreme Court have twice decided do not give the other circuit courts power to issue a mandamus to an executive officer, and the words of the 5th section of the Act concerning the District of Columbia, on which the Circuit Court rely : and that the jurisdiction of the latter is, therefore, in this respect, no greater than that of the other courts.
“ 3. That no power is to be derived from the Act of the 13th, of February, 1801, because that act was repealed in 1802, without any exception as to the Circuit Court of this district.
“ 4. That even, if the Acts of Congress, concerning this Court, had given to it, in express terms, a jurisdiction to issue writs of mandamus to an executive officer, to compel him to perform an official act, no such jurisdiction could be exercised consistently with the provisions of the Constitution, because such a jurisdiction would be, substantially, an exercise of executive power, which cannot be taken from the President, in whom the Constitution has vested it.
“ 5. That the Postmaster-General is an executive officer, and equally independent, with the other heads of the executive departments, of any control, in the exercise of his official duties, by the judiciary.”
The Attorney-General, in reviewing the opinion of this Court, given upon the rule to show cause why a writ of mandamus should not issue, supposes that the Court relied much upon the inferences drawn from the language of Mr. Justice Johnson, in delivering the opinion of the Supreme Court of the United States, in the case of McIntire v. Wood, 7 Cranch, 504. That language is as follows: “ We are of opinion that the power of the circuit courts to issue the writ of mandamus is confined exclusively to those cases in which it may be necessary to the exercise of their jurisdiction. Had the 11th section of the Judiciary Act (of 1789,) covered,, the whole ground of the Constitution, there would be much reason for exercising this power, in many eases wherein some ministerial act is necessary to the completion of an individual right arising under the laws of the United Slates; and the 14th section of the same act would sanction the issuing of the writ for such a purpose. But although the judicial power of the United States extends to cases arising under the laws of the United States, the legislature have not thought proper to delegate the exercise of that power to its circuit courts, except in *243 certain specified cases. When questions arise, under those laws, in the State courts, and the party, who claims a right or privilege under them, is unsuccessful, an appeal is given to the Supreme Court; and this provision the legislature has thought sufficient, at present, for all the political purposes intended to be answered by the clause in the Constitution which relates to the subject.”
This is the whole of the opinion upon that point. The case was a case arising under the laws of the United States, it being a motion or a petition for a mandamus to the register of a land-office in Ohio, commanding him to issue a final certificate of purchase, to the plaintiff for certain lands in that State.
The inference from the language of that opinion is irresistible, that if the legislature had extended the jurisdiction of the circuit courts of the United States to. cases in law and equity arising under the laws of the United Státes, there might be cases in which it would be proper for those courts to issue the w'rit, and that the 14th section of the act, which gives to all the courts of the United States power to issue all writs necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law, would sanction the issuing of the writ.
But this inference is said to.have been repudiated by Judge Johnson himself, in delivering the opinion of the Supreme Court in the subsequent case of McClung v. Silliman, in 6 Wheaton, 598.
The only substantial difference between the case of McIntire v. Wood, and the case of McClung v. Silliman, which was brought up from the Circuit Court of the United States for the District of Ohio, is, that in the former, the controversy was between citizens of the same State, and the only ground of federal jurisdiction was, that it was a ease arising, under the laws of the United States. And in the latter (McClung v. Silliman,) it was a case arising under the laws of the United States, “between a citizen of the State where the suit was brought, and a citizen of another State.” - This last circumstance would have given the Circuit Court of Ohio jurisdiction of the case, if it had been one, of which a State court might have had jurisdiction. But inasmuch as a State court had no jurisdiction of cases arising under the laws of the United States, and the 11th section of the Judiciary-Act of 1789 only gave to the circuit courts a jurisdiction concurrent with the courts of the several States, the Circuit Court of the United States for Ohio, had not jurisdiction under the 11th section of the act, although the character of the parties would have'given it jurisdiction, if, from the nature of the subject-matter of the controversy, it had been a case of which a Stale court could have had jurisdiction. The same objection, therefore, to *244 the jurisdiction of the Circuit Court of the United States for Ohio, existed in McClung v. Silliman, as in McIntire v. Wood, namely, that there was no existing act of Congress which delegated to the circuit courts of the United States cognizance of “ cases arising under the laws of the United States.”
The 11th section of the Act of 1789, gives jurisdiction only upon the ground of the character of the parties, not upon the ground of the subject-matter of the controversy; and was only intended to give to parties of a certain description a right to prosecute, in the federal courts, the same causes of action which they .could prosecute in a State court. The words “ concurrent with the courts of the several States,” do not enlarge the jurisdiction of the State courts, but are restrictive of the general words “ all suits of a civil nature at common law or in equity,” which would, if not thus restrained, have comprehended “ cases arising under the laws of the United States.”
With this exposition and construction of the 11th section of the Act of 1789, there is no discrepancy between the opinions of the Supreme Court in those two cases; and the opinion in McClung v. Silliman, becomes perfectly intelligible.
Mr. Justice Johnson, in McClung v. Silliman, (6 Wheat. 599,) says : “In the case of McIntire v. Wood, decided in this court in 1813, the mandamus, contended for, was intended to perfect the same claim, and, in point of fact, the suit was between the same parties. The influence of that decision on these cases is resisted on the ground that it did not appear, in that case, that the controversy was between parties who, under the description of person, were entitled to maintain suits in the courts of the United States; whereas the averments, in the present case, show that the parties litigant are citizens of different Slates, and therefore competent parties in the Circuit Court. But we think it perfectly clear, from an examination of the decision alluded to, that it was wholly uninfluenced by any considerations drawn from the wrant of personal attributes of the parties. The case came up on a division of opinion, and the single question stated, was, ‘ whether that court had power to issue a writ of mandamus to the register of a land-office in Ohio, commanding him to issue a final certificate of purchase, to the plaintiff, for certain lands in that State.’ ‘ Both the argument of counsel, and the opinion of the court, distinctly show that the power to issue a mandamus, in that case, was contended for as incident to the judicial powers of the United States; and the reply of the court is, that though, argumenti gratia, it be admitted that this controlling power over its miffisterial officers ■would follow from vesting in its courts the whole judicial power of the United States, the argument fails here, since the legislature *245 has only made a partial delegation of the judicial powers to the circuit courts. That if the inference be admitted as far as the judicial power of the court actually extends,’ (namely, as we understand it, if the controlling power over ministerial officers would exist as far as the judicial power is actually granted to the circuit courts,) 1 still cases arising under the laws of the United States, are not, per se, among the cases comprised in the jurisdiction of the circuit courts', under the provisions of the 11th section (of the Act of 1789) ; jurisdiction being, in such cases, reserved to the Supreme Court, under the 25th section, by way of appeal from the decisions of the State courts.’ -
“ There is, then,” continues the judge, “ no just inference to be drawn from the decision, in the case of McIntire v. Wood, in favor of a case in which the circuit courts are vested with jurisdiction under the eleventh section.”
The word “then,” in that sentence, means “ thereforeand “ therefore ” means for the ,reason aforesaid; and the reason aforesaid is, that the eleventh section did not give the circuit courts jurisdiction of “ eases arising under the laws of the United States; ” and the reason, why the eleventh section did not give that jurisdiction, is, that the jurisdiction, thereby given, is a jurisdiction “ concurrent with the courts of the several States,” and, consequently, could be exercised only in cases of which the courts of the several States previously had cognizance ; that the courts of the several States had not, previously, cognizauce of cases arising under the laws of the United Stales; and therefore jurisdiction of those cases is not given to the-circuit, courts, by that section.
The inference, therefore, “ drawn from the decision, in the case of McIntire v. Wood,”- which is repudiated by Judge Johnson, is not the inference that if the legislature had extended the jurisdiction of the circuit courts of the United States to cases in law and equity arising under the laws of the United States, there might be cases in which it might be proper for those courts to issue the writ, and that the fourteenth section of the act would sanction the issuing of it; which is the inference which this Court drew, in giving its opinion upon the rule to show cause; and which, we are still of opinion, is a necessary inference from the language of Mr. Justice Johnson in that case, and which is in no manner impugned or repudiated by the same judge in the case of McClung v. Silliman.
Again, Mr. Justice Johnson, in the same case (p. 601,) says: “ It is now contended that, as the parties to this controversy are competent to sue under the eleventh section, being citizens of different States, this is a case within the provisions of the four *246 teenth section, and the Circuit Court was vested with power to issue this writ under the description of a “ writ not provided for by statute,” but “ necessary for the exercise of its jurisdiction.” The case, certainly, does present one of those instances of equivocal language, in which the proposition, though true in the abstract, is, in its application to the subject, glaringly incorrect.”
The proposition, which is thus said to be true in the abstract, is this : that as the parties were competent to sue, under the eleventh section, being citizens of different States, the fourteenth section gave the Court power to issue the writ of mandamus, under the description of a “ writ, not provided for by statute,” but “ necessary for the exercise of its jurisdiction.”
Here it may be proper to observe, that although in this case of McClung v. Silliman, the parties were competent to sue in the Circuit Court, yet the court had not jurisdiction of the subject-matter, it being a case arising under the laws of the United States.
The judge proceeded to say: “ It cannot be denied that the existence of this power is necessary to the exercise of jurisdiction in the court below; but why is it necessary ? Not because the court possesses jurisdiction, but because it does not possess it.” That is, as we understand it, the Court has no jurisdiction ; and if it can have any, it must be by first obtaining, by means of a mandamus, the document which is the object of the mandamus, and which will enable the party to sue at law.
The judge proceeds: “ It must exercise this power, and compel the emanation of the legal document, or the execution of the legal act, by the register of the land-office, or the party can1 not sue.
“ The fourteenth section of the act under consideration could only have been intended to vest the power, now contended for, in cases where the jurisdiction already exists, and not where it is to be courted or acquired by means of the writ proposed to be sued out.”
Here, again, the inference, from the language of the judge, is very strong, that in cases where the jurisdiction already exists, the fourteenth section was intended to vest the power of issuing the writ.
Again, in p. 604, the judge says : “ It is not easy to conceive on what legal ground a State tribunal can, in any instance, exercise the power of issuing a mandamus to the register of a land-office. The United States have not thought proper to delegate that power to their own courts. But when, in the case of Marbury v. Madison, and that of McIntire v. Wood, this Court decided against the exercise of that power, the idea never presented itself to any one that it was not within the scope of the *247 judicial powers of the United States, although not vested by law in the courts of the general government.”
If, then, the inference drawn by this Court from the decision and language of the Supreme Court in the case of Mclntire v. Wood, is an obvious and necessary inference, and is not impugned nor repudiated in that of McGlung v. Silliman, namely: that if the eleventh section had given to the circuit courts, cognizance of all cases in law and equity arising under the Constitution and laws of the United States, there would be much reason for exercising this power in many cases, and that the fourteenth section would sanction the issuing of it for such a purpose; and if we show that Congress has given to this Court cognizance of all eases in law and equity arising under the Constitution and laws of the United States, it will follow that there may be cases in which it may be proper for this Court to exercise the power ; and that Congress, by the third section of the Act of the 27th of February, 1801, [2 Stat. at Large,-103,] which gives to this Court the same powers which it had given to the other circuit courts by the fourteenth section of the Act of 1789, has given this Court the power to issue the writ; and the former opinion of the Court, so far as it rested upon the inference drawn from the decision and language of the Supreme Court in the case of McIntire v. Wood, is fully supported.
Under this head, it would, then, be only necessary to show that by the fifth section of the Act of the 27th of February, 1801, Congress has given to this Court cognizance of all cases in law and equity arising under the Constitution and laws of the United States.
That section, so far as it relates to this question, is in these words : “That the said court” (the Circuit Court of the District of Columbia) “shall have cognizance of all cases in law and equity between parties, both or either of which shall be resident or shall be found within the said district.”
These words are comprehensive enough to include “all cases in law or equity arising under the Constitution and laws of the United States.”
In the case of Cohens v. Virginia, (6 Wheat. 379,) Chief Justice Marshall, in delivering the unanimous opinion of the Supreme Court of the United States upon the question of jurisdiction, says, “The jurisdiction of the court, then, being extended, by the letter of the Constitution, to all cases arising under it, or under the laws of the United Stales, it follows that those who would withdraw any case, of this description, from that jurisdiction, must sustain the exemption they claim, on the spirit and true meaning of the Constitution ; which spirit and true meaning must be so apparent as to overrule the words which its framers have employed.”
*248 But it is contended, in the opinion of the Attorney-General, which the Postmaster-General has made part of his return, that “ there is no essential difference between the fifth section of the Act” (of the 27th of February, 1801,) “ concerning the District of Columbia, and the eleventh section of the Judiciary Act of 1789, which prescribes the jurisdiction of the other courts.”
“ The material words,” he says, “of the fifth section, omitting other classes of cases, are, that the Circuit Court of this district shall have cognizance of all cases in law and equity, between parties, both or either of which shall be resident, or shall be found, within the said district.
“ Those of the eleventh section, omitting value and alternative cases, are, that the circuit courts of the United States shall have cognizance of all suits of a civil nature, at common law, or in equity, where the dispute is between a citizen of the State where the suit is brought, and a citizen of another State, —
“Except that, in the other circuit courts, it is requisite that one parly should be a citizen of the State where the suit is brought, and the other party a citizen of another State; and that in this district it will be sufficient if either of the parties be resident, or be found here, there would seem to be no substantial difference between the two provisions. Indeed, unless the phrase, ‘ all cases in law and equity,’ means something different from ‘ all suits of a civil nature at common law or in equity,’ used in the other, it is certain that there can be no such difference, and, consequently, that the power and jurisdiction of the Circuit Court of this district, in regard to the writ of mandamus, so far as depends on the fifth section above quoted, are precisely the same with those of the other circuit courts.”
But the Attorney-General, in attempting to reduce these two sections to an equation, by striking out from both sides the terms which he deemed equivalent, has overlooked entirely, the words, “ concurrent with the courts of the several States,” in the eleventh section of the Act of 1789; which are the very words that constitute the essential difference between the extent of jurisdiction granted in the respective sections. If they had not been stricken out of the equation, that side of it which regards the eleventh section would have been stated thus: “ The circuit courts of the United States shall have original cognizance, concurrent with the courts of the several States, of all suits of a civil nature at common law or in equity,” where the suit is between a citizen of the State where the suit is brought, and a citizen of another State.”
The other side of the equation (that which regards the fifth sec-iton of the Act of the 27th of February, 1801, which gives jurisdiction to this Court,) would be, “ The said court ” (the Circuit
*249 Court of the District of Columbia,) “ shall have cognizance of all cases in law and equity between parties, both or either of which shall be resident, or be found, within said district.”
Again ; by striking out from both sides of the equation the personal attributes of the respective parties, and thus reducing it to its lowest and most simple terms, the equation will stand thus : —
By the eleventh section of By .the fifth section of the the Act of 1789, “the circuit Act of the 27th of February, courts” of the United States 1801, “the said court” (the “shall have original cognizance, Circuit Court of the District of concurrent with the courts of Columbia,) “shall have cogni-the several Slates, of all suits of zance” “ of all cases in law and a civil nature, at common law equity.” or in equity.”
Here it is evident that the jurisdiction given to the circuit courts of the United Slates, by the eleventh section of the Act of 1789, extends to those cases only of which the State courts then had cognizance. The State courts had then no cognizance of “cases arising under the Constitution, the laws of the United States, and treaties made under their authority,” nor of “ cases affecting ambassadors,” &c.
The Supreme Court of the United States, in the case of Martin v. Hunter, (1 Wheat, pp. 334, 335,) say: “ In the first place, as to cases arising under the Constitution, laws, and treaties of the United States: —
“ Here the State courts could not ordinarily possess a direct jurisdiction. The jurisdiction over such cases could not exist, in the State courts, previous to the adoption of the Constitution ; and it could not afterwards be directly conferred upon them ; for the Constitution expressly requires the judicial power to be vested in courts ordained and established by the United States.” And in page 337, they say: “It can only be in those cases where, previous to the Constitution, State tribunals possessed jurisdiction independent of national authority, that they can now constitutionally exercise a concurrent jurisdiction.”
It is true that in the State courts, in the exercise of their ordinary jurisdiction, questions, upon the construction of the Constitution, laws, and treaties of the United States, may incidentally arise, and must be decided by those courts; but it does not follow that therefore they have direct jurisdiction of cases in which the cause of action arises under, or for the violation of, a law of the United States.
In cases where they have jurisdiction of questions arising incidentally, in causes within their ordinary jurisdiction, provision is made for an appeal, or writ of error, to the Supreme Court of the *250 United States, under the twenty-fifth section of the Judiciary Act of 17S9.
Thus, the Supreme Court, in the same case of Martin v. Hunter, (p. 340,) say : “But it is plain that the framers of the Constitution did contemplate that cases within the judicial cognizance of the United States, not only might, but would, arise in the State courts, in the exercise of their ordinary jurisdiction.”
And again in page 342, they say: “ It was foreseen that in the exercise of their ordinary jurisdiction, State courts would incidentally take cognizance of cases arising under the Constitution, the laws, and treaties of the United States. Yet, to all these cases, the judicial power, by the very terms of the Constitution, is to extend. It cannot extend by original jurisdiction if that vras already rightfully and exclusively attached in the State courts, which, (as has been already shown,) may occur; it must therefore extend by appellate jurisdiction or not at all.”
But in the same case, (in p. 372,) Mr. Justice Johnson says, “That the real doubt is whether the State tribunals can constitutionally exercise jurisdiction in any of the cases to which the judicial power of the United States extends.”
However that may be, we think it clear that the concurrent jurisdiction of the State courts, referred to in the eleventh section of the Act of 1789, is the ordinary and direct jurisdiction which those courts possessed at the time of passing that act; and that the grant of jurisdiction, by that section, to the circuit courts, is to be measured by the ordinary and direct jurisdiction which the State courts then possessed. That as the ordinary and direct jurisdiction of the State courts did not then extend to cases arising under the Constitution and laws of the United States, the jurisdiction of the circuit courts of the United States, given by that section, did not extend to those cases.
The wmrds “ all suits of a civil nature at common law or in equity,” are sufficiently broad to comprehend “ all cases in law and equity, arising under the Constitution and laws of the United States,” and would have extended the jurisdiction of the circuit courts of the United States to those cases, but for the restraining words, “ concurrent with the courts of the several States,” provided the parties had been competent to litigate in those courts ; for, although Congress had power to give those courts jurisdiction of cases arising under the Constitution and laws of the United States, whatever- might be the character of the parties, yet they had a right to restrict it to cases in which the character of the parties also would enable them to sue in those courts. Thus, in the case of McClung v. Silliman, the Circuit Court of the United States, although the parties were competent to litigate *251 iti that court, had not jurisdiction of the case, because it was a “ case arising under the laws of the United States,” and the 11th section of the Judiciary Act of 1789 had not conferred upon the circuit courts of the United States jurisdiction in such cases. Although the parties were competent, yet the subject-matter of the controversy was not within the jurisdiction of the court. But if Congress, by the 11th section of the Act of 1789, had given to the circuit courts of the United States jurisdiction of all cases arising under the laws of the United States, although they should have confined that jurisdiction to the persons described in that section, the Circuit Court, in the case of Me Clung v. Silliman, would have had jurisdiction of the ease; 'for the subject-matter of the controversy, as well as the parties, would have been within the cognizance of the court.
That Congress claim a right thus to discriminate between persons, in granting jurisdiction of cases arising under the laws of the United States, appears from their having granted it in the ease of patents; and of the Bank of the United States; and of the Postmaster-General; and of all the officers of the United States, who, under the Act of the 3d of March, 1815, c. 782, § 4, [3 Stat. at Large, 244,] shall sue under the authority of any act of Congress. Congress could have given jurisdiction in those eases only on the ground that they were cases arising under the laws of the United States; for the characters of the parties did not furnish a ground, per se, of jurisdiction under the Constitution. See the Postmaster-General v. Early, 12 Wheat. 145, and Osborn v. Bank of United States, 9 Id. 825.
The words, “ concurrent with the courts of the several States,” therefore, in the 11th section, clearly excluded from the cognizance of the circuit courts, cases in law and equity, arising under the Constitution and laws of the United States. There are no such words in the 5th section of the Act of the 27th of February, 1801, which gives this Court its jurisdiction ; nor any other words to qualify or restrict the full force of the words “ all cases in law and equity.”
The argument, therefore, which was drawn from the similarity of the language of the two sections which have thus been compared, entirely fails.
But it has been contended, in argument, before this Court, that the intention of the legislature is the best guide to the true construction of a statute; and that the statute must be construed now as it would have been at the time it was passed ; and the Attorney-General,_ in his opinion, admits that this Court, when the case of Marbury v. Madison was decided, “ possessed precisely the same power, in this respect, which it possesses now.” *252 It was also contended, in argument, that as Congress had not thought proper, by the Act of 1789, to confer on the other circuit courts of the United States jurisdiction in cases arising under the Constitution and laws of the United Slates, it was not their intention to confer it on this Court, by the Act of the 27lh of February, 1801.
If it was intended, by Congress, to confer on this Court the same jurisdiction only which it had conferred on the other circuit courts of the United States, it is probable they would, instead of enacting the 5lh section, have referred to the laws giving that jurisdiction, as they had referred to them in the 3d section, for our powers. But the 5th section has no reference whatever to the jurisdiction given to those courts; and that jurisdiction, if referred to, would have been quite insufficient for the objects for which this Court was established. It would have given only the federal jurisdiction, and would not have provided a substitute for the State jurisdiction which had ceased to exist, upon the cession of the territory to the United States. The section, therefore, giving jurisdiction to this Court, was to be modelled so as to give the court all the federal and all the State jurisdiction. As there were no jealous rival jurisdictions here, it was unnecessary to discriminate between federal and State jurisdiction. The only judicial power which could be exercised here- was the judicial power of the United States. The only concern of the framers of the law was to give jurisdiction in language broad enough to cover the whole ground of federal and State judicial power.
The jurisdiction, therefore, which is given to this Court, cannot be limited by the terms in which judicial power has been meted ' out to the other courts of the United States by the Constitution. ■
But it may be' fairly inferred that 'Congress intended, by the Act of the 27th of February, 1801, to give this Court jurisdiction of cases arising under the laws and Constitution of the United States, because they had; on the 13th of the same month, given that jurisdiction, in express terms, to the other circuit courts, by the 11th section of the act of that date. By that section, it is, among other things, enacted, “ that the said circuit courts, respectively, shall have cognizance of all cases in law or equity, arising under the Constitution and laws of the United States, and treaties made, or which shall be made, under their authority.” “ And also of all actions or suits, matters or things, cognizable by the judicial authority of the United States, under and by virtue of the Constitution thereof, where the matter in dispute shall amount to four hundred dollars, and where original jurisdiction is not given, by the Constitution of the United States, to the Supreme Court thereof, or exclusive jurisdiction, by law, to the district courts of the United States.”
*253 It would have been strange, indeed, if Congress should have given this jurisdiction io every-other circuit court, and refused it to that of the District of Columbia, where there was no other court to take jurisdiction of those cases; where there was no jealous rival to be offended at the'grant of jurisdiction; and where every possible case that can arise is a case arising under the Constitution and laws of the United States.
And still more strange would it be, if that should be adjudged to be the true construction of the 5th section of the Act of the 27th February, 1801, the words of which are so comprehensive that it was not necessary to introduce the words, “arising under the laws of the United States,” after the words “ all cases in law and equity; ” for these words include all cases in law and equity, arising under the general laws of the United States, as well as under those adopted by Congress as the laws of this district.
That Congress had in view the Act of the 13th of February, 1801, when they passed the Act of the 27th of February, 1801, appears from the terms of the 3d section of the latter act, by which they say, that “the said court and the judges thereof shall have all the powers by law vested in the circuit courts, and the judges of the circuit courts of the United States.”
Until the 13th of February, 1801, the office of a judge of the Circuit Court of the United. States had never existed. The old circuit courts which were abolished on the 13th of February, • 1801, had been always held by a judge, or judges of the Supreme Court, and the judge of the District Court, neither of whom was ever called, either legally, or in common parlance, a judge of the Circuit Court. The judges of the circuit courts, therefore, to whose powers reference is had in the 3d section of the act of the 27th February, 1801, must have been the new judges whose offices had been created by the act of the 13th of February, 1801.
That act was in full force on the 27th of February, 1801, and it is of no importance whether the courts rvhich were thereby oydained and established, had or had not been organized, or whether the judges had or had not been appointed before the 27th of February. The reference, in the third section of the Act concerning the District of Columbia, to the circuit courts, and the judges of the circuit courts of the United States, must have alluded to the powers vested by law in those courts and judges as they were newly organized by the act of the 13th of February; and those powers would be the same, whether the new circuit courts were, or were not organized, and whether the new judges were, or were not appointed before the 27th of February. But, so far as the extent of the powers vested in this *254 Court by the act of that date is concerned, it is perfectly immaterial whether the reference in the third section of the Act is to the powers given to the circuit courts of the United States by the Act of the 13th of February, 1801, or by the Judiciary Act of the 24th of September, 1789, for the powers are the same ; as appears by reference to the 10th section of the Act of the 13th of February, which is in these words:
“ And be it further enacted, That the Circuit Court shall have, and are hereby invested with all the powers heretofore granted by law to the circuit courts of the United States, unless where otherwise provided by this act.”
The act of the 13th of February, continued in full force until the 1st of July, 1802. From the 27th of February, 1801, to the 1st of July, 1802, therefore, there could be no doubt as to the extent of the powers of this Court; and the construction of the Act of the 27th February, 1801, must be the same now as it was then, unless it has been altered by some act subsequently passed. None has since been passed, in any manner restricting the powers of this Court as they then existed. We still have, as we had then, all the powers which were by the 14th section of the Judiciary Act of 1789, vested in the circuit courts of the United States; which powers have been found abundantly sufficient (with the aid of some small powers given by subsequent statutes,) for the exercise of the jurisdiction given by the 5th section of the Act of the 27th of February. But none of our powers are derived from, or dependent upon, the Act of the 13th of February, 1801, or the Judiciary Act of 1789.
The 3d section of the Act of the 27th of February, 1801, does not refer expressly to any particular act of Congress, but to the powers which were then, by law, vested in the circuit courts, and the judges of the circuit courts of the United States; not the powers which had been, at any prior period, or might, at any future time, be vested in those courts and judges; but the powers as they then existed. Our powers were then as well ascertained and fixed as if they had been particularly enumerated and minutely described in the Act of the 27th of February, which established this Court. No subsequent alteration, or modification, or repeal of the powers of the other circuit courts could affect our powers ; and there is nothing in the Act of the 27th of February which can justify the assumption that our powers “were to be the same with those of the circuit courts, and the judges of the circuit courts of the United States, as they should, from time to time, be vested by law in those courts and judges.”
As the Act of the 27th of February, 1801, was not in any manner dependent on that of the 13th of February, the repeal of the latter could not affect the former.
*255 The Act of the 13lh of February was referred to in the former opinion of this Court, for the purpose of showing that the casfes of McIntire v. Wood, and McClung v. Silliman, would probably have been differently decided, if that act had been in force at the time of those decisions ; because those cases were decided upon the ground that Congress had not, by the 11th section of the Act of 1789, given to the circuit courts of the United States, jurisdiction of eases arising under the Constitution and laws of the United States, which jurisdiction had been given by the 11th section of the repealed Act of the 13th of,February, 1801.
Another motive for referring to that act was, to show that Congress had given to the other circuit courts, jurisdiction of cases arising under the laws of the United States, at the time when they gave jurisdiction to this Court, and thence to infer that they had conferred the same jurisdiction upon this Court.
In our former opinion it was said that the only point decided in-the case of McClung v. Silliman was, that “ a State court cannot issue a mandamus to an officer of the United States.” ,
Upon examining the record of that ease in the office of the. clerk of the Supreme Court, it appears that there were two cases brought up by writ of error; one of them from the State court, and the other from the Circuit Court of the United States. The former was decided by the State court in 1815, and the other by the Circuit Court of the United States in 1821, or 1822. Both causes were argued before the Supreme Court as one case, and both were decided by that Court; so that the question respecting the jurisdiction of the Circuit Court was decided, as well as that respecting the jurisdiction of the State court. We were led into the mistake by the marginal note of the reporter, as well as by some expressions of the judge. Our mistake, however, did not affect our opinion.
We place no reliance on the difference between a ease and a suit. If there is any difference, however, the word case is more comprehensive than the word suit. A case must exist of which a Court may take cognizance before a suit can be brought upon it.
After reconsidering the former opinion of the Court in this case, with all the light thrown upon it by the opinion of the Attorney-General, and the argument of the District Attorney, we are still of opinion that this Court has jurisdiction in cases arising under the laws of the United States, and that the cases of McIntire v. Wood, and McClung v. Silliman, so far from showing that it has not power to issue a writ of mandamus to a ministerial officer of the United States, afford strong ground of inference that it has the power, because it has that jurisdiction, the want of which was the ground of the decisions in those cases.
*256 1. The Court is, then, obliged to consider the first reason assigned by the Postmaster-General for declining to obey the mandamus, which is,
That it is doubted whether the Constitution of the United States confers, on the judiciary department of the government, authority to control the Executive Department in the exercise of its functions, of whatsoever character.
A question of jurisdiction, however suggested, should always be well considered by the Court; and in the present case it has become a highly important question, as it involves the construction of the Constitution of the United States upon the respective powers and duties of two of the great constitutional departments of the government.
Before we proceed to examine the grounds upon which the supposed conflicting powers are respectively claimed, much discussion may be prevented by ascertaining, as exactly as we can, the extent of the powers claimed, and the points conceded on one side and the other.
In the first place the judiciary department is understood as disclaiming all right to control any executive officer in the exercise of functions, in the discharge of which he is to use his own discretion, or is legally bound to act according to the will of his superior. The word “ control ” seems in itself to imply that the party to be controlled has power to exercise his functions, or discharge his duty, in several different ways. It is not the word, therefore, which expresses correctly the kind of power or authority asserted by a court when"it issues its mandamus. To “ control ” properly means to keep under check ; to govern; to restrain. A mandamus is a simple command to a person to do an act which he is bound by law to do, and which he has no lawful right to refuse to do.
In the present ease, the mandamus asked for is a writ commanding the Postmaster-General to do an act which a statute positively requires him to do ; which he cannot lawfully refuse to do ; and in regard to the doing of which he is not bound to act according to the will of any superior officer; the Court therefore, in issuing the mandamus, does not attempt to control him in his executive functions.
The question, therefore, proposed by the Postmaster-General, is not the true question presented in the present case. The abstract proposition, arising upon the case, is, that this Court has power to issue a mandamus to an executive officer of the United States, commanding him to do a ministerial official act which he is positively required by law to do ; over which he has no discretion, and in regard to which he is not bound, by law, to act ae- *257 cording to the will of another, and by his refusal to do which, an individual has sustained, or will sustain, injury. This seems to be the only claim of power which it is necessary for this Court to make, in order to support the mandamus in the present case.
On the other side it is admitted by the Attorney-General, in his opinion appended to the answer of the Postmaster-General, and was also admitted by the District Attorney in his argument, “ that where a vested legal right has been violated by a public officer; or where a specific duty, on the performance of which individual rights depend, is assigned by law to an officer, and he refuses to perform it, the individual, who considers himself aggrieved, has a right to resort to the laws of his country for a remedy ; and that the conduct of the officer is liable to be judicially examined; and that this, if ever doubtful, is now too well settled to be disputed. Actions of trespass, and other actions, for damages against collectors of the customs, officers of the army and navy, and other public functionaries, for official acts or omissions injurious to the vested rights of individuals, are of frequent occurrence; and it is not to be doubted that, through such actions, any officer of the government, the President included, may be held responsible in damages for the violation of any vested legal right. But these actions,” (it is said) “ are against the officer in his individual character, and do not imply any power, in the judicial tribunals in which they may be prosecuted, to supervise and control, in advance, the official action of the officer.”
Again, in the opinion of the Attorney-General, it is said : “ The obvious design of all these provisions,” (that the executive power shall be vested in a President of the United States; that he shall take care that the laws be faithfully executed ; and that he shall have power to appoint and remove the executive officers,) “ was, to make the President responsible for the faithful execution of the laws, and for the official acts of all the officers of the executive department. Not that he should be liable to impeachment, or other criminal procedure, or to a civil action, for every illegal act, or culpable omission of each one of those officers.” “ Nor that the inferior officer should be exempt from personal liability to impeachment, indictment, or civil action, for any culpable act, or omission of duty, even though he may be able to plead, in his excuse, the express direction of the President. But it is possible for the President, through the heads of the executive departments, to give more or less attention to the proceedings of each department, and to take care that the laws concerning it be faithfully executed; and it is agreeable to reason, and to the rules of law, that where two persons unite in the performance of an illegal act, or in a culpable omission of duty, each, to a greater or less ex *258 tent, and according to the circumstances of the case, should be personally responsible, although one of them may have an official superiority to the other. This species of responsibility it was the design of the Constitution to fasten upon the President; and hence it vests in him, and in him alone, with a few specified exceptions, the whole executive power of the government.”
Again, he says: “ It belongs to the legislature to create the executive departments; to define their powers and duties; to provide the requisite officers; to prescribe their various functions; and to make all other legal provisions, which may be necessary and proper to regulate the action of those departments. But when a law is once passed for the government of the executive officer, all that appertains to its execution falls under the care of the President. It is his province to instruct and command the officer ; to remove him if he acts unfaithfully ; and to appoint one in his place who will fulfil his duty agreeably to law.”
The Attorney-General, also, at the commencement of his opinion, dated on the 19th of June, 1837, states the facts of the case as follows:
“ The case proposed by you, in your communication of the 29th nit. and now presented, relates to the power of the Circuit Court of this District to issue a mandamus to the Postmaster-General, an executive officer of the United States, for the purpose of compelling him to perform an official act, alleged to have been enjoined upon him by a special act of Congress passed for the relief of the parties applying for the writ. This treats exclusively of certáin claims depending in the Post-Office Department, and growing out of contracts with that department ; it refers these claims to the Solicitor of the Treasury for settlement; and it directs the Postmaster-General to credit the contractors with whatsoever sum of money, if any, the solicitor shall decide to be due them. The duty, imposed by this law, is, therefore, in every sense, an official duty; it relates to the business of his department; it is imposed upon him by his name of office. The Solicitor of the Treasury has made an award, by which he decides that certain sums of money are due to the contractors ; and the Postmaster-General has credited them with a part of these sums ; but, for reasons satisfactory to his own judgment and sense of duty, has refused to credit the balance until directed so to do by a further act of Congress. The contractors have applied to the late President of the United States, to take order, by virtue of his constitutional duty to see the laws faithfully executed, for the crediting of the balance; but, being satisfied with the course of the Postmaster-General, he declined making any such order, and referred the parties to Congress for further legislative directions. The like application has been made to the *259 present Chief Magistrate, who deemed it inexpedient to interfere with the disposition of the subject made by his predecessor ; and the parties now apply to the Circuit Court of this district for an order, in the form of a writ of mandamus, to the Postmaster-General to credit and pay the balance of the Solicitor’s award, on the ground that this is a mere ministerial act, to the performance of which the applicants have a fixed legal right under the Act of Congress as it now stands, and for which they have no other adequate legal remedy.”
The admissions, in these extracts, respecting the personal liability of the executive officers, and the power of the legislature to create executive departments and officers, make it unnecessary to refer to the large class of cases in "which the courts have decided that executive officers rvere liable, in actions at law, for injuries done to individuals by such officers, in the erroneous or illegal exercise of their functions, although acting under the orders of their superior officers, whose orders, if warranted by law, they were bound in law to obey.
It being admitted, then, that these executive officers are personally liable at law, for damages in the ordinary forms of action, for illegal, official, ministerial acts or omissions, the inquiry seems to be reduced to the question whether, when it is still in the power of an officer to do the act, the unlawful refusal to do which has already made him liable to an action at law for damages, the Court has not power to issue the writ of mandamus, commanding him to do it, instead of a capias to arrest his body for not having done it. What is there in the official character of the officer to deprive the Court of this power, or to render it improper in the Court to exercise it ? Or, in the language of the Supreme Court of the United States in the case of Marbury v. Madison, we may ask, “If it be no intermeddling with a subject over which the executive cán be considered as having exercised any control, what is there, in the exalted station of the officer, which shall bar a citizen from asserting, in a court of justice, his legal rights, or shall forbid the Court to listen to the claim, or to issue a mandamus directing the performance of a duty not depending on executive discretion, but on particular acts of Congress and the general principles of law ?
“If one of the heads of the departments commits an illegal act, under color of his office, by which an individual sustains an injury, it cannot be pretended that hiá office alone exempts him from being sued in the ordinary mode of proceeding, and being compelled to obey the judgment of the law. How, then, can his office exempt him from this particular mode of deciding on the legality of his conduct, if the case be such a case as would, were *260 any other individual the party complained of, authorize the process ? It is not by the office of the person to whom the writ is directed, but the nature of the thing to be done, that the propriety or impropriety of issuing a mandamus is to be determined. Where the head of a department acts in a case in which executive discretion is to be exercised, in which he is the mere organ of the executive will, it is again repeated, that any application, to a court to control, in any respect, his conduct, would be rejected without hesitation. But where he is directed by law to do a certain act, affecting the absolute rights of individuals, in the performance of which he is not placed under the particular direction of the President, and the performance of which the President cannot lawfully forbid, and is, therefore, never presumed to have forbidden, it is not perceived on what ground the courts of the country are further excused from the duty of giving judgment that right be done to an injured-individual, than if the same services were to be performed by a person not the head of a department.”
The force of this opinion, it is suggested, is much impaired by the observations made by Chief Justice Marshall himself, in the subsequent case of Cohens v. Virginia, in 6 Wheat. 399, where he says, “It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious: the question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it are considered in relation to the ease decided, but their possible bearing in all other cases is seldom completely investigated. In the case of Marbury v. Madison, the single question before the court, so far as that case can be applied to this,” (that is, to the case of Cohen,) “ was whether the legislature could give this court original jurisdiction in a case in which the Constitution had clearly not given it, and in which no doubt respecting the construction of the article could possibly be raised. The court decided, and we think very properly, that the legislature could not give original jurisdiction in such a case; but in the reasoning of the court in support of this decision, some expressions are used which go far beyond it.”
Here it is evident that the expressions alluded to were used in support of the decision that the legislature could not give original jurisdiction in such a case; and not those used in support of those parts of the opinion of the Supreme Court, in the case of Marbury v. Madison, which were cited by this Court in its former opinion, and which are again cited in this; and which are, there *261 fore, in no manner affected by these obervations of the Chief Justice, further than'the maxim, which he lays down, may be supposed to affect the extent of the language used.
"Whatever odium may be attempted to be cast upon those parts of the opinion of the Supreme Court in that case, and whether they can be considered as authoritative judicial decisions, binding upon this Court, or only as obiter dicta, yet they must be considered as the opinions of six learned judges constituting the highest judicial tribunal of the country to which can be referred the ultimate decision of all constitutional questions, never revoked nor reversed.
The sentiments they contain are based on thé soundest principles of civil liberty, and have never been answered, and can never be answered, without invoking principles which tend to set the executive authority above the restraints of law.
But they are now attempted to be obviated, and we will consider in what manner.
It is premised that, by the theory of our government, the three great departments, the legislative, executive, and judicial, are to be kept so distinct that one cannot exercise any portion of the power which properly belongs to the other. That whatever power is in its nature executive, can be constitutionally exercised only by. an executive officer; and whatever power is in its nature judicial, can only be exercised by courts and judges constitutionally established and appointed.
It is, then, contended that the Constitution, by declaring that “the executive power shall be vested in a President of the United States,” and that “ he shall take care that the laws be faithfully executed; ” and by giving him the power of appointment and removal of all executive officers, has vested “in him and in him alone,” with a few exceptions, “the whole executive power of the government.”
“ That the obvious design of these provisions was, to make the President responsible for the faithful execution of the laws, and for the official acts of all the officers of the executive department.” “ That the executive officers are his agents, for whom he is held responsible to the people, whose agent he is.” That “ the acts of the executive officers are the acts of the President; that constitutionally he is as responsible for them as if they were done by himself; though not morally. That, so far as regards the execution of the laws, therefore, no distinction can be maintained between the acts of the President and those of his subordinate officers. That in law they are all the acts of the President.” That when a mandamus issues from the judiciary to an executive ministerial officer, commanding him to do a merely *262 ministerial act which he is absolutely required by an act of Congress to do, which he cannot lawfully refuse to do, and which the President cannot lawfully forbid him to do, it is said l! they attempt to control the executive power, to assume the functions of the President, and to make themselves the executive in the last resort; superior to the executive created by the Constitution, and elected by the people.”
This argument rests, almost entirely, upon the force of the word “ control; ” which, as before suggested, implies an interference with some right or power of the person to be controlled. To command a person to do what, by law, he is bound to do, and what he has no right to refuse to do, is not to control him in the exercise of any of his functions, but to compel him to execute them. Before it can be shown that such a mandamus as is above described would control the executive in any of its functions, it must appear that the executive has a discretion to do or not to do the thing commanded. If it has no lawful right to judge whether the thing shall or shall not be done, if it has no lawful authority to forbid the officer to obey the law, what function of the executive is interfered with by the mandamus ? Will it be said that the officer has a right to refuse to obey the law,' and throw himself upon his responsibility to the President ? Or, that the President, throwing himself upon his responsibility to the people, has a right to command him to disobey the law ? If such things should be done, they must be acknowledged to be violations of the law; and could only be done under a hope that the emergency of the case would palliate, if not justify, the act, and that the offence would be politically pardoned by the people. Will it be said that the officer has a right to refuse obedience to the law, and throw himself upon his personal responsibility in damages to the injured party ? This would be a wrong done to the party; and a man can never have a right to do wrong.
But it is contended that the officer is officially responsible to the President alone; and that the President alone has the right to command him to do his duty; and that the Court has no right to do that which it is the duty of the President to do, namely, to command the officer to do his duty.
This proposition raises the questions, What is the relation between the executive and the judicial departments of the government ? What is the line which separates the rights and duties of the one from those of the other ? And how far one may tread upon the ground of the other ?
The three great departments of this government are only branches of the sovereign power of the nation, each exercising its functions in the name and under the authority of that sovereign *263 power. When the President does an act in virtue of his office, it is the act of the sovereign power. So when the judiciary does a judicial act, it is still the act of the same sovereign power. When a mandamus is sent by a court to an executive officer, it is not the court that commands, but the sovereign power. All commands from the Court are issued in the name, and by the authority of, the United States. In each case, it is the whole sovereign power acting by its appropriate organ. The executive and judicial departments are not rivals. They must unite their functions, or the laws cannot be executed. The President is as dependent on the judiciary to enable him to see that the laws be faithfully executed, as the judiciary is on him to enforce its judgments. The moment a litigation arises, whether upon the law or the fact, the power of the President to see that the laws be executed in that case, by any other than judicial process, ceases until the litigation is closed by the judgment of the Court, and the sovereign power commands the proper executive officer to execute that judgment. The duty of the President is as obligatory to see the laws executed through the instrumentality of the judicial tribunals, as it is to see them executed when a resort to those tribunals is not necessary. Thé separation, therefore, of the executive from the judicial power, is not as complete as has been supposed. The executive cannot see that the laws be executed but in the due forms of law. The principles of Magna Ckarta are quite as obligatory upon our executive as the charter itself was upon the kings of England. Nullas liber homo capiatur, &e., nec super eumibi-mus, nec super eum mittimus, nisi per legale judicium parium suo-rum, vel per legem terree. No free man shall be seized, &c., nor will we pass upon him, or condemn him, but by the lawful judgment of his peers, or by the law of the land. The words “per legem terree,” Lord Coke says, mean “by due process of law; ” and that this chapter is but declaratory of the old law of England. (2 Inst. 50.)
In England, the whole sovereign power was, in ancient times, vested, or supposed to be vested, in the king. It was called his realm, his laws, his parliament, his judges, &c. The liberties, recited in Magna Charta, were said to be granted by the king to his subjects; and in the old statutes it is said that the king grant-eth, or ordaineth, &e.; and even now the statutes are said to be enacted “by the King’s most excellent majesty, and with the advice and consent of the lords spiritual and temporal, and the commons,” &c. And even when the authority of parliament was well established, only two powers were acknowledged in the government; the executive, and the legislative. The judicial was not known as a separate power ; but was, both in theory and *264 practice, a part of the executive. The king, at the common law, by his prerogative, had the power, as chief magistrate of the nation, to erect tribunals of justice; to define their powers and duties ; to create offices ; and appoint and remove officers ; and to appoint the judges, and limit the tenure of their office. There could be i^o contest between the executive and judicial power; for the whole was executive. The king had a control over the whole for the purpose of seeing that the laws were executed ; and that power he delegated to his Court of King’s Bench, it being the highest court erected under his authority. The other courts, however, silting in Westminster Hall, are not inferior courts. In these courts, the king, in the eye of the law, is always present, though he cannot personally distribute justice. (1 Bl. Com. 270.) To these courts, therefore, in which the king was supposed to be always present, at least by his judges, it was not necessary that a writ of mandamus should issue. The Court of King’s Bench, in issuing the writ of mandamus, can only be considered as exercising, for the king and in his name, that part of his executive duty which required him to see that the laws were faithfully executed ; a prerogative conferred upon him, by the common law, for the benefit of his subjects.
The prerogatives of the king were of two kinds; first, those which belong strictly to the person of the king; and, second, such as regarded him in his political capacity only; as the supreme head, and chief magistrate of the nation ; as the representative of the sovereignty of the people ; as the administrator of the laws, and as the general conservator of the peace of his dominions.
This second class of prerogatives passed from the king to his colonies, and was exercised under the charters, or royal governments, which, by virtue of his prerogative, he granted or established in this country; and, at the Revolution, passed from them to the several States as they respectively assumed self-government.
The writ of mandamus was founded upon the king’s prerogative of seeing that the laws were faithfully executed, and is, therefore, called a prerogative writ. It was one of the means by which he executed that part of his duty. It was, in truth, an executive proceeding through the instrumentality of his court.
When the prerogative came to this country, and was received into the colonies as part of their respective laws and systems of government, it was accompanied by the judicial aid of a writ of mandamus, to enable the executive power to see that the laws were faithfully executed. It has been before observed, that the executive power cannot cause all the laws to be executed without, the aid of the judicial, because the laws must be executed by due *265 process of law. Thus the bringing of a man before the Court is an executive act, but it must be done in due form of law. For this purpose the sovereign power, by means of a judicial tribunal, sends a writ, commanding the executive to take the body of the person and bring him before the Court. When the cause is-decided and judgment rendered, the same sovereign power sends to the executive another writ commanding him to see that the judgment be executed. Why is not this an interference with the functions of the executive ? Because the executive cannot perform its duty of seeing the laws faithfully executed without the intervention of the judicial power.
So, the executive cannot execute the same duty, even in regard to a subordinate executive officer, where the rights of a third person are concerned, without the intervention of the judicial power, by means of a writ of mandamus, in cases where that is the appropriate remedy; for the only other power which the executive has to cause the law to be executed in that case, is to remove the officer and appoint another. But this does not execute the law; and if it should be the means of causing the law to be executed, yet, whether that means would be used or not, would depend upon the will of the executive, or upon his opinion of the law, or of the manner in which it ought to be executed ; and whatever that opinion might be, it could not be obligatory upon the injured individual; and if that opinion should be against him, the ease must still be referred to a judicial tribunal, before the executive would be able to cause the law, in that ease, to be executed. A writ of mandamus, therefore, is as much a means given to the executive to enable him to cause the laws to be faithfully executed, as a common capias ad respondendum, or a fieri facias, or any other writ devised by the judicial power, is to enable the executive to'discharge that important duty. Surely, the executive cannot complain that the court has furnished him with an additional means of discharging his duty. There is no more interference of the judiciary with the executive, in one case than in the other. Surely the President, upon whom is devolved the high prerogative of seeing that the laws be faithfully executed, will not object to the court’s furnishing him with the high prerogative writ which enables him to execute that high prerogative.
When, therefore, we look closely into the nature of judicial and executive power, and see how nearly they are allied; when we see how necessary they are to each other in the discharge of the duties of both departments; when we look into the origin and nature of the writ of mandamus, and find it to be a prerogative writ to enable the executive, by means of the instrumentality of the courts, to exercise his high prerogative of seeing that the *266 laws are faithfully executed; when we see that the executive may not be able to cause the law to be executed, without the intervention of the court; (for if, as the Postmaster-General asserts in his answer, “ the whole power of the Court would be impotent to control an honest man, if he were conscientious in his refusal,” surely he would not be coerced by the fear of removal); when we find that the liing of England, long before our Revolution, had submitted this part of his prerogative, as well as many other of his executive powers, to his courts; that the right to issue this writ, as well as the writs in the other forms of action, had been delegated to these courts, and that this right came to this country, and was adopted and used by the courts as part of their judicial power, (although it was originally an executive function,) and thereby became part of the judicial power; when, also, we consider that the Court has, confessedly, the power to call the officer before it, in some form of action, to examine into the legality of the manner in which he has discharged his official functions, in the particular case presented to the court for its consideration, and to render judgment against him for damages, if he has acted illegally, even though he acted under the orders of the President; when we find that a writ of mandamus is often used to enable a party to obtain a specific legal remedy, which he could not obtain by any other form of action, we cannot see why the official responsibility of the Postmaster-General to the President, whatever it may be, should prevent the Court, at the instance of the supposed injured individual, from inquiring, in this form of action, whether the officer had ox had not discharged the duty required of him by law, in relation to that individual.
It is true that the Postmaster-General has the same right which every other man has, when he has a duty to perform, to decide whether he will perform it or not, or in what manner he will perform it. But then he decides at his peril, and for himself alone. His judgment cannot bind any other person, nor give any validity to his act. The President, also, as between him and his subordinate officer, may decide, for himself, whether the officer has discharged his duty; but that decision cannot bind a third person. Whatever the responsibility may be, between the officer and the President, it is no concern of the injured individual; it is only an official responsibility which does not affect him. And as to the responsibility of the President to the people, it is a mere political responsibility to the public, at the ballot-box, which, if effectual, in fact, as to the President, would afford no satisfaction to the applicant for redress.
But it is said that “the sole constitutional function of the judges is to expound the laws.” That if the law is so plain as *267 not to need exposition, there is no ease for judicial cognizance, and the law may be executed by the executive, without judicial intervention. Hence, it seems to be inferred, that, as the Court, in its former opinion, admitted that the law was plain, this is not a case cognizable by a judicial tribunal.
The only answer necessary to this objection is, that it is the duty of the Court, not only to expound, but to enforce, the law; that although the law may be plain, and the facts plain, yet if the defendant refuses to obey the law, some sort of judicial process may be necessary to compel him to obey it; and such process cannot be obtained but in due course of law, and in a case brought judicially before the proper tribunal.
Again, it is contended, that, as the Court has no power to execute its judgment without the aid of the executive, it has no power to issue the writ.
The argument, in favor of this seeming non sequilur, is as follows: “The sole constitutional function of the judges is to expound the laws. It is the function and duty of the executive to see them faithfully executed.” “ If the laws could be precisely adapted to every case, there would be no need for a judiciary to expound them. The executive authority could proceed, forthwith, to carry them into execution.” “ The practical exercise of executive power is more remote- in cases which go before the judicial tribunals, but it is the same in principle.” “ Laws which require no exposition are executed without the intervention of the judicial power. Laws which require exposition are executed after that exposition has been given by the judicial power; but, in both cases, the execution is, or should be, according to the Constitution, exclusively the work of the executive.” “ The judges have no effectual means of executing the law. They might imprison the executive officer, but they could not remove him. Imprisonment might not accomplish the object. The Court could not guide his hand nor control his will. If he were conscientious in his refusal, or wished to appear so, no imprisonment, nor pains, nor penalties could compel him to do an act which, in his opinion, violated his oath of office. The whole power of the Court would be impotent to control an honest man.”
“ The inadequacy of the judicial process, and the ample power vested in the President, are conclusive proof that the President, and not the Court, was intended to be the controlling authority in all such cases.” “Suppose the laws require a specific act of the President himself, involving private rights, which he refuses to perform. The courts have as much law for issuing a mandamus against him as against any of his subordinates, in a like case. It is a case, as much as that of which the Court has already assumed *268 jurisdiction. The President disobeys the mandamus, and they send an attachment. By whom do they send it ? By a marshal holding his office at the will of the President, who can strike their process dead in his hands, by dismissing him on the spot. This fact proves the absurdity of the power assumed. And that which the President can legally do to protect himself he can do to protect any of his agents; being always responsible to his country for the proper exercise of his power. But suppose the Court succeed in arresting the President, and put him in the county jail; where then is the supreme executive power of this great Republic ? Transferred from the President’s house to the City Hall. From the chief magistrate elected by the people of the whole United States, to the three judges of the District of Columbia. The arrest and imprisonment of an executive officer, as such, involves the same principles, and would lead to the same consequences, in a greater or less degree according to the importance of the station held by him.” “The idea that courts are the only places where wrongs of all sorts are to be redressed, and the judges the only dispensers of right, is an error. Where the inferior executive officer, or even the President himself, refuses to perform his executive duties, there is an obvious mode of redress, without the interposition of the judicial authority.
“If a subordinate executive officer refuses to perform a ministerial act positively enjoined upon him by law, the injured citizen may appeal to the President, whose duty it is to take care that the laws be faithfully executed, and has power to turn out a perverse subordinate. If the case be so very plain, the President will, at once, enforce an execution of the law, and the citizen will have effectual redress; ‘ though this Court has not jurisdiction.’ If the ease be not so very plain, the matter may be referred back to Congress, to make it plain by further legislation. And thus the citizen would have complete redress, without the aid of the Court. There is a process by which the President himself may be reached for a perverse refusal to execute the laws, or take care that they be executed, and a chief magistrate, who will do his duty, put in his place.
“ Thus there are ample means provided by the Constitution to enable the citizen to obtain his rights at the hand of the executive, without erecting any court into a supreme controlling power over the President and the whole corps of executive officers.
“Indeed, the Court has not, in the Constitution and laws, the means to give redress in such cases.
“ Before they can control the President, they must assume the power to appoint their own marshal, and execute their own mandates. They must do more; they must proceed to the executive *269 offices ; must enter credits with their own hands ; must issue warrants ; and, finally, with their own hands, take the money out of the treasury.”
“ The existence of such a power in the judiciary is repugnant to the whole theory of the Constitution. *Its effectual exertion, if it were practicable, would defeat the President’s power of removal, would take away his responsibility for the faithful execution of the laws, and would transfer to the judiciary, in the particular case, the whole executive power; for it is palpable that if the President, under the belief that the faithful execution of the law will be best secured by not doing a particular thing which is demanded by a third party, so directs the executive officer, and the Court, on the application of such party, issues a mandamus commanding it to be done, and the writ is obeyed, it is the Court, and not the President, that exercises the executive power ; and the distribution of powers, so carefully fixed by the Constitution, is unsettled and overturned. But its effectual execution is not practicable; because the President’s power of removal cannot be restrained ; and by its exercise he can readily defeat any command which the judiciary may address to the executive officer.
“ To illustrate this, let us suppose that the Circuit Court of this district issue a peremptory mandamus to the head of one of the departments, commanding him to execute any particular law, concerning his particular duties, in a given way, and that the officer refuses obedience and is attached and committed for the contempt. This is the end of judicial power in a case of mandamus ; but suppose that at this stage of the proceedings the President interferes by removing the officer and appointing a successor, what then becomes of the judicial remedy ? The act can only be performed by a person holding the officé; the individual, in the custody of the Court, no longer holds the office; it has been legally taken from him; and if he were ever so willing to perform the act, he has rio longer the ability to do so. The proceeding must then be abandoned, or commenced de novo against the new officer ; to be frustrated, if the President thinks proper, at the same stage, as often as the Court shall reach it. If it be said that this is supposing an extreme case, and that the President, from respect to the judiciary, would probably suffer the officer to obey the mandamus rather than to exercise the constitutional power of removal ; the answer is, that the very existence of such a power, whether it be used or not, is fatal to the claim of jurisdiction; and that cases may easily be supposed, in which the President, with the strongest desire to avoid a conflict with the judiciary, may yet have no alternative but to use it.
“ In cases which properly refer themselves to the judiciary, it *270 is rarely, or never, possible to defeat, in this way, the ultimate execution of the judgment of the Court; and the fact, that without the consent of the executive department, a peremptory man-clamus, to an executive officer, must forever remain inoperative, exhibits, in the clearest light, the incapacity of any court to issue the writ.”
The argument, upon this. point, has been thus fully stated, in the language of the return of the mandamus, and of the opinion of the Attorney-General of the United States, annexed to it, that its full force may be perceived. It is, in substance, that the Court has no power to issue the writ, because the President could defeat its execution by dismissing the marshal who comes to serve an attachment of contempt, which is the regular process to enforce obedience to the mandate; or by dismissing the officer to whom the mandamus is issued after he shall have been committed on the process of contempt; that is, that although the Court shall have lawful authority to issue the writ, the President may, by his power of removal, prevent the execution of the lawful judgment of the Court. But the President cannot lawfully defeat the execution of those laws which he is bound by the injunction of the Constitution itself, and his own solemn oath, to see faithfully executed. If it was only meant to say that the President could thus defeat the execution of the judgment of the Court, in a case in which it had not jurisdiction, his right to do it may be admitted; but his power to do so, in a case in which the Court had jurisdiction, is no evidence of the want of jurisdiction in the Court. It is equally in the power of the President to defeat the execution of every other judgment of the Court.
It is true that the Court must depend upon the executive power to execute its judgments; but that power is abundantly able, and bound by the most solemn obligations to do so. The supposed imbecility of the Court, therefore, does not exist; and if it did, the argument equally applies to every other case of which the Court has cognizance.
The idea that the President may defeat judicial process, by striking it dead in the hands of the marshal, by dismissing him on the spot, when he comes to serve it upon an executive officer, is not supported by law; for, by the 28th section of the Judiciary Act of 1789, it is enacted, that “ Every marshal, or his deputy, when removed from office, or when the term for which the marshal is appointed shall expire, shall have power, notwithstanding, to execute all such precepts as may be in their hands, respectively, at the time of such removal, or expiration of office.”
The argument, therefore, raised upon the inability of the Court to enforce its judgments, we think, entirely fails.
*271 But it is said, that, “ from an early period, the writ of mandamus has been used by the English Court of King’s Bench as a means of enforcing its general supervisory jurisdiction over courts, magistrates, and ministerial officers inferior to that tribunal,” “ but we find no instance of its being directed to an officer of the executive departments.” It is admitted, then, that this Court, “ in aid of its appellate jurisdiction, may issue this writ in all cases where any act, necessary to the exercise of that jurisdiction, shall be omitted to be performed by an inferior tribunal, or officer.” But in all other eases it seems to be denied. The books, it is true, speak of inferior tribunals, but not of inferior officers. Blackstone says: “ A writ of mandamus is, in general, a command, issuing in the king’s name, from the Court of King’s Bench, and directed to any person, corporation, or inferior court of judicature, within the king’s dominions, requiring them to do some particular thing, therein specified, which appertains to their office, and duty, and which the Court of King’s Bench has previously determined, or, at least, supposes, to be consonant to right and justice.” 1 Bl. Com. Í10.
We do not think it necessary that the person or the officer to whom a writ of mandamus may issue, must be, in any sense, inferior, in point of official relation to the Court.
Whether there have or have not been cases of mandamus, in England, directed to executive officers, we have not had time to inquire; but we find it stated in 1 Chitty’s General Practice, p. 802, that, “ when it is the duty of an officer of the excise to grant, and he should refuse, a permit to remove wine, the Court would compel the delivery of a proper permit,” (by mandamus) ; for which he cites Rex v. Commissioners of Excise, 2 T. R, 381; Rex v. Cookson, 16 East, 376; Rex v. Commissioners of Liverpool, 2 Maule & Sel. 223.
In the case in 2 T. ft. 381, 385, speaking of the commissioners of excise, it was said by counsel, and not denied, that “ their office, in this respect, is merely ministerial, and they have no discretion.” The court, in that case, refused the mandamus only on the ground that the relator had not made out his right to the permit.
But we do not think it material to show that writs of mandamus, in England, have been issued to the executive officers of the crown. There is a material difference between those crown-officers and the executive officers of the United States. The king of England is the fountain of all office and honor. He creates the offices, and prescribes, from time to time, such duties as he thinks proper. The officers are exclusively his officers — his agents, to act, in all things, according to his will.
*272 In the United States, by the Constitution, all offices are to “ be established by law.” The President cannot appoint an officer to any office not established by law. The legislature may prescribe the duties of the office, at the timé of its creation, or from time to time, as circumstances may require. If those duties are absolute and specific, and not, by law, made subject, to the control or discretion of any superior officer, they must be performed, whether forbidden or not, by any other officer. If there be no other officer who is, by law, specially authorized to direct how the duties are to be performed, the officer, whose duties are thus prescribed by law, is bound to execute them according to his own judgment. That judgment cannot lawfully be controlled by any other person. He is the officer, not of the President who appoints him, but the officer of the sovereign power of the nation. He is the officer of the United States, and. so called in the Constitution, and in all the acts of Congress which relate to such officers. He is responsible to the United States, and not to the President, further than for his fidelity in the discharge of the duties of his office, unless the President is, by express law, authorized to assign him duties over and above those specially prescribed by the legislature. Such an officer is the Postmaster-General. As the head of an executive department, he is bound, when required by the President, to give his opinion, in writing, upon any subject relating to the duties of his office. ^The President, in the execution of his duty, to see that the laws be faithfully executed, is bound to see that the Postmaster-General discharges, “ faithfully,” the duties assigned to him by law; but this does not authorize the President to direct him how he shall discharge them. In that respect, the Postmaster-General must judge for himself, and upon his own responsibility, mot to the President, but to the United States, whose officer he is.j
The President himself, although called, by the Postmaster-General, in his answer, “ the highest representative of the majesty of the people, in this government,” is but an officer of the United States, the head of one of the departments into which the sovereign power of the nation is divided; and, as that is the executive department, he may, with propriety, be called the chief magistrate of the United States. The officers of the United States being thus specially charged, by law, with duties independent of executive control,— duties which they are bound to execute according- to their own judgment, stand on ground different from that occupied by the English executive officers, whose offices are created, and whose duties are assigned, by the king. These have no positive, specific, legal duties to perform which can be the subject of mandamus; they are the mere agents or servants of *273 the king, and responsible only to him.; all their acts being subject to his will. No- definite right of a third person can grow out of duties of that description, where every act of the officer is subject to the control of his superior. If an application should be made to the Court of King’s Bench, for a mandamus to such an officer, commanding him to do some official act, the answer would be that the officer has no will of his own; that he can act only as he shall be directed by the king.. If the king has not ordered the thing to be done, the officer is not bound to do it. If the king has ordered it, he is competent to enforce his order.
There is no analogy, therefore, between the executive officers of the king of England, and the executive officers of the United States, in regard to the nature and foundation of their respective duties, so far as regards the proceeding by mandamus; and the fact, if it be a fact, that there are no English cases of mandamus against the officers of the crown, affords no reason why a mandamus should not issue against an executive officer of the United States.
In the former "opinion of this Court, given upon the rule to show cause, it was suggested “ that the relation between the Postmaster-General and the President of the United Stales, was different from that which subsisted between the President and the other heads of departments, in this, that they, in the very terms by which their offices were created and their duties defined, are to perform such duties, and execute such orders, as they shall be required to perform and execute by the President of the United .States.”
“ The Postmaster-General, however,” (it was said,) “ bears no such relation to the President. We cannot find a word in the law under which he was appointed, or in the various laws of the Post-Office Establishment, or in the Constitution of the United States, which intimates any connection between him and the President; or any authority in the President, to prescribe his duties or control him in the exercise of his official functions.” We were not certain, at that lime, that the Postmaster-General could be considered as the head of an executive department, within the meaning of the Constitution.
We are now, however, inclined to think-that he is ; and that, therefore, there is that connection between him and the President' which results from the right of the President to call upon him for his opinion in writing upon any matter appertaining to the duties of his office; and from the President’s power of appointment and removal.
With the exception of the circumstance that the Postmaster-General is to be considered as the head of an executive depart- *274 merit, we think our former opinion as to the duties of his office, and his official relation to the President, is correct.
The doubt, respecting its being an executive department, was, perhaps, reasonable, considering that the first law, in 1792, was “ An Act to establish the Post-Office and Post-Roads within the United States,” in which it is not called a department. It authorizes the Postmaster-General to appoint “an assistant,” and “deputy-postmasters.” The Postmaster-General was to receive all the revenues and pay all the expenses. That act was followed by the Act of the 8th of May, 1794, having the same title. This act contains the same provisions as those of the last, and does not call it a department. This was followed by the Act of March 2, 1799, entitled “ An Act to establish the Post-Office of the United States.” This act speaks of those who may be employed “in any of the departments of the General Post-Office.” It also directs that the Postmaster-General shall superintend the business of the department in all the duties that may be assigned to it.” It is not, afterwards, in the act, called a department, but it speaks of copies “under the seal of the General Post-Office;” and of the regulations “ of the Post-Office.” This was followed by the Act of the 30th of April, 1810, entitled “An Act regulating the Post-Office Establishment,” which uses the same expressions in the same way, and speaks of debts due “to the General Post-Office.”
Thus stood the law until the Act of the 3d of March, 1825, entitled “An Act to reduce into one the several acts establishing and regulating the Post-Office Department.” The body of the act uses the terms “Post-Office Establishment,” “ General Post-Office,” “the said Department,” and “the Department,” but the terms “ Post-Office Department,” are not used in the body of the act.
By the Act of the 2d of March, 1827, $2,000 were added to the salary of the Postmaster-Gen eral, making it $6,000 per an-num.
Thus the matter stood until the Act of the 2d of July, 1836,' entitled “ An Act to change the organization of the Post-Office Department; and to provide more effectually for the settlement of the accounts thereof; ” which, throughout the body of it, calls it “the Post-Office.Department,” and which, for the first time since the year 1792, introduced the agency of the President into the department by giving him the appointment, with the advice and consent of the Senate, of all deputy-postmasters whose commissions amount to $1,000 annually.
The first act, (22d September, 1789,) under this government, respecting the Post-Office, was temporary, and merely provided *275 for the appointment of a Postmaster-General, referring, for his powers, to the regulations established by the Congress of the Confederation, and delaring “the Postmaster-General to be subject to the direction of the President of the United States, in performing the duties of his office, and in forming contracts for the transportation of the mail.” This act was continued from session to session until the Act of 1792, when the office was removed from all control of the President; and in all the subsequent acts until 1836 there seems to have been a marked anxiety to keep it out of his hands, probably fearing, or foreseeing, the great addition it would make to his patronage.
And when, in 1813, the President wished to have a mail sent from the head-quarters’ of the army to any particular post-office, it was deemed necessary to obtain an act of Congress to enable him to direct the Postmaster-General to do it.
Although the word “Department” had crept, incidentally, into the Acts of 1799 and 1810, yet it was not generally considered as being one of the executive departments, until so called in the Act of 1825; and it was not until his salary was raised to ¡$6,000 that he was admitted into the cabinet in 1829. There was nothing in the earlier acts respecting the Post-Office which could indicate an intention to create a new executive department, except the power given to the Postmaster-General to appoint “an assistant,” and “deputy-postmasters,” a power which Congress could not constitutionally vest in him, unless he were the head of a department.
It required, therefore, a critical examination, and a comparison of the Constitution with the acts * of Congress, to discover that it was such a department as is contemplated by the Constitution.
This investigation of the several acts of Congress, respecting the Post-Office, affords some ground of excuse for having, at first, doubted whether the Postmaster-General was the head of a department, within the meaning of the Constitution; and at the same time shows that the relation in which he stands to the President, so far as regards the President’s right to control him in the discharge of his official functions, is very different from that of the secretaries, who are bound by law to act according to his will. Indeed, it is admitted, in the opinion of the Attorney-General, that the President can control him in his official functions, only “when not prescribed by law.”
The Court, therefore, is confirmed in its opinion, before expressed, that the Postmaster-General, in the faithful discharge of those duties which are prescribed by law, is not lawfully subject to the control of the President. ' The President’s power of controlling an officer in the exercise of his official functions, is limited, *276 we think, to those functions which are by law to be exercised according to the will of the President; and where the order of the President would be a justification in law. In such cases only can the President withdraw the officer from the jurisdiction of the Court and cover him with the mantle of his own responsibility. Whenever that is the case, or whenever the officer himself has a legal discretion, and can plead that discretion, as a justification for refusing to do the thing sought to be commanded, this Court disclaims all power to issue the writ.
In the case of Martin v. Mott, 12 Wheaton, 31, the Supreme Court says: “ Whenever a statute gives a discretionary power to any person, to be exercised by him, upon his opinion of certain facts, it is a sound rule of construction, that the statute constitutes him the sole and exclusive judge of the existence of those facts.”
The argument upon this part of the case seems to apply rather to the form of the action, than to the ultimate responsibility of the officer ; to the preventive rather than to the retributive, powers of the Court.
To this point we would apply the language of the Supreme Court of the United States in the case of Osborn v. The United States Bank, 9 Wheat. 843: “ It is admitted that the privilege of the principal is not communicated to the agent; for the appellants acknowledge that an action at law would lie against the agent, in which full compensation ought to be made for the injury. It being admitted, then, that the agent is not privileged by his connection with his principal, and that he is responsible for his own act, to the full extent of the injury, why should not the preventive power of the court also be applied to him ? Why may it not restrain him from the commission of a wrong which it would punish him for committing ? ” “ Will it be said that the action of trespass is the only rémedy given for this injury ? Can it be denied that an action on the case, for money had and received to the plaintiff's use, might be maintained ? We think it cannot; and if such an action might be maintained, no plausible reason suggests itself to us for the opinion that an injunction may not be awarded to restrain the agent, with as much propriety as it might be awarded to restrain the principal, could the principal be made a party. In the regular course of things the agent would pay over the money immediately to his principal, and would thus place it beyond the reach of the injured party, since his principal is not amenable to the law. The remedy for the injury would be against the agent only ; and what agent could make compensation for such an injury ? The remedy would have nothing real in it. It would be a remedy in name only, not in substance.”
Upon the whole, then, I am authorized to say, that it is the *277 unanimous opinion of the Court, that this Court has jurisdiction and power to issue the writ of mandamus in this case.
It is a jurisdiction which this Court has not sought; but it is one which it cannot shun ; and we say, in the language of the late Chief Justice Marshall, in delivering the opinion of the Supreme Court in the case of Cohens v. Virginia, 6 Wheat. 404:
“ It is most true that this court will not take jurisdiction, if it should not; but it is equally true that it must take jurisdiction if it should. The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the Constitution. We cannot pass it by, because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide if it be brought before us. We have no more right to decline the exercise of jurisdiction which„is given, than to usurp that which is not given. The one or the other would be treason to the Constitution. Questions may occur which we would gladly avoid ; but we cannot avoid them. All we can do is to exercise our best judgment, and conscientiously to perform our duty.”
And we will add, that we feel a consolation in knowing that our judgment may be subjected to the supervision of a higher tribunal.
Let the peremptory mandamus be issued.
On the 13th of July, the peremptory mandamus having been ordered, the Court adjourned to Monday, the 14th of August, on which day, the mandamus having been served on the 19th of July,
Mr. Coxe, for the relators, moved for an attachment against the Postmaster-General, for not obeying the writ; and
Mr. Key, for the Postmaster-General, moved the Court to quash the mandamus, because it was issued on the 17th of July, after the Postmaster-General had, on the 15th of July, sued out a writ of error to the judgment of the Court, rendered on the 13th, awarding a peremptory mandamus; and had given an appeal-bond in the penalty of $500, with sureties approved by the chief judge, and filed a copy of the writ of error.
Mr. Coxe contended, that a writ of error would not lie in such a case as this ; that it lies only in cases where judgment has been rendered for damages or costs under the Statute of 9 Anne, c. 20; which statute applies only to cities, boroughs, and corporations. Dean & Chapter of Dublin v. Dowgatt, 1 P. Will. 348; 1 Bro. Parl. Ca. 73; 3 Id. 505; the case of Wheelwright v. The Columbian Ins. Co. 7 Wheat. 534.
That the appeal-bond ought to have been sufficient to cover the whole debt claimed, and that a bond for $500 only, could not be a supersedeas. The order for a peremptory mandamus is not such *278 a final judgment as will justify a writ of error. Wallen v. Williams, 7 Cranch, 278; Callett v. Brodie, 9 Wheat. 553.
Mr. Key, contra. The writ of error was a supersedeas to the judgment, awarding a peremptory mandamus; the writ, therefore, was improvidently issued, and ought to be quashed. This Court cannot quash the writ of error. It is a supersedeas whatever may be the amount of the bond. Catlett v. Brodie, 9 Wheat. 553. The defendant is a public officer. This is a proceeding against him as such, to compel him to do an official act. The money is safe in the Treasury of the United States, or in the custody of the law. It is only necessary to give bond to cover the costs.
The Court (Thruston, J., absent,) refused to quash the mandamus, considering the writ of error and bond as a supersedeas, and refused, therefore, to grant an attachment for not obeying the writ.
Judgment affirmed by the Supreme Court. 12 Peters, 524.